UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GEORGE TARANTO, *et al.*,

                                    Plaintiffs,

        v.

PUTNAM COUNTY, *et al.*,

                                    Defendants.

No. 21-CV-2455 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances:</u>

Thomas Martin Gambino, Esq.
Law Office of Thomas M. Gambino & Associates PC
Poughkeepsie, NY
*Counsel for Plaintiffs*

James A. Randazzo, Esq.
Portale Randazzo LLP
White Plains, NY
*Counsel for Defendants*

Drew William Sumner, Esq.
Sumner Law LLP
White Plains, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Plaintiffs George Taranto ("Taranto"), Karen Taranto, and Christopher P. Taranto

and Kerrianne Taranto-Garabo as Executors for the Estate of Taranto (altogether, "Plaintiffs")

bring this Action, pursuant to 42 U.S.C. § 1983, against Putnam County ("County"), the Putnam

County Sheriff's Office, Sheriff Robert L. Langley, Jr. ("Langley"), Deputy Sheriff Ronald C.

Yeager ("Yeager"), Investigator Daniel Hunsberger ("Hunsberger"), Deputy Sheriff Ryan Diskin

("Diskin"), Deputy Sheriff Vincent Dalo ("Dalo"), Sergeant William Quick ("Quick"), and

Officers John Does 1–10 (collectively, "Defendants"), in their individual and official capacities, alleging several constitutional violations and state claims.  (*See generally* Second Am. Compl. (Dkt. No. 31).)  Before the Court is Defendants' Motion to Dismiss (the "Motion") the claims in the Second Amended Complaint ("SAC") except for the Fourth Amendment excessive force claim, failure to intervene claims against the on-scene officers, state law claims for assault, battery, and wrongful death, and Karen Taranto's claims for loss of consortium, (*see* Notice of Defs.' Mot. To Dismiss (Dkt. No. 32)).[1]  For the following reasons, Defendants' Motion To Dismiss is granted in part and denied in part.

## I.  Background

### A.  Allegations and Materials Appropriately Considered

As a threshold matter, the Court must determine whether it may consider the (1) Notice of 50-h Hearing attached to Defendants' Motion, (*see* Dkt. No. 34) or the (2) Langley Video Interview, New York Attorney General Complaint, Putnam County Daily Voice News Article, 50-h Adjournment Letters, and Letter from Dr. Frank Kessler attached to Plaintiffs' Opposition (*see* Dkt No. 38) at this stage of the litigation.[2]

#### 1.  Applicable Law

Generally, "[w]hen considering a motion to dismiss, the Court's review is confined to the pleadings themselves," because "[t]o go beyond the allegations in the [c]omplaint would convert the Rule 12(b)(6) motion to dismiss into one for summary judgment pursuant to [Rule] 56."

---

[1] Plaintiffs have withdrawn their malicious prosecution and Eighth Amendment claims. (Mem. of Law for Reply to Mot. to Dismiss. 14, 16.)

[2] The Arrest Report, Use of Force Form, Appearance Ticket, Criminal Court Information, Criminal Court Discovery, Photograph Hospital, Photograph Surgery, and Personnel Investigation, attached to Plaintiffs' Opposition, are also attached to the Second Amended Complaint.

*Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002) (citation omitted).  However, "the Court's consideration of documents attached to, or incorporated by reference in the [c]omplaint, and matters of which judicial notice may be taken, would not convert the motion to dismiss into one for summary judgment." *Id.* (citations omitted); *see also Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (explaining that "when ruling on Rule 12(b)(6) motions to dismiss," courts may "consider the complaint in its entirety. . ., documents incorporated into the complaint by reference, and matters of which a court may take judicial notice" (quotation marks omitted)); *Hu v. City of New York*, 927 F.3d 81, 88 (2d Cir. 2019) ("In deciding a Rule 12(b)(6) motion, the court may consider 'only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which judicial notice may be taken.'" (alteration omitted) (quoting *Samuels v. Air Transp. Loc. 504*, 992 F.2d 12, 15 (2d Cir. 1993))).  Under the Federal Rules of Evidence, a court may take judicial notice of a fact outside of the pleadings provided that the fact "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).

## 2.  Application

"Generally, a court may incorporate documents referenced where (1) [the] plaintiff relies on the materials in framing the complaint, (2) the complaint clearly and substantially references the documents, and (3) the document's authenticity or accuracy is undisputed."  *Stewart v. Riviana Foods Inc.*, No. 16-CV-6157, 2017 WL 4045952, at *6 (S.D.N.Y. Sept. 11, 2017) (emphasis omitted) (collecting cases); *see also Dunkelberger v. Dunkelberger*, No. 14-CV-3877, 2015 WL 5730605, at *5 (S.D.N.Y. Sept. 30, 2015) ("To be incorporated by reference, the complaint must make a clear, definite, and substantial reference to the documents, and to be

integral to a complaint, the plaintiff must have (1) actual notice of the extraneous information and (2) relied upon the documents in framing the complaint." (alterations omitted) (quoting *Bill Diodato Photography LLC v. Avon Prods., Inc.*, No. 12-CV-847, 2012 WL 4335164, at *3 (S.D.N.Y. Sept. 21, 2012))).

Even if not incorporated by reference, a document on which the complaint "solely relies and which is integral to the complaint," *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (citation, emphasis, and quotation marks omitted), or a document on which "the complaint relies heavily on upon its terms and effect," *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (quotation marks omitted), may also be considered by the Court on a motion to dismiss. Documents are "integral" where the plaintiff had to rely on their content "in order to explain what the actual unlawful course of conduct was on which the [d]efendants embarked." *Thomas*, 232 F. Supp. 2d at 276; *see also Gantt v. Ferrara*, No. 15-CV-7661, 2017 WL 1192889, at *14 (S.D.N.Y. Mar. 29, 2017) (holding documents were integral to the complaint where the plaintiff "relied heavily upon [them] in framing the [c]omplaint" (alterations in original) (citation omitted)). Additionally, "no serious question as to [the documents'] authenticity can exist," *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991), and it must be "clear on the record that no dispute exists regarding the authenticity or accuracy of the document," *DiFolco*, 622 F.3d at 111 (citation and quotation marks omitted).

Plaintiffs' Second Amended Complaint states that "Defendants have not held a hearing on this claim pursuant to General Municipal Law 50-h." (SAC ¶ 21.) That is Plaintiffs' sole reference to the 50-h Hearing. (*See generally id*.) No Party has attempted to explain how the Notice of 50-h Hearing, 50-h Adjournment Letters, and Letter from Dr. Frank Kessler regarding Taranto's ability to testify were clearly referenced in or integral to the Second Amended

4

Complaint.  Indeed, the Second Amended Complaint makes no reference to these documents and Plaintiffs have not relied on these documents in framing the Second Amended Complaint. Accordingly, these documents are not considered by the Court at this stage.  For the same reason, the New York Attorney General Complaint against the Putnam County Sheriff's Department, the Putnam County Daily Voice News Article regarding the DiPippo settlement, and the Langley Video Interview, which are not mentioned anywhere in the Second Amended Complaint, cannot be considered.

### B.  Factual Background

The following facts are drawn from the SAC and materials attached thereto and are assumed to be true for the purpose of deciding the instant Motion.

#### 1.  Parties

The Putnam County Sheriff's Office was and remains an agency of Putnam County. (SAC ¶ 5.)  Langley, Yeager, Hunsberger, Diskin, Dalo, Quick, and Officers John Does 1-10 were employed "by Putnam County, by and through the Putnam County Sheriff's Office and/or Fire Department personnel and/or Emergency Medical Technicians" and "were acting within the scope of their employment."  (*Id*. ¶¶ 6–7.)  Langley "at all relevant times herein was and still is employed by Putnam County and/or Putnam County Sheriff's Office as Sheriff of Putnam County" and "supervised the actions of all subordinate officers of the Putnam County Sheriff's Office complained of herein."  (*Id*. ¶¶ 10, 13.)  "John Doe 1 was a Fire Department supervisor present at the time [] Taranto encountered the remaining Defendants" and "John Doe 2-3 are Emergency Medical Technicians present at the time [] Taranto encountered the remaining Defendants."  (*Id*. ¶¶ 14–15.)

"Taranto was born on December 25, 1943 and died on August 25, 2021.  His estate was duly formed on November 4, 2021 in Connecticut where he resided with his wife at the time of his death.  Christopher P. Taranto and Kerrianne Taranto-Garabo, the decedent's children, were appointed by the Connecticut Probate Court as co-executors for the Estate of [] Taranto and have been substituted herein in his place and stead."  (*Id*. ¶ 17.)

### 2.  Factual Allegations Giving Rise to the Current Action

On July 8, 2019 at approximately 2:00 AM while lawfully at his residence located at 202 Apple Tree Lane, Brewster, New York, Taranto heard noise outside his residence and saw flashlights by his window.  (*Id*. ¶¶ 24–25.)  Taranto exited his home and stood on his driveway with his lawfully possessed firearm at his side pointing downward towards the ground.  (*Id*. ¶¶ 26–27.)  Taranto heard multiple Defendants screaming at him to drop his firearm and raise his hands.  (*Id*. ¶ 28.)  Taranto complied with the orders and placed his firearm on the pavement and raised his hands.  (*Id* ¶ 29.)  Taranto further complied with Defendants' orders to walk towards them.  (*Id*. ¶ 30.)

Dalo then approached Taranto from behind and "violently threw him to the ground, banging his head on the ground, repeatedly striking him and smashing his face upon the pavement."  (*Id*. ¶ 31.)  "Thereafter, all Defendants continued to use force upon a prone and helpless [] Taranto as he lie face-down on the pavement experiencing difficulty breathing and chest pains."  (*Id*. ¶ 32.)  "Defendants, [] Yeager, [] Diskin, [] Dalo, [] Quick and/or John Does 1–10 proceeded to throw him to the ground, beat him about the face, head[,] and body with at least closed fists, grind his head and face on the ground and severely brutalize him."  (*Id*. ¶ 40.)

During Taranto's arrest, Defendants believed Taranto to be emotionally disturbed and believed he was "verbally non-compliant."  (*Id*. ¶¶ 33, 37.)  Taranto was a 75-year-old, "frail

man suffering from early dementia," and had recently had open heart surgery at the time of the incident. (*Id.* ¶¶ 33, 39.) Plaintiffs allege Defendants were aware of these facts at the time of the incident. (*Id.* ¶ 39.) Plaintiffs further allege that "[d]espite believing [] Taranto to be an emotionally disturbed person, Defendants failed to utilize a process or procedure to [e]nsure his safety." (*Id.* ¶ 34.) Plaintiffs additionally allege that "[d]uring the course of [] Taranto's arrest, the Defendants did not believe [] Taranto to have used deadly physical force against them." (*Id.* ¶ 35.) Defendants "eventually placed handcuffs" on Taranto while under the supervision of Quick. (*Id.* ¶ 41.) "As the supervisor in charge, [] Quick was responsible for the overall actions of the subordinate officers on scene, including the treatment of [] Taranto and the force used upon him." (*Id.* ¶ 42.)

"Taranto was detained in handcuffs in the rear seat of a police vehicle while pleading for help from law enforcement personnel on scene due to the excruciating pain caused by handcuffs placed on him that were fastened too tight." (*Id.* ¶ 44.) Taranto was removed from the scene while informing Defendants he was "experiencing chest pains and sustained physical injuries to his face, head, and body." (*Id.* ¶ 45.) "Defendants refused to permit [] Taranto to receive proper medical attention at the scene or to be removed from the scene via ambulance." (*Id.* ¶ 46.) "Any first aid provided at the scene by Fire Department personnel or Emergency Medical Technicians present at the scene was insufficient and inadequate to address [] Taranto's medical distress." (*Id.* ¶ 48.) Plaintiffs also allege that "[a]ny Fire Department personnel or Emergency Medical Technicians present on scene conspired with the remaining Defendants to conceal and/or cover up Defendants' excessive use of force utilized upon [] Taranto and the injuries caused to him." (*Id.* ¶ 49.) Taranto was eventually moved to Putnam County Hospital while in Defendants' custody unbeknownst to his family. (*Id.* ¶ 50.)

Defendants entered Taranto's home without his or Karen Taranto's consent.  (*Id*. ¶ 51.)
Once inside the home, Defendants demanded Karen Taranto show them Taranto's pistol permit
and stated "they almost killed her husband and would only tell her that he had been arrested."
(*Id*. ¶¶ 52–53.)  Defendants did not advise her that her husband was going to a hospital or that he
was injured.  (*Id*. ¶ 54.)  Defendants left Taranto at the hospital after placing a criminal court
summons in his pocket charging him with Menacing in the Second Degree "unattended and
without notifying his family who several hours later received a phone call from a nurse at the
hospital."  (*Id*. ¶¶ 55–56.)  Plaintiffs attach an appearance ticket for Taranto with the charge of
Menacing in the Second Degree to the Second Amended Complaint.  (SAC Ex. 4.)  A nurse from
Putnam Hospital called Karen Taranto to inform her that her husband was placed on life support
after suffering cardiac and respiratory failure and pulmonary edema.  (SAC ¶ 57.)  Because
Taranto was unable to breathe on his own, he was placed on a respirator—he remained
unconscious for several days and was in critical condition.  (*Id*. ¶¶ 58–59.)  Taranto was removed
to Danbury Hospital via ambulance given the critical nature of his injuries.  (*Id*. ¶ 60.)  After
recovering consciousness and regaining the ability to breathe on his own, Taranto was released
from the hospital.  (*Id*. ¶ 61.)

On September 1, 2019, Taranto woke up and realized he was unable to walk.  (*Id*. ¶ 62.)
Taranto was taken to Danbury Hospital where a scan revealed that he had "brain bleeds as a
direct result of the brutal attack."  (*Id*. ¶ 63.)  The following day, Taranto underwent surgery to
relieve the bleeding and pressure on his brain.  (*Id*. ¶ 64.)  Taranto lost control of his bladder as a
result of the surgery and had permanent reduced motor skills and cognitive ability.  (*Id*. ¶¶ 66–
67.)  Taranto remained in the hospital for another seven days and then began physical
rehabilitation treatment.  (*Id*. ¶ 65.)

Plaintiffs allege that the "Defendants herein have covered-up Defendants' collective misconduct and violent tendencies of the Defendants, including but not limited to Defendant Quick." (*Id.* ¶ 72.) "After knowing that the original information disseminated concerning [] Taranto was false, Defendants engaged in a course of conduct to continue its malicious prosecution of [] Taranto after falsely arresting him and criminally charging him in an attempt to justify and cover-up their prior false statements and misconduct" and "Defendants thereafter tampered with potential witnesses seeking to obtain false testimony from them and coerce[d] them to falsely testify against [] Taranto in criminal court." (*Id.* ¶¶ 76–77.) "Defendants have fabricated evidence against [] Taranto in an effort to conceal their wrongful actions." (*Id.* ¶ 87.)

Plaintiffs additionally allege that "Defendants failed to disclose criminal discovery in a timely fashion and/or at all" and that "Defendants maintain a pattern, policy and/or practice whereby criminal discovery is not provided in a timely fashion and/or at all." (*Id.* ¶¶ 82–83.) Defendants provided the Putnam County District Attorney's Office documents which have been provided to Taranto's criminal defense attorney which "came after various filings as part of this present litigation apparently in response to those filings." (*Id.* ¶¶ 88–89.) "Criminal Discovery was initially provided to defense counsel by the Putnam County District Attorney's Office on September 10, 2020, with Supplemental Disclosure being provided on November 16, 2020, April 6, 2021 and May 27, 2021"—the "May 27, 2021 Supplemental Discovery was made seven days after Plaintiffs' counsel filed his response to Defendants' pre-motion letter." (*Id.* ¶¶ 90–91.) "Other than document number 28, the disclosure presented as part of the May 27, 2021 Supplemental Discovery existed before the initial discovery response was made on September 10, 2020 but were not provided at that time." (*Id.* ¶ 92.) "One such document . . . purports to be an internal investigation allegedly performed by Defendants pursuant to the arrest of George

Taranto," which "is alleged to have started on July 8, 2019 and ended one-year later on July 9, 2020 resulting in Defendant Langley condoning the actions of the Defendants herein." (*Id.* ¶¶ 93–94.) "This document, along with other documents provided by Defendants as part of [] Taranto's criminal prosecution, have been fabricated by the Defendants in an effort to conceal their wrong-doing." (*Id.* ¶ 95.) "[T]his report was not disclosed as part of the original criminal disclosure on September 10, 2020 or either Supplement disclosure on November 16, 2020 or April 6, 2021." (*Id.* ¶ 96.) Plaintiffs attach a list of materials disclosed to defense counsel on different dates, beginning in September 2020 and ending in May 2021. (SAC Ex. 9.)

Plaintiffs point to "misconduct committed by the Defendants in the matter of *DiPippo v. County of Putnam, et al* where Defendants, among other things, also failed to disclose criminal discovery." (SAC ¶ 84.) "In the matter of *DiPippo v. County of Putnam*, Defendant Quick was also one of the defendants who failed to disclose and apparently hid criminal discovery." (*Id.* ¶ 85.)[3]

The complaint arrest report attached to Plaintiffs' Second Amended Complaint July 8, 2019, reported by Yeager and reviewed by Quick, states:

> ON 07/08/2019 AT APPROXIMATELY 0310 HOURS, MEMBERS WERE INVESTIGATING A STOLEN VEHICLE INCIDENT AT 201 APPLE TREE LN IN THE TOWN OF SOUTHEAST. WHILE STANDING IN THE PARKING LOT OUTSIDE OF SAID RESIDENCE, AN OLD WHITE MALE, GEORGE C TARANTO DOB . . . 1943, EXITED HIS RESIDENCE AT 202 APPLE TREE LANE AND WALKED UP TO INVESTIGATOR HUNSBERGER. INV HUNSBERGER TURNED TO ASK THE MAN TO GO BACK INTO HIS RESIDENCE WHEN MEMBER OBSERVED INV HUNSBERGER RUN TO COVER AND HEARD INV HUNSBERGER YELL "HES GOT A GUN".
>
> DEPUTY DALO, DEPUTY DISKIN, SERGEANT QUICK AND MYSELF ALL DREW OUR SERVICE WEAPONS AND ORDERED MR. TARANTO NUMEROUS TIMES TO PUT DOWN HIS WEAPON AND PUT HIS HANDS

---

[3] Defendants note that the defendant in *DiPippo v. County of Putnam* was actually Quick's father. (Defs.' Mem. 18.)

IN THE AIR. MR. TARANTO DID NOT INITALLY COMPLY WITH ORDERS AND TOOK COVER BEHIND A VEHICLE. ALL MEMBERS CLEARLY STATED MULTIPLE TIMES THAT WE WERE POLICE FROM THE SHERIFF'S OFFICE. AFTER MULTIPLE ORDERS TO PUT DOWN HIS WEAPON, MR. TARANTO COMPLIED, PUT HIS WEAPON DOWN ON THE PAVEMENT, AND LISTENED TO ORDERS TO WALK TOWARD DEPUTIES. AT THIS TIME DEPUTY DALO WAS ABLE TO SNEAK UP BEHIND MR. TARANTO AND BRING HIM TO THE GROUND. ALL MEMBERS THEN ASSISTED TRYING TO GET MR. TARANTO IN HANDCUFFS. MR. TARANTO WAS ORDERED NUMEROUS TIME TO PUT HIS HANDS BEHIND HIS BACK BUT CONTINUED TO KEEP THEM LOCKED UNDER HIS BODY. MEMBERS WERE ABLE TO FREE MR. TARANTO'S ARMS AND GET THEM BEHIND HIS BACK SO THAT HE COULD BE PLACED IN HANDCUFFS.

EMS WAS CALLED TO THE SCENE TO EVALUATE MR. TARANTO FOR ANY INJURIES. HE WAS TRANSPORTED BY AMBULANCE TO PUTNAM HOSPITAL CENTER FOR FURTHER EVALUATION. MEMBER FOLLOWED THE AMBULANCE TO PHC AND ISSUED MR. TARANTO AN APPEARANCE TICKET FOR THE TOWN OF SOUTHEAST COURT FOR THE CHARGE OF MENACING IN THE 2ND DEGREE (PL 120.14(1)) FOR 08/01/2019 AT 1800 HOURS AT WHICH TIME HE WILL BE ARRAIGNED. MEMBER ALSO CHARGED MR. TARANTO WITH CRIMINAL POSSESSION OF A WEAPON IN THE 4TH DEGREE (VTL 265.01(2)), RESISTING ARREST (PL 205.30) AND OBSTRUCTING GOVERNMENTAL ADMINISTRATION IN THE 2ND DEGREE (PL 195.05).

THE COLT MUSTANG .380 PISTOL WITH A FULL MAGAZINE OF AMMUNITION

(SAC Ex. 3.)  Additionally attached to the Second Amended Complaint is a use of force form prepared by Quick indicating that Taranto was emotionally disturbed, that he resisted through "Verbal Non Compliance," "Verbal Threats/Gestures" and "Physically Uncooperative (Resisting)," that "verbal command," "physical direction," "impact weapon," and "hands" were used to control Taranto, and that "suspect was tackled then physically restrained" and sustained "laceration to head/shoulder pain."  (SAC Ex. 5.)

Plaintiffs additionally attach a Putnam County Sheriff's Department Personnel

Investigation conducted by Kevin McManus which lists personnel involved as Quick,

Diskin, Dalo, Yeager, Hunsberger, and Investigator Ryan McMahon and states that:

> On 07/08/2019, the afore mentioned Sheriff's Office members were investigating a stolen vehicle complaint on Apple Tree Lane within Reed Farm, located in the T/O Southeast. During the investigation, the defendant exited his residence of 202 Apple Tree Lane holding a unholstered handgun. The defendant was ordered to drop his weapon multiple times over the course of 3 minutes. Upon the defendant finally placing his weapon on the ground, he was taken to the ground by Deputy Dalo and assisted by other members. The defendant continued to struggle while members attempted to handcuff him. As a result of being taken to the ground, the defendant sustained a small cut or rash to his head.

(SAC Ex. 8.)  The Recommendation of Investigating Officer stated that:

> All Sheriff's Office members on scene acted within the scope of their duties in assisting with effecting a lawful arrest of the defendant. Furthermore, all Sheriff's Office members acted within the scope of the New York State Penal Law as it pertains to Article 35 as well as within the rules and regulations of the Putnam County Sheriff's Department in effecting said arrest using the minimum force necessary. Since Sgt, Quick was directly involved in the incident, member believes any investigation should be conducted by his direct supervisor. Sheriff's Office Rules and Regulations Article 8.1A, in effect at the time of this incident states Any injury to a prisoner whether the injury occurred while the subject was being taken into custody or while the person was in custody of the Putnam County Sheriff's Department shall be the subject of an internal investigation, Member observed video and spoke with Sgt, Quick and several of the Deputies involved after the incident and investigation determined that the there was no improper conduct on the part of any Sheriff's Office member on scene. Member used my discretion in determining there was no need for a detailed written report.

(*Id*.)  The report is signed by Langley, among others, stating "no action needed,

acceptable force used on combative subject was armed with a firearm which was still

within reach."  (*Id*.)  Plaintiffs, citing to this document, allege Langley "'rubber stamped'

an approval of the treatment of [] Taranto while in police custody."  (SAC ¶ 86.)

"Defendant Langley's deliberate indifference to 'rubber stamp' his deputies[']

misconduct during an election year is nothing more than an attempt to protect his position rather than addressing the misconduct of his deputies."  (*Id*. ¶ 106.)

Finally, Plaintiffs attach Taranto's Information signed by Yeager for Menacing in the Second Degree, Criminal Possession of a Weapon in the Fourth Degree, Resisting Arrest, Obstructing Governmental Administration in the Second Degree, based upon the following facts, respectively:

> The said defendant, at or about 03:10 hours on the aforesaid date, while in front of 202 Apple Tree Ln in the Town of Southeast, County of Putnam, New York, did intentionally place or attempt to place members of the Putnam County Sheriff's Office in reasonable fear of physical injury, serious physical injury or death. Specifically, your defendant placed Investigator Hunsberger, Deputy Diskin, Deputy Dalo, Deputy Yeager and Sergeant Quick in reasonable fear of physical injury, serious physical injury or death by displaying a Colt Mustang .380 pistol.

> The said defendant, at or about 03:10 hours on the aforesaid date, at 202 Apple Tree Ln, in the Town of southeast, County of Putnam, New York, was in possession of a Colt Mustang .380 pistol with intent to use the same unlawfully against another.

> The said defendant, at or about 03:10 hours on the aforesaid date, while at 202 Apple Tree Ln in the Town of Southeast, County of Putnam, New York, did intentionally prevent or attempt to prevent members of the Putnam County Sheriff's Office from effecting an authorized arrest of himself, in that the defendant did physically struggle with members to avoid being handcuffed.

> The said defendant, at or about 03:10 hours on the aforesaid date, at 202 Apple Tree Ln, in the Town of Southeast, County of Putnam, New York, did intentionally prevent or attempt to prevent members of the Putnam County Sheriff's Office from performing an official function by means of intimidation, physical force or interference, or by means of an independently unlawful act in that he menaced police officers with a firearm which interfered with an official police investigation.

(SAC Ex. 10.)

C.  Procedural History

Plaintiffs filed their original Complaint on March 19, 2021, (Dkt. No. 1), their Amended Complaint on July 12, 2021, (Dkt. No. 14), and their Second Amended Complaint on January 10, 2022, (Dkt. No. 31).  Defendants filed their Motions to Dismiss and accompanying

Memorandum of Law on January 21, 2022.  (*See* Not. of Mot. (Dkt. No. 32); Mem. of Law in

Supp. of Mot. ("Defs.' Mem.") (Dkt. No. 33).)  Plaintiffs filed their Opposition on February 18,

2022.  (*See* Mem. of Law for Reply to Mot. to Dismiss ("Pls.' Mem.") (Dkt. No. 37).)  Plaintiffs

additionally filed a motion to amend that same day.  (Dkt. No. 39).)  Defendants filed their Reply

(*see* Reply to Mot. ("Defs.' Reply Mem.") (Dkt. No. 40)), and their Opposition to Plaintiffs'

motion to amend on March 4, 2022, (Dkt. No. 41)  Plaintiffs filed their Reply to Defendants'

Opposition to Plaintiffs' motion to amend on March 9, 2022.  (Dkt. No. 42.)

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual

allegations" to survive a Rule 12(b)(6) motion to dismiss, "a plaintiff's obligation to provide the

grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic

recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 555 (2007) (alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of

Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me

accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it

tenders naked assertions devoid of further factual enhancement."  *Id.* (alteration and quotation

marks omitted).  Rather, a complaint's "[f]actual allegations must be enough to raise a right to

relief above the speculative level."  *Twombly*, 550 U.S. at 555.  Although, "once a claim has

been stated adequately, it may be supported by showing any set of facts consistent with the

allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a

claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claim[]

across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also*

*Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79. ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegation contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw all reasonable inferences in the plaintiff's favor," *Div. 1181*, 9 F.4th at 95 (citation omitted).  Additionally, "when ruling on a Rule 12(b)(6) motion to dismiss," district courts are directed to confine their consideration to "the complaint in its entirety, . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (quotation marks omitted); *see also Dashnau v. Unilever Mfg. (US), Inc.*, 529 F. Supp. 3d 235, 240 (S.D.N.Y. 2021) (same).

B.  Analysis

1.  False Arrest

A §1983 claim for false arrest "rest[s] on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).  A § 1983 false arrest claim "is substantially the same as a claim of false arrest under New York law." *Id*.  New York law requires a plaintiff to show "that (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3)

the plaintiff did not consent to the confinement[,] and (4) the confinement was not otherwise privileged." *Toussaint v. Cnty. of Westchester*, No. 21-CV-03817, 2022 WL 2834108, at *5 (S.D.N.Y. July 20, 2022). "[T]he existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest . . . under § 1983." *Dillon v. Rosen*, No. 22-CV-7035, 2022 WL 4538397, at *3 (S.D.N.Y. Sept. 28, 2022) (quoting *Jenkins v. City of N.Y.*, 478 F.3d 76, 84 (2d Cir. 2007)); *see also Figueroa v. Mazza*, 825 F.3d 89, 99 (2d Cir. 2016) ("The existence of probable cause to arrest . . . will defeat a claim of false arrest under the Fourth Amendment."). "[A] claim for false arrest will not lie so long as the arresting officer had probable cause to arrest the plaintiff for some crime." *Jaegly v. Couch*, 439 F.3d 149, 150 (2d Cir. 2006).

Generally speaking, officers have probable cause to arrest when they have "reasonably trustworthy information as to facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (internal quotation marks and alterations omitted). As the Second Circuit recently observed:

> To determine the existence of probable cause, a court considers the totality of the circumstances, based on 'a full sense of the evidence that led the officer to believe that there was probable cause to make an arrest.' The court considers those facts available to the officer at the time of the arrest and immediately before it. The significance of each of these factors may be enhanced or diminished by surrounding circumstances.

*Guan v. City of New York*, 37 F.4th 797, 804 (2d Cir. 2022) (quotation marks and citations omitted).

Moreover, "[t]he doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*,

555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "The

qualified immunity defense, thus, is a broad shield that protects 'all but the plainly incompetent

or those who knowingly violate the law.'"  *Kass v. City of N.Y.*, 864 F.3d 200, 206 (2d Cir. 2017)

(quoting *Zalaski v. City of Hartford*, 723 F.3d 382, 389 (2d Cir. 2013)).  "[I]n the qualified

immunity context, an officer invoking the probable cause defense need only establish that he or

she acted with arguable probable cause[.]"  *Schlaepfer v. City of N.Y.*, No. 20-CV-3339, 2022 WL

4484571, at *9 (S.D.N.Y. Sept. 27, 2022) (quotation marks omitted); *Kass*, 864 F.3d at 206 ("An

officer is entitled to qualified immunity from a federal false arrest and imprisonment claim if he

had arguable probable cause to arrest the plaintiff for any offense, regardless of the offense with

which the plaintiff was actually charged.").  "Arguable probable cause exists if either (a) it was

objectively reasonable for the officer to believe that probable cause existed, or (b) officers of

reasonable competence could disagree on whether the probable cause test was met."  *Falls v.*

*(Police Officer) Detective Michael Pitt*, No. 16-CV-8863, 2021 WL 1164185, at *12 (S.D.N.Y.

Mar. 26, 2021) (quoting *Walczyk v. Rio*, 496 F.3d 139, 163 (2d Cir. 2007)); *see also Amore v.*

*Novarro*, 624 F.3d 522, 536 (2d Cir. 2010) (same).

Defendants argue there existed probable cause to arrest Taranto for, among other

offenses, criminal possession of a weapon in the fourth degree.  (Defs.' Mem. 4–9.)  "A person is

guilty of criminal possession of a weapon in the fourth degree when . . . [h]e or she possesses any

dagger, dangerous knife, dirk, machete, razor, stiletto, imitation pistol, undetectable knife[,] or

any other dangerous or deadly instrument or weapon with intent to use the same unlawfully

against another[.]"  N.Y. Penal Law § 265.01(2).  "Crucially, for the charge of criminal

possession of a weapon in the fourth degree, 'the element of intent to use a dangerous instrument

unlawfully can be presumed from a finding that defendant possessed a dangerous

instrument.'" *Curanaj v. Cordone,* No. 10-CV-5689, 2012 WL 4221042, at *11 (S.D.N.Y. Sept.

19, 2012) (quoting *People v. Campbell,* 450 N.Y.S.2d 210, 211 (App. Div. 1982)).  Plaintiffs

clearly alleged that Taranto was in possession of a firearm, (SAC ¶¶ 26–27), accordingly, at the

least, Defendants had arguable probable cause to arrest Taranto.  *See Curanaj,* 2012 WL

4221042, at *11 (holding that the "[d]efendants had arguable probable cause on the charge of

Criminal Possession of a Weapon in the Fourth Degree" when the plaintiff clearly "possessed a

dangerous instrument"—an ax— because "[f]rom that fact, the intent element is satisfied"); N.Y.

Penal Law § 265.15 ("The possession by any person of any dagger, dirk, stiletto, dangerous knife

or any other weapon, instrument, appliance or substance designed, made or adapted for use

primarily as a weapon, is presumptive evidence of intent to use the same unlawfully against

another."); *cf. Egan v. New York City,* No. 16-CV-1479, 2018 WL 4926445, at *9 (S.D.N.Y. Oct.

10, 2018) (holding that because the "criminal purpose of a laser pointer is not immediately

apparent" possession of a laser pointer would not be "enough to provide probable cause in this

case: there must be probable cause to believe that Plaintiff possessed the laser with the intent to

use it unlawfully"); *Levy v. City of New York,* 935 F. Supp. 2d 575, 586 (E.D.N.Y. 2013) (noting

in false arrest case for N.Y. Penal Law § 265.01(2) that "[b]ecause a kitchen knife is an

inherently utilitarian utensil, the key inquiry is the manner in which the kitchen knife is used").

Thus, the Court grants the Motion to Dismiss the false arrest claim.

## 2.  Denial of Fair Trial

"When a police officer creates false information likely to influence a jury's decision and

forwards that information to prosecutors, he violates the accused's constitutional right to a fair

trial, and the harm occasioned by such an unconscionable action is redressable in an action for

damages under 42 U.S.C. § 1983." *Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 130 (2d Cir.

1997).  To state a fair trial right claim, a plaintiff must plausibly plead the following elements:

"an (1) investigating official (2) fabricates information (3) that is likely to influence a jury's

verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of

life, liberty, or property as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279

(2d Cir. 2016) (citing *Ricciuti*, 124 F.3d at 130).

　　Probable cause is not a defense to a denial of fair trial claim.  *See Heard v. City of New

York*, 319 F. Supp. 3d 687, 697 (S.D.N.Y. 2018); *Overby v. Fabian*, No. 17-CV-3377, 2018 WL

3364392, at *11 (S.D.N.Y. July 10, 2018).  "Because probable cause is no defense to a denial of

the right to a fair trial claim, fair trial claims cover kinds of police misconduct not addressed by

false arrest or malicious prosecution claims."  *Garnett*, 838 F.3d at 278; *see also Brandon v. City

of New York*, 705 F. Supp. 2d 261, 276 (S.D.N.Y. 2010) (noting that the Second Circuit has

permitted "claims for both malicious prosecution and a denial of [a plaintiff's] fair right to trial

based on the same alleged fabrication of evidence").

　　Plaintiffs make many conclusory allegations regarding fabrication of evidence.  For

instance, Plaintiffs allege "[a]fter knowing that the original information disseminated concerning

[] Taranto was false, Defendants engaged in a course of conduct to continue its malicious

prosecution of [] Taranto after falsely arresting him and criminally charging him in an attempt to

justify and cover-up their prior false statements and misconduct," that "Defendants thereafter

tampered with potential witnesses seeking to obtain false testimony from them and coerce them

to falsely testify against [] Taranto in criminal court," that "Defendants have fabricated evidence

against [] Taranto in an effort to conceal their wrongful actions," that "[a]fter knowing that the

original allegations concerning [] Taranto were false, Defendants engaged in a course of conduct

to fabricate their claims concerning [] Taranto," and that Defendants "[f]abricat[ed] and

contrive[ed] criminal charges lodged against Plaintiff."  (SAC ¶¶ 76–77, 87, 99, 123.)  Plaintiffs'

Opposition similarly states "[a]s discussed herein, Plaintiffs have demonstrated, before discovery

has proceeded, the extent and nature of the fabrication of evidence by the Defendants pursuant to

the arrest and prosecution of [] Taranto," which "includes the criminal discovery turned over by

the Defendants to the prosecutor after pleadings were docketed pursuant to this litigation despite

the documents provided during criminal discovery having been previously available based upon

the dates of creation."  (Pls.' Mem 15.)  However, the Opposition, like the Second Amended

Complaint does not specifically point to particular instances of fabrication of evidence.[4]

Conclusory statements that officers fabricated evidence do not suffice to state a claim for

the denial of a fair trial.  *See Longo v. Ortiz*, No. 15-CV-7716, 2016 WL 5376212, at *6

(S.D.N.Y. Sept. 26, 2016) (holding that the plaintiff failed to state denial of fair trial claim where

he alleged "he was denied the right to a fair trial . . . when the defendants fabricated evidence,

gave false testimony, and made false extrajudicial statements . . .  to be used against [the

plaintiff] at trial as well as to a Supreme Court judge in an effort to secure a search warrant,

indictment and conviction" (internal quotation marks omitted)); *see also Harasz v. Katz*, 239 F.

Supp. 3d 461, 493 (D. Conn. 2017) (holding that the plaintiff failed to state a denial of fair trial

claim where he merely alleged that officers "did in fact participate in fabrication of evidence,

ignored the truth when presented[,] and chose what to bring as the truth . . . [and] did not want

the truth to interfere with their witch hunt.").  "Instead[,] plaintiffs must identify the actual

fabrication," which Plaintiffs fail to do.  *Hutchins v. Solomon*, No. 16-CV-10029, 2018 WL

---

[4] Plaintiffs in their Opposition also point to "the statements of [] Langley, which purport
to have one of his subordinates change the Use of Force Form with respect to the use of an
impact weapon upon [] Taranto."  (Pls.' Mem 15.)  Plaintiffs do not make any such allegations in
the Second Amended Complaint.

4757970, *16 (S.D.N.Y. Sept. 29, 2018); *see also Thompson v. City of New York*, No. 18-CV-04105, 2020 WL 2097622, at *4 (S.D.N.Y. May 1, 2020) ("The [c]omplaint does not identify what evidence was fabricated; and the [c]omplaint fails to identify what, if any, fabricated evidence the defendants offered or to whom it was offered and what effect the purported false evidence would have had on the jury."); *Cunningham v. City of New York*, No. 17-CV-5124, 2018 WL 4168964, at *5 (S.D.N.Y. Aug. 30, 2018) (dismissing fair trial claim where the complaint failed to assert that arresting report contained a fabrication); *Waddlington v. City of New York,* 971 F. Supp. 2d 286, 297 (E.D.N.Y. 2013) (dismissing fair trial claim, and noting that the "[p]laintiff at no point alleges with specificity what false information [defendant police officers] created or forwarded to the D.A.'s Office"); *cf. Long v. New York City,* No. 14-CV-9908, 2016 WL 4203545, at *3 (S.D.N.Y. Aug. 8, 2016) ("[The p]laintiff claims specific sentences in specific documents were intentionally falsified by Officer Vazquez.").

Plaintiffs additionally allege that an investigation that ended on July 9, 2020 "along with other documents provided by Defendants as part of [] Taranto's criminal prosecution, have been fabricated by the Defendants in an effort to conceal their wrong-doing." (SAC ¶ 94–95.) Again, Plaintiffs have not identified any specific fabrication. Furthermore, Plaintiffs have not alleged a causal connection between any fabrication contained within the investigation, which concluded a year after Taranto was arrested, and any deprivation. "The manufacture of false evidence, in and of itself . . . does not impair anyone's liberty, and therefore does not impair anyone's constitutional right . . . the deprivation of liberty of which [a plaintiff] complains [must] be shown to be the result of [the defendant's] fabrication of evidence." *Zahrey v. Coffey*, 221 F.3d 342, 348–49 (2d Cir. 2000) (internal quotation marks omitted) (noting that plaintiff had alleged the "eight months he was confined, from his bail revocation (after his arrest) to his acquittal" was

the result of "the manufacture of false evidence").  Without such an allegation, Plaintiffs claim

cannot stand.  *Cf. Ricciuti*, 124 F.3d at 126–27, 130 (holding qualified immunity is unavailable

where plaintiffs alleged that a fabricated confession caused prosecutors to add another charge);

*Harris v. City of New York*, No. 15-CV-8456, 2017 WL 6501912, at *8 (S.D.N.Y. Dec. 15,

2017) ("[F]abricated evidence may cause a further deprivation if it adversely informs a

prosecutor's charging and bail determinations."); *Long v. New York City*, No. 14-CV-9908, 2016

WL 4203545, at *5 (S.D.N.Y. Aug. 8, 2016) ("[F]abrication of evidence leading to pre-trial

detention can satisfy the causation element for a fair trial claim.").

### 3.  Deliberate Indifference to Medical Needs

Because Taranto was a pre-trial detainee at the time he was allegedly denied adequate

medical care, Plaintiffs' claim falls under "the Due Process Clause of the Fourteenth

Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight[h]

Amendment."  *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017).  A pre-trial detainee's rights

are "at least as great as the Eighth Amendment protections available to a convicted prisoner."  *Id*.

(quotation marks omitted).

To establish a claim for deliberate indifference to medical needs under the Due Process

Clause of the Fourteenth Amendment, a pre-trial detainee must establish two elements: (1) that

the "deprivation of medical care . . . [was] 'sufficiently serious,'" and (2) that the defendant

"acted or failed to act with 'a sufficiently culpable state of mind.'"  *Smith v. Outlaw*, No. 15-CV-

9961, 2017 WL 4417699, at *2 (S.D.N.Y. Sept. 30, 2017) (quoting *Farmer v. Brennan*, 511 U.S.

825, 834 (1994); *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006)).  The first element is

objective and requires allegations that suggest that the detainee was subject to "conditions posing

a substantial risk of serious harm."  *Blandon v. Capra*, No. 17-CV-65, 2017 WL 5624276, at *7

(S.D.N.Y. Nov. 20, 2017) (quotation marks omitted) (quoting *Hayes v. N.Y.C. Dep't of Corrs.*, 84 F.3d 614, 620 (2d Cir. 1996)).  The second element, which is applied somewhat "differently to claims under the Eighth Amendment [than] the Fourteenth Amendment," also imposes an objective standard, whereas the Eighth Amendment imposes a "subjective standard."  *Howard v. Brown*, No. 15-CV-9930, 2018 WL 3611986, at *4 (S.D.N.Y. July 26, 2018) (citation omitted).  That is, the law enforcement or prison official need only "recklessly fail[ ] to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety."  *Darnell*, 849 F.3d at 35.

Plaintiffs contend in their Opposition that "Taranto was detained at the scene for such an extended period of time" which "begs further inquiry of . . . why he was not immediately transported to a hospital."  (Pls.' Mem. 18.)  Plaintiffs allege that before he was transported for treatment, Taranto was detained in the rear seat of a police vehicle, however the Second Amended Complaint does not allege the length of the detention.  (SAC ¶ 44.)  Plaintiffs additionally allege that "Taranto was eventually removed from the scene while he informed the Defendants that he was experiencing chest pains and sustained physical injuries to his face, head, and body" and transported to a hospital to received care.  (*Id.* ¶¶ 45, 50.)

"When the basis for a . . . claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the [detainee's] *underlying medical condition* alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious, to support a[] . . .claim."  *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (citation and quotation marks omitted); *see also James v. Brown*, No. 14-CV-1767, 2016 WL 3945688, at *4 (S.D.N.Y.

July 19, 2016) (noting that where an inmate alleges "an unreasonable delay or interruption in treatment, the seriousness inquiry focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." (alteration and citation omitted)). "[A] short interruption of care, even if the underlying medical condition is serious, does not constitute a serious medical need where the 'alleged lapses in treatment are minor.'" *Ferguson v. Cai*, No. 11-CV-6181, 2012 WL 2865474, at *4 (S.D.N.Y. July 12, 2012) (quoting *Smith*, 316 F.3d at 186).  "Where temporary delays or interruptions in the provision of medical treatment have been found to satisfy the objective seriousness requirement in this Circuit, they have involved either a needlessly prolonged period of delay, or a delay which caused extreme pain or exacerbated a serious illness." *Id.* (collecting cases).  Where a plaintiff cannot show actual injury, he may nonetheless satisfy the objective prong by demonstrating that the delay of medical treatment exposed him to "an unreasonable risk of future harm." *Smith*, 316 F.3d at 188. However, "the inmate must show that the risk of future harm is 'so grave that it violates contemporary standards of decency.'" *Braxton v. Nichols*, No. 08-CV-8568, 2010 WL 1010001, at *3 (S.D.N.Y. Mar. 18, 2010) (quoting *Helling v. McKinney*, 509 U.S. 25, 36 (1993)).

     "Although in many cases, calling for medical assistance within an hour or so of the injury may have sufficed in meeting an official's duties, *see Pateman v. City of White Plains*, No. 17-CV-6156, 2020 WL 1497054, at *21 (S.D.N.Y. Mar. 25, 2020) (collecting cases), the Second Circuit has also noted that 'it's the particular risk of harm faced by a [detainee] due to the challenged deprivation of care' that is relevant to deliberate indifference claims, *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003) (citation omitted)." *Maldonado v. Town of Greenburgh,* 460 F. Supp. 3d 382, 396 (S.D.N.Y. 2020).  Therefore, "delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the

delay worsened the medical condition, and considering the reason for the delay." *Id*. (quoting *Smith*, 316 F.3d at 186). For instance, in *Maldonado*, this Court held that a pretrial detainee's estate plausibly alleged deliberate indifference to medical needs when the pretrial detainee was tasered, was not responding to NARCAN, and even though the defendant was told the pretrial detainee needed to be rushed to medical treatment immediately, there was a 20-minute delay in transporting the pretrial detainee to the emergency room. *Id*. at 389, 397. The pretrial detainee was pronounced dead at the hospital. *Id*. at 390. Here, Plaintiffs have not alleged how much time transpired between the incident and Taranto's arrival at the hospital—it is possible Taranto was transported to the hospital almost immediately after the alleged incident. *See Cooper v. City of New York*, No. 14-CV-3698, 2016 WL 4491719, at *1, 8 (E.D.N.Y. Aug. 25, 2016) (holding plaintiff who was attacked by police, became unconscious, and fell into a coma had not alleged deliberate indifference to medical needs when the "incident took place at 1:15pm, and it was reported at 1:32pm" and plaintiff was then admitted to the emergency room approximately 20 minutes later). Indeed, Plaintiffs allege that Taranto was removed from the scene "while" informing Defendants he was "experiencing chest pains and sustained physical injuries to his face, head, and body"—indicating there was no delay between Taranto's complaints and his transport to the hospital. (SAC ¶ 45.) Additionally, Plaintiffs have not alleged any fact indicating that any delay worsened Taranto's medical condition. Without any sense of the time that transpired between Taranto's injury and the subsequent transport to the hospital or any allegations as to whether any delay worsened or posed any specific risk to Taranto's medical condition, Plaintiffs have not plausibly alleged any delay constitutes deliberate indifference to medical needs. *See Smith*, 316 F.3d at 186 ("[It is] the particular risk of harm faced by a

[detainee] due to the challenged deprivation of care, rather than the severity of the [detainee's] underlying medical condition, considered in the abstract, that is relevant.").

Plaintiffs additionally allege that "Defendants refused to permit [] Taranto to receive proper medical attention at the scene or to be removed from the scene via ambulance," and that "[a]ny first aid provided at the scene by any Fire Department personnel or Emergency Medical Technician present at the scene was insufficient and inadequate to address [] Taranto's medical distress."  (*Id.* ¶¶ 46, 48.)  "While Plaintiff[s] allege[] that 'all defendants' failed to provide adequate medical treatment, that allegation is insufficient because it is conclusory."  *Sterling v. Akinyombo,* No. 20-CV-10804, 2022 WL 2657223, at *5 (S.D.N.Y. July 8, 2022) (citation omitted).  Plaintiffs have not alleged which Defendants were involved in any deprivations of care or what medical attention was or was not provided at the scene.  Such conclusory allegations cannot withstand Defendants' Motion to Dismiss.  *See Price v. Koenigsmann*, No. 19-CV-4068, 2022 WL 125818, at *5 (S.D.N.Y. Jan. 13, 2022) (holding that factual allegations plaintiff makes that reference "Defendants" and their deliberate indifference to his medical needs "are vague and conclusory" and therefore cannot support a plausible deliberate indifference claim).

### 4.  1985(3) Conspiracy

To state a claim for conspiracy in violation of § 1985(3), a plaintiff must allege (1) a conspiracy, (2) with the intent or purpose to deprive a person of equal protection of the law, (3) an act in furtherance of the conspiracy, (4) which results in an injury to a person, or a person's property, or the deprivation of a federal constitutional right.  *Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015).  "In order to maintain an action under [§] 1985, a plaintiff must provide some factual basis supporting a meeting of the minds, such that [the] defendants entered into an agreement, express or tacit, to achieve the unlawful end."  *Webb v. Goord*, 340 F.3d 105, 110 (2d

Cir. 2003) (citation and internal quotation marks omitted).  "In addition, a plaintiff must allege

that she is a member of a protected class and that the conspirators acted with class-based

discriminatory motivation."  *Arroyo-Horne v. City of New York*, No. 16-CV-3857, 2019 WL

3428577, at *5 (E.D.N.Y. July 30, 2019), *aff'd*, 831 F. App'x 536 (2d Cir. 2020).

Defendants argue that Plaintiffs failed to plead any specifics about the alleged conspiracy

and failed to plead a factual basis supporting a meeting of the minds.  (Defs.' Reply Mem. 4.)

Plaintiffs argue that they have sufficiently pled a cause of action of conspiracy noting that the

identities of the John Doe Defendants are unknown but that they were present on the scene at the

time of Taranto's arrest and failed to intervene when Taranto was assaulted, failed to provide

proper medical attention, and "covered-up the wrongdoing of the known Defendants."  (Pls.'

Mem. 15.)  Plaintiffs also allege that "[i]n furtherance of the conspiracy, Defendants fabricated

evidence against [Taranto], failed to provide evidence in a timely manner despite it being

available during [] Taranto's criminal prosecution and engaged in acts to cover up the excessive

use of force upon [] Taranto by the Defendants herein."  (SAC ¶ 153.)  However, Plaintiffs have

not included any facts which support a plausible allegation that Defendants conspired together,

let alone conspired to deprive Taranto's of equal protection of the laws.  Accordingly, the claim

cannot stand.  *See Ziglar v. Abbasi*, 582 U.S. 120, 154 (2017) ("To state a claim under § 1985(3),

a plaintiff must first show that the defendants conspired—that is, reached an agreement—with

one another."); *see also Arroyo-Horne*, 2019 WL 3428577, at *5 (dismissing 1985 conspiracy

claim when the complaint "does not provide any allegations or include any facts from which the

Court could conclude that any individual(s) conspired to deprive Plaintiff of equal protection of

the laws or equal privileges and immunities under the laws."); *K.D. ex rel. Duncan v. White*

*Plains Sch. Dist.*, 921 F. Supp. 2d 197, 308 (S.D.N.Y. 2013) (dismissing the plaintiff's section

1985(3) claim because the complaint did not "set forth any specific facts that indicate any sort of meeting of the minds . . . let alone an agreement to violate [the plaintiffs' rights]" (emphasis omitted)); *Friends of Falun Gong v. Pacific Cultural Enter., Inc.*, 288 F. Supp. 2d 273, 279 (E.D.N.Y. 2003) (finding that the plaintiff failed to adequately plead a section 1985(3) claim because "the complaint [did] not include any facts that could support an inference of a conspiracy" and because the plaintiff "cite[d] no facts from which a meeting of the minds could be inferred").

However, even if Plaintiffs have plausibly alleged concerted action by Defendants, the claim still fails. Defendants additionally argue that Plaintiffs' §1985(3) should fail as "Plaintiffs failed to plead membership in a protected class under § 1985(3)." (Defs.' Reply Mem. 4.) The Court agrees. To establish a violation of § 1985(3), a plaintiff must establish, among other elements, that the conspiracy was motivated by "some racial or perhaps otherwise class-based, invidious discriminatory animus." *McDaniel v. City of New York*, 585 F. Supp. 3d 503, 522 (S.D.N.Y. 2022), *report and recommendation adopted*, No. 19-CV-11265, 2022 WL 874769 (S.D.N.Y. Mar. 24, 2022) (quotation marks omitted). Plaintiffs have not attempted to do so. (*See generally* SAC.) Accordingly, the section 1985(3) conspiracy claim fails on this ground as well. *McDaniel*, 585 F. Supp. 3d at 522 (dismissing claims pursuant to §1985 when the complaint "provides no factual assertions that would establish the requisite discriminatory animus"); *see also Joyner v. Alston & Bird LLP*, No. 21-CV-8549, 2022 WL 6244417, at *10 (S.D.N.Y. May 13, 2022), *report and recommendation adopted*, No. 21-CV-8549, 2022 WL 4115954 (S.D.N.Y. Sept. 9, 2022) (dismissing claim § 1985(3) in part because plaintiff had not alleged "discriminatory animus aimed at depriving her of a federal constitutional right").

### 5. 1983 "Cover-Up" Claim

"In a section 1983 claim alleging a cover-up by government agents, the constitutional right at issue is the First Amendment right of access to courts: the theory is that the cover-up has made it impossible for the plaintiff to litigate an underlying claim, because material evidence was destroyed, for instance, or because the statute of limitations expired before the plaintiff discovered the cover-up." *Tavares v. New York City Health & Hosps. Corp.,* No. 13-CV-3148, 2015 WL 158863, at *7 (S.D.N.Y. Jan. 13, 2015) (citing *Christopher v. Harbury,* 536 U.S. 403, 413–14 & n. 11 (2002) (describing these claims as "backward-looking access claims")). "The Second Circuit has emphasized, however, that '[t]he viability of [such] claims is far from clear,' pointing out that the *Harbury* decision was careful not to endorse their validity." *Id*. (citing *Sousa v. Marquez,* 702 F.3d 124, 128 (2d Cir. 2012)).

Nevertheless, even assuming backward-looking access claims are actionable, Plaintiffs' fail. "[S]uch claims are available only if a judicial remedy was 'completely foreclosed' by the alleged cover-up." *Sousa,* 702 F.3d at 128 (quoting *Broudy v. Mather,* 460 F.3d 106, 120 (D.C. Cir. 2006)). Plaintiffs' claims are clearly not foreclosed as they are bringing them in this very Action and have not argued that any claims have been foreclosed—accordingly the claim is dismissed. *See Tavares,* 2015 WL 158863, at *7–8 (dismissing "cover-up" claim when plaintiff "has not alleged that the DOCCS [d]efendants' actions prevented him from litigating his underlying Eighth Amendment and state-law medical malpractice claims against the City [d]efendants—indeed, he is bringing those very claims in this action.").

### 6. Individual Liability

Defendants argue that Plaintiffs "impermissibly plead all causes of action against all named Defendants instead of bringing each cause of action against only the involved

[D]efendants." (Defs.' Mem. 14.)  Specifically, Defendants argue that Plaintiffs' "Fourth Amendment false arrest and excessive force claims" and failure to intervene claims against Langley "who was not present at the scene on July 8, 2019" must fail for lack of personal involvement. (*Id.*)

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Sterling*, 2022 WL 2657223, at *4 (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).  "[A] plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quotation marks omitted); *see also Leneau v. Ponte*, No. 16-CV-776, 2018 WL 566456, at *15 (S.D.N.Y. Jan. 25, 2018) (dismissing allegations against a defendant for lack of personal involvement because the "[p]laintiff's general allegation that all defendants were involved in the alleged constitutional violations does not rescue the claims against" a particular defendant).  Accordingly, "a plaintiff may not rely on a special test for supervisory liability" instead, "[t]he violation must be established against the supervisory official directly." *Tangreti*, 983 F.3d 616–18.

The Court agrees that Plaintiffs have not alleged Langley's personal involvement in Plaintiffs' remaining constitutional claim, namely their excessive force claim.  While Plaintiffs have pled that Langley "failed to intercede to terminate the aforementioned assault upon [] Taranto" they have not alleged he was present during the incident at issue or how he somehow permitted the use of force to occur.  (SAC ¶ 71.)  And while they allege Langley "was personally aware of the events complained of herein as they were occurring" they have not alleged any fact indicating this was the case.  (*Id.* ¶ 73.)  Such conclusory allegations do not sufficiently allege

personal involvement.  *See Falls v. Pitt*, No. 16-CV-8863, 2018 WL 3768036, at *6 (S.D.N.Y.

Aug. 8, 2018) (finding personal involvement not established where the plaintiff failed to allege

the defendants were "present" for the alleged violation or "participated directly" in or "somehow

permitted" the alleged violation); *Lara-Grimaldi v. Cnty. of Putnam*, No. 17-CV-622, 2018 WL

1626348, at *11 (S.D.N.Y. Mar. 29, 2018) (holding personal involvement not established where

the "[c]omplaint contain[ed] no allegations whatsoever that [the defendant] was involved in,

aware of, or somehow permitted" the violation).

      Plaintiffs additionally state in their Opposition that dismissal of Langley is inappropriate

at this stage because he "established policy, was responsible for the training and discipline of

officers and the overall operation of the Defendant police department."  (Pls.' Mem. 19.)  "While

personal involvement of a supervisor may be established by showing that he created a policy or

custom under which the violation occurred, conclusory allegations that a defendant was involved

in the creation and enforcement of unconstitutional policies cannot sustain a claim of personal

involvement."  *Koehl v. Bernstein,* No. 10-CV-3808, 2011 WL 2436817, at *19 (S.D.N.Y. June

17, 2011), *report and recommendation adopted by*, No. 10-CV-3808, 2011 WL 4390007

(S.D.N.Y. Sept. 21, 2011) (citation omitted).  Plaintiffs appear to only allege a single instance of

excessive force in their Second Amended Complaint, namely the incident at issue.  (*See

generally* SAC.)  "Allegations involving only a single incident are generally insufficient to

demonstrate the existence of an official policy or custom for purposes of establishing personal

involvement under § 1983."  *Parris v. N.Y. State Dep't Corr. Servs.*, 947 F. Supp. 2d 354, 364

(S.D.N.Y. 2013).  Accordingly, this single alleged use of force is insufficient to plausibly allege

personal involvement on the basis of a policy.  *See Tubbs v. Venettozzi*, No. 19-CV-126, 2019

WL 2610942, at *8 (N.D.N.Y. June 26, 2019) (holding that allegations that Superintendent was

31

made aware of complaints about due process violations and allowed a custom of due process

violations in disciplinary hearings failed when plaintiff only alleged two such incidents); *Lindsey*

*v. Butler*, 43 F. Supp. 3d 317, 331 (S.D.N.Y. 2014), *on reconsideration in part*, No. 11-CV-9102,

2014 WL 5757448 (S.D.N.Y. Nov. 5, 2014) (holding that plaintiff's claims that Commissioner

Kelly "created or adopted" an unconstitutional policy were insufficient to plausibly allege

personal involvement "[w]ithout more than the allegations related to the single incident in the

station house").  Additionally, insofar as Plaintiffs seek to hold Langley liable on the basis of his

supervisory position, the Second Circuit has made clear that in the wake of *Iqbal*, plaintiffs

cannot rely on supervisory liability to establish personal involvement.  *Tangreti*, 983 F.3d at 620

(holding it was insufficient to show that defendant "was negligent, or even grossly negligent, in

her supervision of the correctional officers or in failing to act on the information she had" for the

purposes of personal involvement); *see also Bridgewater v. Taylor*, 832 F. Supp. 2d 337, 348

(S.D.N.Y. 2011) (holding personal involvement not established where the plaintiff made

conclusory claims that a supervisory official failed to provide proper training and supervision or

created a policy).

### 7.  Putnam County Sheriff's Office

Defendants argue that "claims against the Putnam County Sheriff's Office must be

dismissed because the police department is a non-suable entity."  (Defs.' Mem. 23.)  The Court

agrees.  Under law of the State of New York, "a department of a municipal entity is merely a

subdivision of the municipality and has no separate legal existence."  *Hoisington v. County of*

*Sullivan,* 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999).  "[T]he Sheriff's Department [does not] exist

separate and apart from the County and, as a result, [ ] can[not] be sued."  *Sagaria v. Orange*

*Cnty. Jail,* No. 20-CV-2287, 2021 WL 4392422, at *3 (S.D.N.Y. Sept. 24, 2021); *see also*

*Gleeson v. County of Nassau*, No. 15-CV-6487, 2019 WL 4754326, at *14 (E.D.N.Y. Sept. 30,

2019) (holding Nassau County Sheriff's Department and Nassau County Correction Center were

not proper parties because they are administrative arms of Nassau County); *Polite v. Town of*

*Clarkstown,* 60 F. Supp. 2d 214, 216 (S.D.N.Y. 1999) ("Therefore, municipal departments in this

State—such as the Clarkstown Police Department—are not amenable to suit, and no claims can

lie directly against them.")  Indeed, "Plaintiffs concede the Putnam County Sheriff's Office is not

a suable entity."  (Pls.' Mem. 26.)

### 8.  *Monell* Claim

"To state a claim under [§ 1983], the plaintiff must show that a defendant, acting under

color of state law, deprived him of a federal constitutional or statutory right."  *Sykes v. Bank of*

*Am.*, 723 F.3d 399, 405–06 (2d Cir. 2013).  However, "Congress did not intend municipalities to

be held liable [under § 1983] unless action pursuant to official municipal policy of some nature

caused a constitutional tort."  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  Thus,

"to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a

plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a

constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the

municipality caused the constitutional injury."  *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d

Cir. 2008); *see also Williams v. Lohard*, No. 20-CV-10571, 2022 WL 269164, at *3 (S.D.N.Y.

Jan. 28, 2022) ("[The] [p]laintiff's claim against the [c]ity fails for lack of facts supporting the

existence of a municipal policy or practice." (citing cases)); *Palmer v. City of New York*, 564 F.

Supp. 3d 221, 240 (E.D.N.Y. 2021) (dismissing claim against city where the plaintiffs failed to

"sufficiently allege[ ] that they suffered constitutional violations as a result of an official policy

or custom" (quotation marks omitted)); *Salvatierra v. Connolly*, No. 09-CV-3722, 2010 WL

5480756, at *10 (S.D.N.Y. Sept. 1, 2010) (dismissing a claim against agencies where the plaintiff did not allege that any policy or custom caused the deprivation of his rights), *report and recommendation adopted*, 2011 WL 9398 (S.D.N.Y. Jan. 3, 2011).

This multi-factor test, and particularly the fifth element, reflects the notion that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (holding that a municipality may not be liable under § 1983 "by application of the doctrine of respondeat superior." (italics omitted)); *Vassallo v. Lando*, 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal entity may only be held liable where the entity *itself* commits a wrong"); *Newton v. City of N.Y.*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right."). Instead, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.").

"In determining municipal liability, it is necessary to conduct a separate inquiry into whether there exists a 'policy' or 'custom.'" *Davis v. City of N.Y.*, 228 F. Supp. 2d 327, 336 (S.D.N.Y. 2002), *aff'd*, 75 F. App'x 827 (2d Cir. 2003). Normally, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [municipality]." *Newton*, 566 F. Supp. 2d at 271; *see also City of Okla. City v. Tuttle*, 471 U.S. 808, 823–24 (1985) (plurality opinion) ("Proof of a single incident of unconstitutional activity is

not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Bird v. Cnty. of Westchester*, No. 20-CV-10076, , at *12 (S.D.N.Y. June 23, 2022) ("[The] [p]laintiff fails to allege the existence of any other similar incident, which dooms [the p]laintiff's claim because a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the municipality." (quotation marks omitted)); *Santana v. City of N.Y.,* No. 15-CV-6715, 2018 WL 1633563, at *10 (S.D.N.Y. Mar. 29, 2018) ("[A] 'single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy.'" (quoting *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998)); *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation.").

A plaintiff may satisfy the "policy or custom" requirement by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Atadzhanov v. City of New York,* No. 21-CV-5098, 2022 WL 4331304, at *11 (S.D.N.Y. Sept. 19, 2022) (citations omitted); *see also Patterson v. Cnty. of Oneida*, 375 F.3d 206, 226–27 (2d Cir. 2004) (describing methods of establishing *Monell* liability).  Moreover, as noted, a plaintiff must also establish a causal link between the municipality's policy, custom, or practice and the

alleged constitutional injury.  *See Tuttle*, 471 U.S. at 824 n.8 ("The fact that a municipal 'policy'

might lead to 'police misconduct' is hardly sufficient to satisfy *Monell*'s requirement that the

particular policy be the 'moving force' behind a constitutional violation.  There must at least be

an affirmative link between[, for example,] the training inadequacies alleged, and the particular

constitutional violation at issue." (emphasis omitted)); *Batista v. Rodriguez*, 702 F.2d 393, 397

(2d Cir. 1983) ("Absent a showing of a causal link between an official policy or custom and the

plaintiffs' injury, *Monell* prohibits a finding of liability against the [c]ity."); *Hincapie v. City of

New York,* 434 F. Supp. 3d 61, 77 (S.D.N.Y. 2020) (holding that the plaintiff "fails to state a

*Monell* claim" because the plaintiff "has not pled facts demonstrating a direct link between his

injuries and the alleged municipal policy"); *Johnson v. City of New York*, No. 06-CV-9426, 2011

WL 666161, at *3 (S.D.N.Y. Feb. 15, 2011) (noting that after demonstrating the existence of a

municipal policy or custom, "a plaintiff must establish a causal connection—an affirmative

link—between the policy and the deprivation of his constitutional rights" (quotation marks

omitted)).

     Plaintiffs assert that the County is liable to Plaintiffs for the alleged constitutional

deprivations based upon its maintenance of "a policy, practice or custom, officially or

unofficially, of unconstitutional practices, including the use of force, the cover-up of police

misconduct, the failure to maintain an independent police review board, the fabrication of

evidence, the intimidation of witnesses, the failure to disclose discovery during criminal

prosecution and the condoning of police misconduct."  (SAC ¶ 161.)  Plaintiffs further allege that

the County "by and through its policy makers, maintained a policy, practice or custom, officially

or unofficially, of failing to adequately supervise, discipline and/or train its officers, including

with respect to the use of force, tactics with respect to emotionally disturbed persons and the use of weapons during police encounters."  (*Id*. ¶ 162.)

Plaintiffs do not allege that the County maintains a formal policy officially endorsed by the municipality.  (*See generally id*.)[5]  Accordingly, the Court need only analyze whether Plaintiffs have plausibly alleged that there existed a sufficiently widespread practice to constitute a custom, whether policymakers failed to provide adequate training or supervision so grossly that it rises to gross indifference, or whether actions by final policymakers constituted official policy. *See Atadzhanov*, 2022 WL 4331304, at *11 (listing the four modes of proving a policy, custom, or practice under *Monell*).

---

[5] Plaintiffs posit that the municipal liability lies because of "the failure to maintain an independent police review board."  (SAC ¶ 161.)  However, an alleged absence of a formal policy is not a policy: "the absence of a policy is not a policy and is not actionable under *Monell*."  *Zachary v. City of Newburgh*, No. 13-CV-5737, 2014 WL 1508705, at *5 (S.D.N.Y. Apr. 1, 2014) (citing *Monell*, 436 U.S. at 690–91); *see also Quinones v. New York City*, No. 19-CV-5400, 2020 WL 5665142, at *19 (S.D.N.Y. Aug. 17, 2020) ("[B]ut, under *Monell*, a municipality's failure to put a formal policy in place to prevent unlawful conduct is not the same thing as an actionable policy."), *report and recommendation adopted*, No. 19-CV-5400, 2020 WL 6901340 (S.D.N.Y. Nov. 23, 2020).  "Nonetheless, the Supreme Court has left a narrow opening for § 1983 claims like the one [the Court] address[es] here seeking liability based not on affirmative conduct but on a government official's failure to act."  *Reynolds v. Giuliani*, 506 F.3d 183, 191–92 (2d Cir. 2007) (citing *City of Canton*, 489 U.S. at 394–95 (O'Connor, J., concurring in part and dissenting in part) ("Where . . . a claim of municipal liability is predicated upon a failure to act, the requisite degree of fault must be shown by proof of background events and circumstances which establish that the 'policy of inaction' is the functional equivalent of a decision by the city itself to violate the Constitution.")).  When a municipality "does not have an adequate policy . . . *Monell* liability exists 'where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions."  *Fraser v. City of N.Y.*, No. 20-CV-4926, 2021 WL 1338795, at *10 (S.D.N.Y. Apr. 9, 2021) (quoting *Reynolds*, 506 F.3d at 192).  "Such a pattern, if sufficiently persistent or widespread as to acquire the force of law, may constitute a policy or custom within the meaning of *Monell*."  *Id*.

a. Widespread Practice

To demonstrate a de facto policy or custom through a widespread practice, a plaintiff must "show that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions." *Buari v. City of N.Y.*, 530 F. Supp. 3d 356, 398 (S.D.N.Y. 2021) (quoting *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004)). A practice can constitute a custom under *Monell* when the practice is "persistent and widespread," or "permanent and well settled as to constitute a 'custom or usage' with the force of law" and to "imply the constructive knowledge of policymaking officials." *In re N.Y.C. Policing During Summer 2020 Demonstrations*, 548 F. Supp. 3d 383, 400 (S.D.N.Y. 2021) (quoting *Sorlucco v. N.Y.C. Police Dep't,* 971 F.2d 864, 870–71 (2d Cir. 1992)); *see also Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 532 (S.D.N.Y. 2012) (noting that to demonstrate a practice is sufficiently widespread and crystalized to constitute a custom under *Monell*, "a plaintiff must prove that the custom at issue is permanent and well-settled" (citing *Praprotnik*, 485 U.S. at 127)).

Plaintiffs allege that "Defendants maintain a pattern, policy and/or practice whereby criminal discovery is not provided in a timely fashion and/or at all" and cite to *DiPippo v. County of Putnam,* No. 17-CV-7948, 2019 WL 1004152 (S.D.N.Y. Feb. 28, 2019). (SAC ¶¶ 83–84.) In *DiPippo*, plaintiff Anthony DiPippo alleged in part that he was denied a fair trial and wrongfully convicted based upon fabricated evidence during his criminal trials in 1994 and 2012. 2019 WL 1004152, at *8. The court held that plaintiff had

> pleaded ample specific facts indicating that Defendants used extremely similar coercive investigative techniques on at least six witnesses within the [] investigation [at issue]. These techniques included: procuring testimony that implicated DiPippo in exchange for leniency, threatening witnesses with prosecutions against them if they did not provide inculpatory testimony, harassing and assaulting witnesses over extended periods of time, isolating witnesses and interrogating them for hours,

> forcing or attempting to force witnesses to sign false affidavits or other pre-written statements, administering sham polygraph examinations, failing to keep records of meetings with witnesses, using force on witnesses, and denying witnesses the opportunity                to                consult                with                counsel.

*Id.* at *9.  Based on these allegations, and the fact that "DiPippo was wrongfully convicted twice and tried three times by a jury" and the plaintiff "alleged facts that indicated that the [Putnam County Sheriff's Department] officers used similar unconstitutional methods in every trial" the court held that, that the plaintiff had sufficiently pled a *Monell* claim under a widespread practice theory.  *Id.* at *11.

Defendants argue that Plaintiffs' sole reliance on this case dooms their *Monell* claim as the case resolved by settlement without determination or admission of liability.  (Defs.' Mem. 18–19.)  Indeed, courts in this District have held that "citations to lawsuits, even if they did involve comparable conduct, do not alone establish a custom or practice that is widespread and persistent, *particularly if the lawsuits did not result in an adjudication of liability*."  *Bethune v. Westchester County*, No. 18-CV-3500, 2020 WL 1032508, at *5 (S.D.N.Y. Mar. 2, 2020) (emphasis added) (granting a motion to dismiss where the plaintiff premised *Monell* liability on, inter alia, citations to several filed lawsuits); *see also Barnett v. Westchester County*, No. 18-CV-2483, 2020 WL 1032445, at *5 (S.D.N.Y. Feb. 28, 2020) (same); *Vincent v. Winski*, No. 14-CV-7744, 2018 WL 1441370, at *17 (S.D.N.Y. Mar. 22, 2018) (granting the defendants' motion to dismiss *Monell* claims where "the only facts that [the] [p]laintiff identifie[d] in support of any pattern of mishandling situations because of a failure to train . . . consist[ed] of other litigations resulting in settlements"); *Tieman v. City of Newburgh*, No. 13-CV-4178, 2015 WL 1379652, at *17 (S.D.N.Y. Mar. 26, 2015) (concluding that "lawsuits cited by [the] [p]laintiff in the [proposed amended complaint], even when combined with [other] allegations . . . , are insufficient to plausibly support an inference of a widespread custom" to establish *Monell*

39

municipal liability).  *DiPippo* was settled without an admission of liability.  *See* Stipulation of

Discontinuance with Prejudice, *DiPippo*, 2019 WL 1004152, Dkt. No. 98.  Accordingly,

Plaintiffs cannot allege a widespread practice on the basis of *DiPippo* alone.  *See McDonald v.*

*City of Troy*, 542 F. Supp. 3d 161, 175–76 (N.D.N.Y. 2021) (holding that while "Plaintiffs' eight

settled [excessive force] lawsuits over eight years is not the best record for a small city like Troy

to sport. . . . [B]ecause plaintiff has not pointed to a single related case that actually resulted in a

finding of liability on the City's part, that showing falls woefully short of establishing *Monell*

liability"); *An v. City of New York,* 230 F. Supp. 3d 224, 229–30 (S.D.N.Y. 2017) (granting a

motion to dismiss where a complaint sought to establish *Monell* liability based on "cites [to] six

lawsuits filed between 2012 and 2016 and one newspaper report" but failed to plausibly allege a

custom because "the Complaint fail[ed] to allege that any of the six lawsuits, which were filed

over a course of four years, resulted in a finding that the NYPD officers violated the plaintiffs'

First Amendment rights").[6]

### b.  Failure to Train

*Monell* liability can also exist "'where a local government is faced with a pattern of

misconduct and does nothing, compelling the conclusion that the local government has

acquiesced in or tacitly authorized its subordinates' unlawful actions.'"  *Fraser*, 2021 WL

---

[6] Plaintiffs have not argued that they have plausibly alleged municipal liability on the basis of a widespread practice of excessive force.  (Pls.' Mem. 22–24.)  Indeed, Plaintiffs have not pointed to any other instances of excessive use of force beyond the incident described at hand.  (*See generally* SAC.)  This alone is fatal to Plaintiffs' *Monell* claim.  *See Aragon v. New York*, No. 14-CV-9797, 2017 WL 2703562, at *6 (S.D.N.Y.  June 22, 2017) (dismissing claims where "[the] [p]laintiff seems to allege the existence of a practice adopted by the [County] solely based on [the] [p]laintiff's alleged experience"); *Gordon v.  City of New York*, No. 10-CV-5148, 2012 WL 1068023, at *4 (E.D.N.Y. Mar. 29, 2012) (dismissing *Monell* claim where the plaintiff's "allegation [was] unsupported by anything other than the facts of what occurred in his particular case").

1338795, at *10 (quoting *Reynolds*, 506 F.3d at 192). One category of municipal acquiescence involves a failure to train public officials. However, a failure to train constitutes a policy or custom that is actionable under § 1983 only where "in light of the duties assigned to specific officers or employees[,] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390. The Second Circuit has held that a finding of deliberate indifference requires: (1) "that a policymaker knows 'to a moral certainty' that her employees will confront a given situation"; (2) "that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "that the wrong choice by the . . . employee will frequently cause the deprivation of a citizen's constitutional rights." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 440 (2d Cir. 2009) (alteration in original) (quoting *Walker v. City of N.Y.*, 974 F.2d 293, 297–98 (2d Cir. 1992)). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61.

To set forth a failure to train claim, "a plaintiff must plausibly allege a specific deficiency in the municipality's training." *Tieman*, 2015 WL 1379652, at *22. Here, Plaintiffs' claim fails first and foremost because they have not alleged a specific training deficiency. Indeed, Plaintiffs' Second Amended Complaint does not "contain sufficient factual matter" to state a training deficiency "that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Instead, Plaintiffs only broadly allege "Defendant Putnam County and/or Putnam County Sheriff's Office breached their duty to the public and the Plaintiff specifically by deploying Deputies without first properly screening the hiring of and training of them," that the

County failed to "train its officers, including with respect to the use of force, tactics with respect to responding to emotionally disturbed persons and the use of weapons during police encounters," and that "Langley has failed to train and/or retrain his deputies, including the Defendants herein, in the proper and lawful use of force," "the proper treatment of prisoners requiring medical attention," "proper response and/or treatment of emotionally disturbed persons," and the "requirement to timely transmit criminal discovery as part of a criminal prosecution."  (SAC ¶¶ 108–111, 162, 201.)   Simply put, the sum total of Plaintiffs' failure-to-train claim is based on a threadbare description of the County's training, and is the type of conclusory claim that courts routinely dismiss.  *See, e.g.*, *Clarke v. Antonini*, No. 21-CV-1877, 2022 WL 4387357, at *12 (S.D.N.Y. Sept. 22, 2022) (dismissing *Monell* claim where plaintiff failed to "allege a specific deficiency in either the [c]ity or the [c]ounty's training for his failure-to-train theory"); *Lehal v. Cent. Falls Det. Facility Corp.*, No. 13-CV-3923, 2016 WL 7377238, at *11 (S.D.N.Y. Nov. 21, 2016) (dismissing failure to train claim when a "[p]laintiff's new allegations regarding a supposed lack of training are too general and speculative to support a *Monell* claim"); *Triano*, 895 F. Supp. 2d at 539–40 (dismissing *Monell* claim where the plaintiff "merely alleged that the [t]own failed to train its employees, without providing any supporting factual detail about alleged deficiencies in the training program"); *Walker v. City of New York*, No. 14-CV-808, 2015 WL 4254026, at *11 (S.D.N.Y. July 14, 2015) (dismissing failure to train claim where the plaintiff "neither cites to procedural manuals and training guides, nor highlights the pertinent aspects of police training in order to prove the claim").

Furthermore, in addition to identifying a specific training deficiency, a plaintiff must "establish that that deficiency caused the constitutional deprivation."  *Benn v. City of New York*, No. 18-CV-722, 2021 WL 3193022, at *6 (S.D.N.Y. July 28, 2021) (citation omitted).  Plaintiffs,

however, only make conclusory assertions that Langley, "as Sheriff of Putnam County and/or subordinates under his command, fail to properly train and/or supervise its officers resulting in the unlawful actions complained of herein." (SAC ¶ 115.) Plaintiffs' conclusory assertions do not suffice to plausibly allege that a deficiency in training caused Taranto's injury. *See King v. City of Beacon Police Dep't,* No. 20-CV-5815, 2021 WL 1550073, at *3 (S.D.N.Y. Apr. 20, 2021) (dismissing *Monell* claims when a plaintiff's allegations that his injuries "resulted from a municipal policy or custom" were "wholly conclusory"); *Acosta v. City of New York*, No. 11-CV-856, 2012 WL 1506954, at *11 (S.D.N.Y. Apr. 26, 2012) (dismissing *Monell* claim where the plaintiff merely alleged that the city "failed to train its police officers," because the plaintiff "failed to set forth factual allegations that would support a plausible inference that the [c]ity's 'policies' or 'customs' caused . . . [the] alleged violations of [the] plaintiff's rights").

In sum, Plaintiffs have not pled a plausible *Monell* claim under a failure to train theory.

### c. Failure to Discipline or Supervise

"In *City of Canton*, the Supreme Court established the 'deliberate indifference' standard in the context of a claim for failure to train, but 'the stringent causation and culpability requirements set out in that case have been applied to a broad range of supervisory liability claims,' including claims for failure to supervise and failure to discipline." *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 306 (S.D.N.Y. 2015) (quoting *Reynolds*, 506 F.3d at 192).

"To establish *Monell* liability premised on a failure to supervise, a plaintiff must plead that (1) there was a pattern of allegations of or complaints about, or a pattern of actual, similar unconstitutional activity, and (2) the municipality consistently failed to investigate those allegations." *Lopes v. Westchester Cnty.*, No. 18-CV-8205, 2020 WL 1445729, at *5 (S.D.N.Y. Mar. 25, 2020). Alternatively, "a plaintiff may plead (1) that there was a pattern of actual similar

constitutional violations and (2) the municipality consistently failed to discipline those involved." *Tieman*, 2015 WL 1379652 at *21 (emphasis omitted).  To establish deliberate indifference for a failure to supervise and/or discipline claim, the plaintiff must show that "the need for more or better supervision to protect against constitutional violations was obvious," which may be established "through proof of repeated complaints of civil rights violations . . . if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Buari,* 530 F. Supp. 3d at 400.

"[A]n allegation of numerous claims of [the underlying constitutional wrong] by itself is insufficient to raise an inference of deliberate indifference due to failure to supervise." *Tieman*, 2015 WL 1379652, at *21.  Rather, a plaintiff must allege that "meaningful attempts to investigate repeated claims . . . are absent." *Id.* (quoting *Hart v. City of Binghamton*, No. 10-CV-1064, 2012 WL 1565085, at *5 (N.D.N.Y. May 2, 2012)).  In other words, "[f]or deliberate indifference to be shown, the response must amount to a persistent failure to investigate the complaints or discipline those whose conduct prompted the complaints." *Hart*, 2012 WL 1565085, at *5.  Plaintiffs do not make any such allegation, instead Plaintiffs allege that Langley, "as Sheriff of Putnam County and/or subordinates under his command, fail to . . . supervise its officers resulting in the unlawful actions complained of herein," failed "to discipline subordinates upon findings of misconduct," and that the "attack against [] Taranto could have been prevented had Putnam County and/or Sheriff Langley acted properly by removing Deputies who have demonstrated violent tendencies, failed to act within the boundaries of law, properly train its officers, properly supervise its officers and/or to discipline officer misconduct."  (SAC ¶¶ 75, 115.)  While the *DiPippo* case points to misconduct that occurred in the Putnam County Sheriff's Office, Plaintiffs make no specific factual allegations regarding any failures to

investigate complaints or discipline officers involved in that matter by the Putnam County

Sheriff's Office's in the Second Amended Complaint.  (*See generally* SAC.)  The only relevant

allegations in the Second Amended Complaint are that "Plaintiffs are presently aware of similar

misconduct committed by the Defendants in the matter of *DiPippo v. County of Putnam, et al*

where Defendants, among other things, also failed to disclose criminal discovery," and that "[i]n

the matter of *DiPippo v. County of Putnam*, Defendant Quick was also one of the defendants

who failed to disclose and apparently hid criminal discovery."  (*Id*. ¶¶ 84–85.)  However,

Plaintiffs have made no allegations regarding any prior lack of investigation into or disciplining

of Quick, or any other officer for that matter, in the Second Amended Complaint, which dooms

their claim.  *See Esperanza v. City of New York,* 325 F. Supp. 3d 288, 309 (E.D.N.Y. 2018)

("Plaintiffs do not allege any specific facts regarding whether the [c]ity investigated or

disciplined Lluka in response to the complaints of excessive force."); *Walker*, 2015 WL

4254026, at *11 (noting that "[e]ven if [the] [p]laintiff had shown an obvious need for more or

better supervision by listing the numerous lawsuits and complaints, he has not stated any facts to

show that the [c]ity has acted with deliberate indifference" where "he does not specifically claim

that the [c]ity *failed to investigate* the list of lawsuits").  Cases finding failures to supervise or

discipline have required more.  *See, e.g.*, *Buari*, 530 F. Supp. 3d at 407–08 (ruling that the

plaintiff sufficiently alleged failure to supervise when "in approximately 72 cases where courts

had found prosecutorial misconduct occurred []including the use of and failure to correct false or

misleading testimony and *Brady* violations[], officials could only identify one prosecutor from

between 1975 and 1996 who had been disciplined in any respect"); *Marlin v. City of New York*,

No. 15-CV-2235, 2016 WL 4939371, at *20–21 (S.D.N.Y. Sept. 7, 2016) (denying motion to

dismiss on failure to discipline claim where officers were not disciplined in over thirty-five percent of substantiated complaints, which "plausibly suggest[ed] that the City did nothing").[7]

### d.  Final Policymaker

"Actions by an individual with final decision-making authority in a municipality constitute official policy for purposes of a § 1983 claim." *Anthony v. City of New York*, 339 F.3d 129, 139 (2d Cir. 2003).  "[E]ven a single action by a decisionmaker who possesses final authority to establish municipal policy with respect to the action ordered is sufficient to implicate the municipality in the constitutional deprivation for the purposes of § 1983." *Amnesty*, 361 F.3d at 126 (internal quotation marks and citation omitted).  When a non-decisionmaker committed the constitutional violation "a plaintiff must allege facts suggesting that an officer with final policymaking authority ordered, ratified, or 'was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions.'" *Hu v. City of New York*, 927 F.3d 81, 105 (2d Cir. 2019) (quoting *Amnesty Am.*, 361 F.3d at 126).

---

[7] In *DiPippo*, the court noted that Plaintiff alleged that "Stephens and other supervisors purportedly knew about Castaldo and Quick's misconduct, personally participated in it, and failed to document or disclose it. Stephens and other supervisors also allegedly failed to prevent Castaldo and Quick from engaging in misconduct, participated in it, encouraged it, and affirmatively misrepresented to prosecutors that no misconduct had occurred . . . Stephens updated Thoubboron about all major investigatory developments. Hence, Thoubboron was either aware of the misconduct committed by Defendants Stephens, Castaldo, and Quick or willfully blind to it."  2019 WL 1004152, at *6.  However, Plaintiffs have made no specific allegations in the Second Amended Complaint about any alleged failure to supervise or discipline.

Plaintiffs additionally allege that "[a]t all times mentioned herein and prior to the incidents described herein, Putnam County, by and through its policy makers, maintained a policy, practice or custom, officially or unofficially, of failing to adequately supervise, discipline and/or train its officers, including with respect to the use of force, tactics with respect to responding to emotionally disturbed persons and the use of weapons during police encounters." (SAC ¶ 162.)  Plaintiffs have not alleged any prior failures to supervise or discipline officers for use of force, tactics with respect to responding to emotionally disturbed persons and the use of weapons during police encounters.

"An official has final authority if his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions." *Anthony*, 339 F.3d at 139.  When alleging policymakers caused the violation, "the critical inquiry is not whether an official generally has final policymaking authority; rather, the court must specifically determine whether the government official is a final policymaker with respect to the particular conduct challenged in the lawsuit." *Guity v. Uniondale Union Free School Dist.*, No. 18-CV-04369, 2019 WL 3402280, at *7 (E.D.N.Y. July 26, 2019) (alteration omitted).  "Whether an official has final policymaking authority is a legal question, determined on the basis of state law." *Roe,* 542 F.3d at 37.

Plaintiffs do allege in the Second Amended Complaint that "Defendant Langley is the final decision/policy maker of the Putnam County Sheriff's Department and in is familiar with, creates and implements his Department's practices and policies."  (SAC ¶ 107.)  However, Plaintiffs do not point to any support for this proposition, which they must do to sufficiently allege Langley was a final policymaker with respect to the particular conduct challenged in this lawsuit.  *See Coppola v. Town of Plattekill*, No. 17-CV-1032, 2018 WL 1441306, at *10 (N.D.N.Y. Mar. 22, 2018) ("[M]inimal, conclusory statements fall far short of satisfying Plaintiff's burden to allege facts creating a plausible inference that either of these defendants were final policymakers.  Plaintiff does not direct the Court to New York State law, municipal charters, or any other source that could support her claim."); *W.A. v. Hendrick Hudson Cent. Sch. Dist.*, No. 14-CV-8093, 2016 WL 1274587, at *12–13 (S.D.N.Y. Mar. 31, 2016) (dismissing a *Monell* claim where the plaintiffs "allege[d] that 'Coughlin, as an administrator for the District, possesses policy making authority,'" but "cite[d] no state or county law that actually vests Coughlin with final policymaking authority over the maintenance and protection of student

records"); *Canner v. City of Long Beach*, No. 12-CV-2611, 2015 WL 4926014, at *6 (E.D.N.Y. Aug. 18, 2015) (noting a prior order where the court dismissed the plaintiffs' *Monell* claim where the "plaintiffs did not reference any state law supporting their claim that [an official] was a final policymaker"); *see also Jeffes v. Barnes,* 208 F.3d 49, 57–58 (2d Cir. 2000) ("Where a plaintiff relies not on a formally declared or ratified policy, but rather on the theory that the conduct of a given official represents official policy, it is incumbent on the plaintiff to establish that element as a matter of law."); *Long v. Cnty. of Orleans*, 540 F. Supp. 3d 344, 352–53 (W.D.N.Y. 2021), *appeal dismissed* (Sept. 1, 2021) (holding at summary judgment that the "[p]laintiff's vague assertion of final policymaking authority by Sheriff Bower is simply insufficient to satisfy his burden" when the plaintiff "neither produced nor pointed to any evidence or legal authority supporting the conclusion that Sheriff Bower had final policymaking authority regarding the force to be used in effectuating an arrest or when probable cause for an arrest has been established" (quotation marks omitted)).  Accordingly, the *Monell* claim cannot stand.[8]

### 9.  State Claims

Defendants move to dismiss all of Plaintiffs' state claims "except for state law claims for assault, battery and wrongful death, and Ms. Taranto's corollary claims for loss of consortium." (Defs.' Mem. 2.)[9]

---

[8] Furthermore, Plaintiffs do not specifically argue in their Opposition that *Monell* liability is predicated upon an act of a final policymaker or point to a specific to act in their briefing. (Pls.' Mem. 22–24.)

[9] Defendants aver that Plaintiffs' state law claims are precluded due to their failure to comply with General Municipal Law § 50-h.  (Defs.' Mem 20–21.)  Section 50-h states:

> [w]herever a notice of claim is filed against a city, county, town, village, fire district, ambulance district or school district the city, county, town, village, fire district, ambulance district or school district shall have the right to demand an examination

a.  Defamation

To state a claim for defamation under New York law, a plaintiff must allege "(1) a false statement about the plaintiff; (2) published to a third party without authorization or privilege; (3) through fault amounting to at least negligence on part of the publisher; (4) that either constitutes defamation per se or caused special damages." *Alvarado v. Mount Pleasant Cottage Sch. Dist.*, 404 F. Supp. 3d 763, 790 (S.D.N.Y. 2019) (quotation marks omitted).  Under New York law, "spoken defamatory words are slander; written defamatory words are libel." *Albert v. Loksen*, 239 F.3d 256, 265 (2d Cir. 2001); *see also Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 176 (2d Cir. 2000) ("Libel is a method of defamation expressed in writing or print.").

A plaintiff must plead the defamatory statements with some particularity.  N.Y. C.P.L.R. 3016(a) ("In an action for libel or slander, the particular words complained of shall be set forth in

---

of the claimant relative to the occurrence and extent of the injuries or damages for which claim is made, which examination shall be upon oral questions unless the parties otherwise stipulate . . . .  The action . . . may not be commenced until compliance with the demand for examination if the claimant fails to appear at the hearing or requests an adjournment or postponement beyond the ninety day period.

N.Y. Gen. Mun. Law § 50-h(1);(5).  In federal court, "a 'plaintiff's failure to attend a 50-h [h]earing—*no matter the reason*—is a complete bar to his state law claims[.]'" *Bird v. Cnty. of Westchester*, No. 20-CV-10076, 2022 WL 2263794, at *12–13 (S.D.N.Y. June 23, 2022) (citation omitted); *see also Misek-Falkoff v. Metro. Transit Auth. (MTA)*, 843 N.Y.S.2d 155, 156 (App. Div. 2007) ("A party who has failed to comply with General Municipal Law § 50-h is generally precluded from commencing an action against a municipality[.]"); *Baumblatt v. Battalia*, 520 N.Y.S.2d 571, 574 (App. Div. 1987) (dismissing a complaint against a town because "the plaintiff failed to appear for examination on his original notice of claim as requested by the town's attorney pursuant to General Municipal Law § 50-h and this failure bars the commencement of an action against the town").  Plaintiffs' Second Amended Complaint only states that "Defendants have not held a hearing on this claim pursuant to General Municipal Law 50-h."  (SAC ¶ 21.)  This Court cannot determine at this stage whether this was due to Taranto's failure to attend the hearing.

Defendants also moved to dismiss Plaintiffs' intentional infliction of emotional distress claims against the County.  (Defs.' Mem 21.)  Plaintiffs "concede that a cause of action for intentional infliction of emotional distress against Putnam County cannot be maintained."  (Pls.' Mem. 25.)

the complaint, but their application to the plaintiff may be stated generally.").  Under Federal

Rule of Civil Procedure 8's liberal pleading standards, this requires a plaintiff to "identify the

allegedly defamatory statements, the person who made the statements, the time when the

statements were made, and the third parties to whom the statements were published."  *Neal v.*

*Asta Funding, Inc.,* 13-CV-2176, 2014 WL 3887760, at *3 (S.D.N.Y. June 17, 2014).

Plaintiffs argue they have sufficiently pled a cause of action for defamation because the

"filing of false criminal allegations sufficiently demonstrates libel/slander per se."  (Pls.' Mem.

26.)  More specifically, Plaintiffs allege that "Defendants, individually and/or collectively, have

defamed [Taranto] by libel per se and/or slander per se, libel and/or slander, based upon the false

arrest of Plaintiff and release of false information concerning said arrest, the sum and substance

of which defamatory statements was that [Taranto] engaged in acts constituting the crime of

Menacing in the Second Degree and other alleged criminal acts despite knowing them to be

false."  (SAC ¶ 206.)

However, "[o]fficers may not be held liable for any allegedly defamatory statements in

their criminal complaints, because 'individuals participating in a public function such as judicial

proceedings are afforded protection from liability by an absolute immunity.'"  *Grant v. City of*

*Syracuse*, No. 15-CV-445, 2017 WL 5564605, at *11 (N.D.N.Y. Nov. 17, 2017); *Lockett v. City*

*of Middletown*, No. 19-CV-08255, 2021 WL 1092357, at *6 (S.D.N.Y. Mar. 22, 2021) (same).

Accordingly, "[a] person filing a formal complaint charging another with a crime is . . .  entitled

to absolute immunity from a civil suit for defamation."  *Grant*, 2017 WL 5564605, at *11

(citation omitted); *see also Frederique v. Cnty. of Nassau*, 168 F. Supp. 3d 455, 488 (E.D.N.Y.

2016) ("[T]o the extent that Plaintiffs argue that the Felony Complaints and District Court

Informations contained defamatory statements, the [Nassau County Police Department] officers

who made those statements are protected from liability by an absolute immunity."); *Goncalves v. Reynolds*, 198 F. Supp. 2d 278, 282 (W.D.N.Y. 2001) (holding that absolute immunity shielded the defendant from liability for defamation where the "defendant's actions with respect to plaintiff's arrest and the bringing of the assault charge were clearly prosecutorial in nature, and were directly related to the decision to prosecute plaintiff").  Accordingly, Plaintiffs' defamation claim cannot stand.

### b.  Negligence

The elements of a negligence claim under New York law are: "(i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach."  *Lombard v. Booz–Allen & Hamilton, Inc.*, 280 F.3d 209, 215 (2d Cir. 2002) (citing *Merino v. New York City Transit Auth.,* 639 N.Y.S.2d 784 (App. Div. 1996)).

Plaintiffs argue they "have sufficiently pled negligence as an alternate theory of liability," because Defendants "owned [sic] a duty of care to [] Taranto who was deprived of his liberties while in Defendants['] custody, care and control."  (Pls.' Mem. 25.)  "Under New York law, a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest or initiating a prosecution."  *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994); *see also Toure v. Air France*, No. 21-CV-1645, 2022 WL 4079592, at *3 (E.D.N.Y. Sept. 6, 2022) ("[A] plaintiff seeking damages for an injury resulting from a wrongful arrest and detention may not recover under broad general principles of negligence . . .  but must proceed by way of the traditional remedies of false arrest and imprisonment.") (citation omitted); *Durr v. Slator*, 558 F. Supp. 3d 1, 40 (N.D.N.Y. 2021) ("When a plaintiff brings excessive force and assault claims which are premised upon a defendant's allegedly intentional conduct, a negligence claim with respect to the

51

same conduct will not lie." (citation and quotation marks omitted)); *Dollard v. City of New York*, 408 F. Supp. 3d 231, 238–39 (E.D.N.Y. 2019) ("New York does not, as a matter of public policy, recognize a claim for negligence arising out of an arrest or prosecution. . . .  To the extent that a claim for negligence and/or NIED is based upon injury incident to an arrest, a plaintiff must resort to the traditional tort remedies of false arrest, false imprisonment, and malicious prosecution."); *Sullivan v. City of New York*, No. 17-CV-3779, 2018 WL 3368706, at *18 (S.D.N.Y. July 10, 2018) ("New York courts have long held that, where a plaintiff brings false-arrest and false-imprisonment claims, she cannot also recover under broad principles of negligence.").  Accordingly, Plaintiffs cannot maintain a negligence claim insofar as that claim overlaps with excessive force, false arrest, false imprisonment, and malicious prosecution causes of action.

"However, a plaintiff may proceed with negligence claims brought against law enforcement officials if such claims are not duplicative of false arrest, false imprisonment, or malicious prosecution." *Lalonde v. City of Ogdensburg*, — F. Supp. 3d —, 2023 WL 2537626, at *29 (N.D.N.Y. Mar. 16, 2023).  Accordingly, courts have allowed negligence actions pertaining to deprivations of adequate medical care to proceed.  *See Durr*, 558 F. Supp. 3d at 40–41 (holding that plaintiff plausibly alleged both a deliberate indifference to medical claim needs claim and a negligence claim related to the failure to provide medical care upon his arrest).

"[I]t is well-established in New York that when the State assumes physical custody of inmates or detainees, who cannot protect and defend themselves in the same way as those at liberty can, the State owes a duty of care to safeguard those individuals from harm." *Maldonado*, 460 F. Supp. 3d at 400–01 (quotation and citation omitted).  Accordingly, courts have found that when a plaintiff is injured during an arrest and the arresting officers fail to

provide medical care upon arrest, a plaintiff may proceed with a negligence claim. *See Durr*, 558 F. Supp. 3d at 41 (holding negligence claim survived when the "complaint plausibly alleges that Plaintiff was seriously injured during the course of his arrest and that the City Defendants, knowing that Plaintiff was in severe pain, declined to take him to the Upstate Emergency Department for treatment, despite being instructed to do so by healthcare personnel").

Plaintiffs allege that "Defendants refused to permit [] Taranto to receive proper medical attention at the scene or to be removed from the scene via ambulance," and that "[a]ny first aid provided at the scene by any Fire Department personnel or Emergency Medical Technician present at the scene was insufficient and inadequate to address [] Taranto's medical distress." (SAC ¶¶ 46, 48.)  Federal Rule of Civil Procedure 8 "requires, at a minimum, that a complaint give each defendant fair notice of what the plaintiff's claim is and the ground upon which it rests." *Patrico v. Voya Fin., Inc.,* No. 16-CV-7070, 2017 WL 2684065, at *5 (S.D.N.Y. June 20, 2017) (quotation marks omitted).  A complaint fails this standard when it "lump[s] all the defendants together in each claim and provid[es] no factual basis to distinguish their conduct." *Id.*  Plaintiffs have brought the claims against multiple Defendants, namely Putnam County Sheriff's Office employees, not all of whom were present at the scene, and possibly Fire Department personnel, and Emergency Medical Technicians.  (*See generally* SAC.)  It is unclear from Plaintiffs' pleadings which Defendants prevented Taranto from receiving proper medical attention or what medical attention Taranto was prevented from receiving, as Plaintiffs have simply pled that "Defendants" were responsible for such actions and have not provided a "plausible factual basis to distinguish the conduct of each of the defendants." *Bardwil Indus. Inc. v. Kennedy,* No. 19-CV-8211, 2020 WL 2748248, at *3 (S.D.N.Y. May 27, 2020).  On that basis, the negligence claim must fail. *See Nesbeth v. N.Y.C. Mgmt. LLC*, 17-CV-8650, 2019 WL

110953 (S.D.N.Y. Jan. 4, 2019) ("[I]t is well-established in this Circuit that plaintiffs cannot simply lump defendants together for pleading purposes" under Rule 8 (quotation marks omitted)); *Medina v. Bauer*, No. 02-CV-8837, 2004 WL 136636, at *6 (S.D.N.Y. Jan. 27, 2004) ("By lumping all the defendants together and failing to distinguish their conduct, plaintiff's amended complaint fails to satisfy the requirements of Rule 8.  Specifically, the allegations fail to give adequate notice to these defendants as to what they did wrong.").

### c.  Negligent Hiring, Supervision, and Training

Defendants argue that Plaintiffs' negligent-hiring, retention, training, and supervision claims are not actionable under New York law because all Defendants were acting within the scope of their employment.  (Defs.' Mem. 21.)  Indeed, Plaintiffs allege that, at all relevant times, Defendants "were acting within the scope of their employment and in furtherance of the purposes and business of Putnam County and/or the Putnam County Sheriff's Office, and/or Fire Department personnel and/or Emergency Medical Technicians."  (SAC ¶ 7.)  "New York law provides that an employer can be liable for the torts of an employee who acts within the scope of his or her employment under the theory of respondeat superior, but no claim may proceed against the employer for negligent hiring, retention, supervision or training."  *Hurt v. City of New York,* No. 15-CV-7612, 2018 WL 4007639, at *4 (S.D.N.Y. Aug. 22, 2018) (quotation marks omitted).  An "exception to [this] general principle exists where the plaintiff is seeking punitive damages from the employer based on alleged gross negligence in the hiring or retention of the employee." *Nesheiwat v. City of Poughkeepsie*, No. 11-CV-7072, 2013 WL 620267, at *2 (S.D.N.Y. Feb. 13, 2013).

"It is [ ] well settled that 'the State and its political subdivisions [such as counties] are not subject to punitive damages . . . [as] the goals of punishment and deterrence are not served

when punitive damages are imposed against the State, for in such circumstances, it ultimately is the innocent taxpayer who is punished.'" *Martinez v. Cnty. of Suffolk*, 999 F. Supp. 2d 424, 433 (E.D.N.Y. 2014) (citing *Hubbard v. Town of Sand Lake*, 667 N.Y.S.2d 496, 498 (App. Div. 1998)); *see also Ogunkoya v. Cnty. of Monroe*, No. 15-CV-6119, 2020 WL 3791850, at *8 (E.D.N.Y. July 7, 2020) (noting that municipalities are not subject to punitive damages). "Thus, the negligent hiring claim . . . is dismissed." *Martinez,* 999 F. Supp. 2d at 433.

### d.  Prima Facie Tort

To survive a motion to dismiss on a claim of prima facie tort, a plaintiff must allege: (1) the defendant's intentional infliction of harm; (2) special damages resulting from the defendant's actions; (3) a lack of "excuse or justification"; and (4) that the defendant's act or acts would otherwise be lawful. *NE Brands LLC v. Seattle Pac. Indus., Inc*., No. 19-CV-7420, 2020 WL 4287989, at *2 (S.D.N.Y. July 27, 2020) (quoting *U.S. for Use and Benefit of Evergreen Pipeline Constr. Co., Inc. v. Merritt Meridian Constr. Corp*., 95 F.3d 153, 161 (2d Cir. 1996)). "Special damages" refers to an injury made up of a "specific and measurable loss." *Freihofer v. Hearst Corp*., 65 N.Y.2d 135, 143 (1985). Defendants argue that Plaintiffs have failed to allege any specific damages and their claim therefore fails. (Defs.' Mem. 22.) Plaintiffs have failed to respond to this argument. (*See generally* Pls.' Mem.)

Federal courts have the discretion to deem a claim abandoned when a defendant moves to dismiss that claim and the plaintiff fails to address in their opposition papers the defendant's arguments for dismissing such a claim. *See, e.g.*, *Lipton v. Cnty. of Orange*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004) ("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed."); *Anti–Monopoly, Inc. v. Hasbro, Inc.*, 958 F. Supp. 895, 907 n.11 (S.D.N.Y. 1997) ("[T]he failure to

provide argument on a point at issue constitutes abandonment of the issue . . . which provides an independent basis for dismissal." (citations omitted)), *aff'd*, 130 F.3d 1101 (2d Cir. 1997); *see also Robinson v. Fischer*, No. 09-CV-8882, 2010 WL 5376204, at *10 (S.D.N.Y. Dec. 29, 2010) (report and recommendation) (collecting cases).  Because Plaintiffs have failed to address Defendants' argument for dismissing the prima facie tort claim, that claim is abandoned.  *See Laface v. E. Suffolk BOCES*, No. 18-CV-1314, 2019 WL 1959489, at *8 (E.D.N.Y. May 2, 2019) ("In the Second Circuit, a plaintiff's failure to respond to contentions raised in a motion to dismiss constitute[s] an abandonment of those claims." (alteration and quotation marks omitted) (collecting cases)); *Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08-CV-442, 2014 WL 4723299, at *7 (S.D.N.Y. Sept. 23, 2014) ("At the motion to dismiss stage . . . a plaintiff abandons a claim by failing to address the defendant's arguments in support of dismissing that claim.").

### III.  Conclusion

For the foregoing reasons, Defendants' Motion is granted in part and denied in part. Defendants' request that all of Plaintiffs' state causes of action be dismissed as a result of Plaintiffs' failure to comply with New York's General Municipal Law is denied.  The remainder of Defendants' Motion is granted.  Because this is the first adjudication of Plaintiffs' claims on the merits, Plaintiffs' claims are dismissed without prejudice.  If Plaintiffs wish to file a third amended complaint alleging additional facts and otherwise addressing the deficiencies identified above, Plaintiffs must do so within 30 days of the date of this Opinion & Order.  There will be no extensions.  Plaintiffs are further advised that the third amended complaint will completely replace, not supplement, the instant Second Amended Complaint.  The third amended complaint must therefore contain all of the claims, defendants, and factual allegations that Plaintiffs wish

the Court to consider.  If Plaintiffs fail to timely file a third amended complaint, the claims may be dismissed with prejudice.

The Court will hold a status conference on October 3, 2023, at 12:15 P.M.  The clerk of the court is respectfully requested to terminate the pending Motions (Dkt. Nos 17, 32, 39).

SO ORDERED.

Dated:    September 28, 2023
          White Plains, New York

_____
KENNETH M. KARAS
United States District Judge