USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/31/2026

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X

Christopher P. Taranto et al.,

                Plaintiffs,

         -against-

Putnam County et al.,

                Defendants.

-------------------------------------------------------------------X

21-cv-02455-VR

**OPINION & ORDER**

**VICTORIA REZNIK, United States Magistrate Judge:**

Plaintiffs Christopher Taranto, Kerrianne Taranto-Garabo, and Karen Taranto sue Defendants Putnam County, the Putnam County Sheriff's Office, and several individual officers—Robert L. Langley, Jr., Ronald Yeager, Daniel Hunsberger, Ryan Diskin, Vincent Dalo, and William Quick. They seek damages for harms allegedly suffered by George Taranto, the deceased, when he was arrested outside his home in Brewster, New York in July 2019. (ECF No. 60).[1] On August 14, 2024, the parties consented to jurisdiction before a Magistrate Judge for all purposes, under 28 U.S.C. § 636(c). (ECF No. 65). Defendants now move for summary judgment (ECF No. 85), which Plaintiffs oppose (ECF No. 89). For the reasons below, the motion is **GRANTED**.

---

[1] Plaintiffs Christopher Taranto and Kerrianne Taranto-Garabo are co-executors of the Estate of George Taranto, who was their father. (ECF Nos. 88 at 2 ¶ 1; 90 at 1 ¶ 1). Plaintiff Karen Taranto was George's wife. (ECF Nos. 88 at 2 ¶ 4; 90 at 2 ¶ 4).

## I.    FACTUAL BACKGROUND[2]

### A. The Incident

In the early morning hours of July 8, 2019, Defendant Ryan Diskin, a Deputy Sheriff with the Putnam County Sheriff's Office, responded to a call about an electrical transformer explosion. (ECF Nos. 88 at 2 ¶¶ 10, 14; 90 at 3 ¶¶ 10, 14). The explosion allegedly occurred near 202 Apple Tree Lane in Brewster, where George and Karen Taranto resided. (ECF Nos. 88 at 2–3 ¶¶ 5, 13; 90 at 2–3 ¶¶ 5, 13). While responding to that call, Deputy Sheriff Diskin called for backup for a reported stolen vehicle after he noticed two men drive by him suspiciously. (ECF Nos. 88 at 3 ¶¶ 15–19; 90 at 4 ¶¶ 15–19). Defendants William Quick, Vincent Dalo, Ronald Yeager, and Daniels Hunsberger, all employees of the Putnam County Sherriff's Office, responded to the area. (ECF Nos. 88 at 3 ¶ 20; 90 at 4 ¶ 20). Quick was a Sergeant, Dalo and Yeager were Deputy Sheriffs, and Hunsberger was an Investigator. (ECF Nos. 88 at 2 ¶¶ 8–12; 90 at 2–3 ¶¶ 8–12).

Upon arriving at the scene, Deputy Sheriff Yeager testified that he assisted looking for one of the suspects of the stolen vehicle, who officers believed ran into the woods. (ECF Nos. 88 at 3 ¶ 21; 90 at 5 ¶ 21). Yeager testified that he walked around the condominium complex and into the backyards of some of the condominiums, while shining his flashlight. (ECF Nos. 88 at 4 ¶¶ 22–23; 90 at 5 ¶¶ 22–23) (citing Yeager deposition testimony at ECF No. 87-7 at 29). Meanwhile,

---

[2] The following facts are drawn from each of the parties' Rule 56.1 Statements of Material Facts, along with their supporting affidavits and exhibits. (ECF Nos. 88 [Defendants]; 90 [Plaintiffs]; and 93 [Defendants]).

George Taranto (Taranto) was inside his home on the first floor. (ECF Nos. 90 at 42 ¶ 1; 93 at 1 ¶ 1).[3] While inside his home he heard various noises outside and saw flashlights through his windows. (ECF Nos. 88 at 4 ¶ 24; 90 at 5 ¶ 24, 42 ¶ 1; 93 at 1 ¶ 1). According to Yeager's testimony, he first encountered Taranto as he walked around the side of Taranto's home. (ECF No. 87-7 at 29–30). Yeager testified that he told Taranto that he was with the Putnam County Sheriff's Office looking for somebody in the woods and directed him to remain inside his home. (*Id.*). Yeager then continued walking to the front of the house. (*Id.* at 31).

Shortly thereafter, Taranto exited his home and stood in his driveway holding a firearm. (ECF Nos. 88 at 4 ¶ 32; 90 at 8 ¶ 32). Investigator Hunsberger testified that he heard Taranto call out, "who's out there?" and observed Taranto looking out towards the roadway from behind a garage. (ECF Nos. 88 at 5 ¶¶ 33–34; 90 at 8 ¶¶ 33–34). It is undisputed that Taranto approached Hunsberger in his driveway, who told him that the police were searching for a suspect and Taranto should return to his home. (ECF Nos. 90 at 43 ¶ 4; 93 at 2 ¶ 4). According to Hunsberger's testimony, in this initial interaction with Taranto he could only see his head and his shoulders. (ECF No. 87-3 at 17). Hunsberger testified that he turned to walk away, but turned back around after hearing Taranto call out again, "hey, who the f*** is out there, I said, who the f*** is out there?" (*Id.* at 17–18). It is

---

[3] In ECF No. 90, Plaintiffs responded to each of the numbered paragraphs included by Defendants in their Rule 56.1 Statement of Undisputed Material Facts, (ECF No. 88), but they also included additional renumbered paragraphs at the end of their response (ECF No. 90 at 42–57). And Defendants responded to these additional paragraphs. (ECF No. 93). Thus, all citations will include a page number and the associated paragraph number to avoid confusion.

undisputed that Hunsberger then witnessed Taranto holding a gun in his right hand, which caused Hunsberger to draw his own weapon, take cover, and yell out to the remaining officers that Taranto had a gun. (ECF Nos. 88 at 4–6 ¶¶ 32, 41, 46, 48; 90 at 8, 10–12 ¶¶ 32, 41, 46, 48). Taranto proceeded to take cover behind a nearby car. (ECF Nos. 90 at 43 ¶ 6; 93 at 3 ¶ 6).

According to the arrest report and testimony of Quick and Dalo, Sergeant Quick and Deputy Sheriffs Dalo, Diskin, and Yeager each drew their weapons and ordered Taranto to put down his firearm multiple times. (ECF Nos. 87-4 at 128–29 (Quick); 87-6 at 96 (Dalo); 87-8 at 4 (arrest report)). Hunsberger, Dalo, and Yeager, each testified that, eventually, Diskin took over giving orders to Taranto and was the primary person directing him to drop the gun. (ECF Nos. 88 at 7 ¶ 62; 90 at 14–15 ¶ 62) (citing deposition testimony from Hunsberger, Quick, Dalo, and Yeager). But multiple officers testified that they shouted to Taranto that they were police and ordered him to drop the gun. (ECF Nos. 88 at 6–7, 11 ¶¶ 53, 62, 106; 90 at 13–15, 25 ¶¶ 53, 62, 106) (citing deposition testimony of Quick, Diskin, Dalo, and Yeager). According to officer testimony and the arrest report, Taranto did not initially comply with Defendants' orders and continued to take cover behind some parked cars. (*Id.*).

While events were unfolding, Sergeant Quick and Deputy Sheriff Dalo moved to the back of Taranto's home, leaving Diskin, Ryan, and Hunsberger in front. (ECF Nos. 88 at 7 ¶ 59; 90 at 14 ¶ 59). Defendants ordered Taranto to walk forward after placing the firearm on the ground, and Taranto complied with those orders. (ECF

4

Nos. 88 at 8 ¶¶ 68–70; 90 at 16 ¶¶ 68–70, 43 ¶ 7; 93 at 3 ¶ 7). According to Dalo's testimony, he moved up behind Taranto while Taranto walked forward. (ECF No. 87-6 at 98–99). Diskin testified that he saw Taranto holding something in his left hand after placing the gun in his right hand on the ground, which Diskin yelled out to Dalo as he moved behind Taranto. (ECF No. 87-5 at 68–70). Diskin testified that he did not know what was in Taranto's left hand, but believed Taranto was palming a revolver. (ECF Nos. 88 at 8 ¶¶ 70–73; 90 at 16 ¶¶ 70–73). Multiple officers testified that they did not believe Taranto was complying with the commands to put his hands up and walk towards the officers. (ECF Nos. 88 at 8 ¶¶ 77–78, 80–83; 90 at 17–18 ¶¶ 77–78, 80–83) (citing deposition testimony of Dalo (¶¶ 77, 80–83), Hunsberger (¶ 78). And Dalo testified that he believed Taranto had a second gun in his left hand, causing him to make a "split-second decision" to secure Taranto. (ECF No. 87-6 at 43, 99).[4]

It is undisputed that Deputy Sheriff Dalo "brought Taranto to the ground," where he sustained head trauma after his head struck the ground. (ECF Nos. 90 at 44 ¶ 15; 93 at 5 ¶ 15). But one document described Taranto as being "tackled," (ECF No. 87-10), which was consistent with Sergeant Quick's deposition testimony and a recording of a phone call Quick made to a police dispatcher in which he twice stated

---

[4] Plaintiffs deny the Officers' version of events leading to Taranto being brought to the ground. (*See* ECF No. 90 at 16–20 ¶¶ 71–90). But they do so with conclusory denials that refer the Court "to the reports prepared at the time of this incident and arrest as Plaintiff's Exhibits 6, 8, 10, and 14." (*Id.*) As discussed below, none of these exhibits contradict the Officers' version of events. Instead, they omit mentioning the suspicion about Taranto holding a second gun in his left hand, except for the memo prepared by Sergeant Quick a few months after the incident in which he mentions that Taranto was "standing on the sidewalk with a handgun in his right hand and a second object, later determined to be a holster, in his left hand." (ECF No. 91-10 at 2).

that they had to tackle Taranto. (ECF Nos. 87-4 at 95, 168–69; 91-35) ("[W]e f***ing tackled him. . . . [W]e literally had to tackle him to the f***ing ground because he wasn't obeying any of our commands."). According to Quick and Deputy Sheriff Diskin, while Taranto was on the ground, Defendants ordered Taranto to place his hands behind his back and attempted to handcuff him, but he kept his arms "locked under his body." (ECF No. 87-4 at 174; 87-5 at 70). Some officers testified that they were unsure if Taranto was holding another gun under his body while he was on the ground, and it was later discovered that Taranto was resting on top of a holster for his gun. (ECF Nos. 88 at 10–11 ¶¶ 100–01, 105, 111–12; 90 at 23–24, 26 ¶¶ 100–01, 111–12).[5] But it is undisputed that Taranto was eventually handcuffed. (ECF Nos. 88 at 12 ¶ 119; 90 at 28 ¶ 119).

## B. Post-Incident Arrest and Hospitalization

After being handcuffed, Taranto was placed in the back of one of Defendants' police vehicles. (ECF Nos. 90 at 46 ¶ 30; 93 at 9 ¶ 30). According to video camera footage from inside the vehicle, about three minutes after being placed in the vehicle, Defendants can be heard informing Taranto that an ambulance was on the way to evaluate him. (ECF Nos. 91-15 at 2:40-2:50; 91-16 at 2:40-2:50).[6] A few

---

[5] In their response to Defendants' Rule 56.1 statement, Plaintiffs simply deny these statements and assert that none of the information was later corroborated because it is absent from the arrest report and other documents generated after Taranto's arrest. (ECF No. 90 at 23–24, 26 ¶¶ 100–01, 111–12). But they offer no testimony or documentary evidence that contradicts Defendants' Rule 56.1 statements. And one of the documents they cite, Quick's memo of the incident after reviewing in car video, does refer to discovering a holster that the officers initially believed was a second gun. (ECF No. 91-11 at 2).

[6] ECF No. 91-15 is video footage from a camera mounted inside the front of the vehicle and pointed through the front windshield, whereas ECF No. 91-16 is video footage from a camera mounted inside

minutes later, the video footage shows Emergency Medical Services (EMS) arriving on the scene and treating Taranto while he was seated in the back of the police vehicle. (ECF Nos. 91-15 at 6:55-7:00; 91-16 at 6:55-7:00).[7] Over the course of about 20 minutes, the video footage shows Taranto being treated by EMS and paramedics, who bandaged his injuries. (ECF Nos. 91-15 at 6:55-26:00; 91-16 at 6:55-26:00). When asked if he wanted to go to a hospital, Taranto can be heard declining and stating that he preferred to go back home. (ECF Nos. 91-15 at 24:55-25:10; 91-16 at 24:55-25:10). But the video footage shows that he was ultimately seated onto a stretcher and placed in an ambulance. (ECF Nos. 91-15 at 26:05-29:15; 91-16 at 26:05-29:15).

While Taranto was seated in the police vehicle and treated by EMS, it is undisputed that Sergeant Quick and Investigator Hunsberger spoke to Taranto's wife Karen inside the Taranto home and sought to see Taranto's pistol permit. (ECF Nos. 88 at 15 ¶ 149; 90 at 36 ¶ 149, 47 at ¶ 37; 93 at 11¶ 37). According to Karen's testimony, Quick stated "Do you know that I almost killed your husband tonight?" and "I was this close to killing your husband tonight." (ECF No. 87-2 at 35–36). Karen responded by telling Quick that Taranto recently had open heart surgery and could not afford to miss doses of his heart medication. (*Id.* at 37). It is undisputed

---

the back of the vehicle and pointed through the rear windshield. But the video footage is synced up together.

[7] In their response to Defendants' Rule 56. 1 statement, Plaintiffs deny that any EMS personnel arrived at the scene and treated Taranto because a subpoena to an "Express Ambulance Service" found no records of Taranto being treated. (ECF No. 90 at 30 ¶¶ 128–29). But Plaintiffs' assertions are contradicted by the in-car video footage submitted at ECF Nos. 91-15 and 91-16, which depict EMS personnel arriving and treating Taranto.

that at the time of the incident, Taranto was a frail, 75-year-old man suffering from dementia. (ECF Nos. 88 at 2 ¶¶ 6–7; 90 at 2, 45 ¶¶ 6–7, 20; 93 at 7 ¶ 20). But officers testified that they did not know Taranto might be suffering from dementia until after he was arrested and initially thought that he might be drunk. (ECF Nos. 87-3 at 80–81; 88 at 15 ¶¶ 151, 154; 90 at 36 ¶¶ 151, 154).

After being treated by EMS personnel, Taranto was transported to Putnam County Hospital, where he was admitted in the early morning hours of July 8, 2019. (ECF Nos. 88 at 15 ¶ 148; 90 at 35, 47 ¶¶ 36, 40, 148; 93 at 11–12 ¶¶ 36, 40). According to his medical records, Taranto denied having any chest pain or shortness of breath during his initial evaluation at the hospital; he only stated that he had pain in his head, shoulder, elbow, and knee. (ECF No. 91-23 at 1). But shortly thereafter, he was placed on a respirator after he experienced cardiac failure, respiratory failure, and a pulmonary edema. (ECF Nos. 90 at 48 ¶ 44; 93 at 13 ¶ 44). He was transferred to Danbury Hospital later that day. (ECF Nos. 90 at 48 ¶ 45; 93 at 13 ¶ 45). He was eventually released from the hospital two days later on July 10, 2019, and returned home. (ECF Nos. 90 at 48 ¶ 46; 91-24 at 1; 93 at 14 ¶ 46).

Almost two months later, on September 2, 2019, Taranto returned to the hospital and underwent surgery to relieve bleeding and pressure inside his skull. (ECF Nos. 90 at 48 ¶ 49; 93 at 15 ¶ 49). Roughly two years later, Taranto died in hospice care on August 25, 2021. (ECF Nos. 90 at 57 ¶ 108; 93 at 29 ¶ 108).

### C. Taranto's Criminal Prosecution

After his arrest, Taranto was charged by a criminal information with four misdemeanors: (1) second-degree menacing, (2) fourth-degree criminal possession of a weapon, (3) resisting arrest, and (4) second-degree obstructing governmental administration. (ECF Nos. 87-9; 88 at 16 ¶ 158; 90 at 38 ¶ 158). Among the documents created after the arrest was an arrest report completed by Deputy Sheriff Yeager that reiterated the four charges listed in the information and included a brief narrative summary of what occurred during the incident. (ECF No. 87-8). That arrest report was reviewed by Sergeant Quick. (*Id.* at 1).

According to the arrest report's narrative summary, the incident happened as follows. Quick, Dalo, Diskin, and Yeager all drew their service weapons after hearing Hunsberger yell that Taranto had a gun. (*Id.* at 4). Taranto was ordered to put down his weapon and place his hands in the air, but he initially did not comply. (*Id.*). He eventually complied, placed his gun on the ground "and listened to orders to walk towards" Defendants. (*Id.*). Dalo then "sn[uck] up behind" Taranto and "br[ought] him to the ground." (*Id.*). Taranto was ordered "numerous times" to place his hands behind his back, but he refused and kept them "locked under his body." (*Id.*). He was eventually handcuffed after Defendants were able to free his hands and arms. (*Id.*). EMS responded to the scene and Taranto was transported in an ambulance to Putnam County Hospital. (*Id.*).

Another document created was a "Use of Force" form completed by Sergeant Quick that said, among other things, that Taranto was verbally noncompliant,

9

made verbal threats against Defendants, threatened Defendants with a firearm, and resisted arrest. (ECF No. 87-10). The form also contained check-boxes to show what types of force were used against Taranto. (*Id.*). On the form, the boxes for verbal commands, physical direction, impact weapon, and other were checked, with "hands" being specified as the other method. (*Id.*). Quick also checked the box stating the force used was effective and left a brief description that Taranto was "tackled" and then "physically restrained." (*Id.*). The form then stated Taranto was injured during the incident, suffering a "laceration to [his] head" and "shoulder pain." (*Id.*). Quick later testified that an impact weapon was not used and that he checked that box inadvertently. (ECF Nos. 88 at 16 ¶ 159; 90 at 38 ¶ 159). Other police officers similarly testified that no impact weapon was used. (ECF Nos. 87-7 at 44; 88 at 12 ¶¶ 114–15; 90 at 26–27 ¶¶ 114–15). It is undisputed that Dalo had a taser on his belt (ECF Nos. 88 at 7 ¶ 60; 90 at 14 ¶ 60), although he testified that he did not use it when bringing Taranto to the ground. (ECF No. 87-6 at 38).

A few months after the incident, Sergeant Quick prepared a memo to Sheriff Langley describing the incident after reviewing in-car video. (ECF No. 91-10). That memo provides more detail than the arrest report's narrative summary, including a discussion of Taranto holding a second object in his left hand that was later discovered to be the holster for his gun. (*Id.* at 2).

Taranto's criminal prosecution was eventually handled by Mackenzie Ferguson, an Assistant District Attorney with the Putnam County District Attorney's Office. (ECF Nos. 90 at 52 ¶ 75; 93 at 21 ¶ 75). One of Taranto's

10

neighbors, Sherri Koval, wrote a letter to the District Attorney's Office asking it not to pursue criminal charges against him. (ECF Nos. 90 at 56–57 ¶ 106; 93 at 29 ¶ 106). In the letter, she explained that an "Officer McMahon" asked her to write a statement stating that she saw Taranto outside in their neighborhood with a gun on other nights before the incident, but she refused. (ECF No. 91-26 at 2).

As the prosecution continued, Sergeant Quick emailed Ferguson in October 2019 stating that a "fervent prosecution would help" Defendants after a notice of claim was filed against them. (ECF Nos. 90 at 52 ¶ 73; 93 at 20 ¶ 73). And Quick sent the District Attorney's Office a "to-do" list seeking to have the second-degree menacing charge elevated to a felony, set up a meeting with Robert Tendy, the Putnam County District Attorney, and have Ferguson removed from the case. (ECF Nos. 90 at 51 ¶ 72; 91-27; 93 at 20 ¶ 72). In July 2020, an investigation report was issued by Kevin McManus, a Lieutenant with the Putnam County Sherriff's Office that investigated Taranto's incident. (ECF Nos. 90 at 51 ¶ 68; 91-14; 93 at 19 ¶ 68). Defendant Langley, the Sheriff of Putnam County, approved the report and concluded that "acceptable force" was used. (ECF No. 91-14 at 3). The report notes that "acceptable force used on combative subject who was armed with a firearm which was still within reach." (*Id.*). In March 2021, Langley emailed Tendy to set up a meeting about Taranto's criminal prosecution, which was still ongoing. (ECF Nos. 90 at 52 ¶ 74; 93 at 20 ¶ 74).

Taranto's criminal prosecution continued until his death, but at some point the charge for second-degree criminal possession of a weapon was dropped after the

11

District Attorney's Office learned Taranto had a valid permit for his firearm. (ECF Nos. 88 at 16 ¶ 164; 90 at 39 ¶ 164). The only criminal charges pending against Taranto when he died were the charges for second-degree menacing, resisting arrest, and second-degree obstruction of governmental administration. (ECF Nos. 88 at 16 ¶ 163; 90 at 39 ¶ 163). After his death, the prosecution of the criminal charges against him was abandoned. (ECF Nos. 88 at 17 ¶ 165; 90 at 39 ¶ 165).

### D. Procedural History

On March 19, 2021, George Taranto and his wife, Karen Taranto, commenced this action against Defendants in the Southern District of New York. (ECF No. 1). In the initial complaint, they asserted, among other things, causes of action for false arrest, malicious prosecution, excessive force, fabricating evidence, cruel and unusual punishment, and failure to intercede in violation of 42 U.S.C. § 1983, and state-law claims of assault, battery, false arrest, and negligent hiring and supervision. (*Id.* at ¶¶ 66–131).

Following Taranto's death in August 2021, the parties told the Court that Taranto's children were appointed as co-executors of his estate. (ECF No. 27). And they were substituted into this action as plaintiffs through a second amended complaint filed in January 2022. (ECF No. 31).

After Plaintiffs filed multiple additional amended complaints and engaged in dispositive motion practice (ECF Nos. 37–42, 47, 49), Plaintiffs amended their complaint for the fourth and final time. (ECF No. 60). In their fourth amended complaint, Plaintiffs asserted federal § 1983 claims for false arrest, malicious

prosecution, excessive force, deliberate indifference, failure to intercede, supervisor liability, fabrication of evidence, and "cover up." (*Id.* at 14–19 ¶¶ 91–137). They also asserted state-law claims for respondeat superior, assault, battery, false arrest, and malicious prosecution. (*Id.* at 19–24 ¶¶ 138–75). Shortly thereafter, Defendants joined issue by answering the fourth amended complaint. (ECF No. 61).

After completing discovery in March 2025 (ECF No. 79), Defendants moved for summary judgment to dismiss Plaintiffs' fourth amended complaint in its entirety (ECF Nos. 85–88, 92–93), which Plaintiffs opposed (ECF Nos. 89–91).

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material under Rule 56 where it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[8] A dispute about a material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*[9] In determining whether the moving party has met its burden of proving that there are no genuine disputes of material fact, the Court must resolve all ambiguities and draw all factual inferences for the party opposing the motion. *See Union Mut. Fire Ins. Co. v. Ace Caribbean Mkt.*, 64 F.4th 441, 445 (2d Cir. 2023). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."

---

[8] *See also Red Tree Invs., LLC v. Petróleos de Venez., S.A.*, 82 F.4th 161, 170 (2d Cir. 2023).
[9] *See also Red Tree Invs.*, 82 F.4th at 170.

*Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (internal quotation marks and citations omitted).[10]

"When the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to its case." *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (alteration, internal quotation marks, and citation omitted). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo*, 100 F.3d 253, 258 (2d Cir. 1996). Summary judgment is also appropriate when the movant submits undisputed evidence "that negates an essential element of the non-moving party's claim." *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (internal quotation marks and citations omitted).

But summary judgment must be denied if the Court finds "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

### III.    DISCUSSION

In their operative complaint, Plaintiffs assert a host of federal and state-law claims against Defendants. (ECF No. 60 at 14–19 ¶¶ 91–137). They assert claims, under 42 U.S.C. § 1983, of false arrest, malicious prosecution, excessive force,

---

[10] *See also Wiggins v. Griffin*, 86 F.4th 987, 995 (2d Cir. 2023) (per curiam).

deliberate indifference, fabrication of evidence, cover up, and failure to intercede, against Langley, Quick, Yeager, Diskin, Dalo, and Hunsberger. (*Id.*).[11] They also assert a § 1983 claim of supervisory liability against Langley and Quick. (*Id.* at 17–18 ¶¶ 124–27). Lastly, they assert state-law claims of false arrest, malicious prosecution, assault, battery, and wrongful death against Defendants, and a state-law claim of respondeat superior against Defendant Putnam County. (*Id.* at 19–25 ¶¶ 138–80). The Court addresses each of Plaintiffs' claims in turn.

### A. Plaintiffs' False Arrest Claims under Section 1983 and New York Law (Counts 1, 3, 10)

Defendants seek summary judgment on Plaintiff's § 1983 and New York false arrest claims, arguing that they had probable cause to arrest Taranto on all four of his misdemeanor charges. (ECF No. 86 at 7–11, 25–26). They also argue in the alternative that the claims fail because they are entitled to qualified immunity under federal and state law, respectively, as they had arguable probable cause to arrest him. (*Id.* at 11–12, 25–26).

Plaintiffs respond that Defendants lacked probable cause because Taranto lawfully possessed his weapon, never pointed it at Defendants, and never intended to resist arrest or obstruct Defendants. (ECF No. 89 at 14–16). Plaintiffs also argue that qualified immunity does not apply because Defendants lacked even arguable

---

[11] Some of these § 1983 claims, like false arrest, excessive force, failure to intercede, and deliberate indifference are listed in the operative complaint with their own dedicated headings identifying them as separate "Counts." (ECF No. 60 at 15). Others are contained within "Count 1" of the complaint, which asserts an amalgamation of § 1983 claims that repeats those seen in other counts while also alleging claims of malicious prosecution, fabrication of evidence, and cover up. (*Id.* at 14–15 ¶¶ 91–95).

probable cause to arrest Taranto for any crime. (*Id.* at 17–18). Because a false arrest claim under § 1983 and New York law are substantially the same, *see Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021), the Court analyzes them together, and addresses each of Defendants' arguments in turn.

### 1.  Probable Cause

A false arrest claim in violation of § 1983 "is substantially the same as a claim for false arrest under New York law." *Id.* (internal quotation marks and citations omitted). Thus, both claims are subjected to the same analysis. *See Alexander v. City of Syracuse*, 132 F.4th 129, 156–57 (2d Cir. 2025) (vacating dismissal of § 1983 and New York claims of false arrest after applying same analytical standard to both claims). To survive summary judgment, a plaintiff must show that: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement[,] and (4) the confinement was not otherwise privileged." *Guan v. City of New York*, 37 F.4th 797, 804 (2d Cir. 2022) (internal quotation marks and citation omitted). But probable cause is a "complete defense" to a false arrest claim, "whether that action is brought under state law or under § 1983." *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) (internal quotation marks and citations omitted). This is because probable cause renders the arrest privileged for purposes of the privileged confinement element. *See Guan*, 37 F.4th at 804 ("An arrest is privileged if it is based on probable cause.").

In analyzing probable cause, a court considers "the totality of the circumstances" and the facts "available to the officer at the time of the arrest and immediately before it." *Id.* (internal quotation marks and citations omitted). But a court need not find probable cause for each individual charge against the plaintiff. *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006) ("[I]t is not relevant whether probable cause existed with respect to each individual charge."). Nor must the court find that probable cause existed for "any charge actually invoked by the arresting officer at the time of arrest." *Id.* It is enough that a reasonable person would believe that the arrestee committed or was committing "*any* crime." *Berg v. Kelly*, 897 F.3d 99, 111 (2d Cir. 2018) (concluding prior Supreme Court and Second Circuit precedent held probable cause analysis focused on any crime "whether or not that particular crime was closely related to" crimes arrestee charged with); *see Hernandez v. United States*, 939 F.3d 191, 199 (2d Cir. 2019) (explaining probable cause determination required analyzing circumstances from perspective of "person of reasonable caution" (internal quotation marks and citation omitted)).

Here, Defendants had probable cause to arrest Taranto for *a* crime. And the Court need look no further than the second-degree menacing crime for which he was initially charged. A person is guilty of menacing in the second degree when he attempts to place another "in reasonable fear of physical injury, serious physical injury or death by displaying a deadly weapon, dangerous instrument[,] or what appears to be a pistol, revolver, rifle, shotgun, machine gun[,] or other firearm." N.Y. Penal Law § 120.14(1). Contrary to Plaintiffs' argument, the statute's

17

"displaying" element does not require that the deadly weapon be pointed at the person in reasonable fear. A weapon is considered displayed if it is merely visible to that person. *See People v. Perry*, 967 N.E.2d 1195, 1196 (N.Y. 2012) (holding defendant committed second-degree menacing when he "pulled . . . out" gun and "showed" it to victim (internal quotation marks omitted)); *People v. Bryant*, 161 N.Y.S.3d 399, 404 (N.Y. App. Div. 2021) (affirming conviction for second degree menacing where witness saw "a black and silver object that looked like a gun" when defendant grabbed at his waist during altercation (internal quotation marks, ellipsis, and brackets omitted)), *appeal dismissed*, 195 N.E.3d 55 (N.Y. 2022); *Nadine C. v. Keith S.*, 182 N.Y.S.3d 95, 97 (N.Y. App. Div. 2023) (finding testimony that respondent "showed" gun to petitioner sufficient to show second-degree menacing). And it is undisputed that a firearm was visible in Taranto's hand when he confronted Hunsberger and the other officers outside his home. (ECF Nos. 88 at 4, 5, 7 ¶¶ 32, 41, 65; 90 at 8, 10, 15 ¶¶ 32, 41, 65). Indeed, Plaintiffs admit that Taranto had a gun in his hand during the incident and set it on the pavement after hearing Defendants screaming at him to drop his firearm and raise his hands. (ECF Nos. 88 at 8 ¶¶ 68–69; 90 at 16 ¶¶ 68–69). That is sufficient to conclude that Taranto displayed a firearm in satisfaction of the menacing element. *See LaFontaine v. City of New York*, No. 08 Civ. 15555 (SHS), 2009 WL 3335362, at \*5 (S.D.N.Y. Oct. 14, 2009) (finding probable cause for second-degree menacing arrest because witness told officer plaintiff "pulled out a gun and waved it at him during a dispute"); *Johnson v. City of New York*, 19 Civ. 08745 (GBD) (OTW), 2025 WL

2776053, at *4 (S.D.N.Y. Sept. 30, 2025) (concluding defendants had actual probable cause to arrest plaintiff on second-degree menacing charge because he was "wielding a wooden dowel rod during an altercation"); *see Perry*, 967 N.E.2d at 1196.

Plaintiffs also fail to raise a genuine factual dispute on the reasonable fear element. At his deposition, Investigator Hunsberger testified that he feared for his life. (ECF No. 87-3 at 47) ("[My] first thought was he's got a gun out on me already, he's got the tactical advantage over me. I was a hundred percent in fear for my life."). And there is similar evidence as to Sergeant Quick. He was described as "frantic" when he exclaimed that he almost killed Taranto during the incident. (ECF Nos. 90 at 55 ¶ 97; 93 at 27 ¶ 97). That emotional state is corroborated by the recording of the phone call Quick made to a police dispatcher shortly after the incident. (ECF No. 91-35). Plaintiffs say nothing about Quick's reasonable fear, and they simply deny Hunsberger's account because the post-arrest paperwork did not include it. (ECF No. 90 at 10–11 ¶¶ 43–45). But simply denying the truth of Hunsberger's testimony about being in reasonable fear of injury or death, without any contradictory evidence to question its veracity, does not create a question of fact to survive summary judgment. *See Carzoglio v. Abrams*, 18-CV-04198 (PMH), 2022 WL 2193376, at *6 (S.D.N.Y. June 17, 2022) (granting summary judgment on § 1983 claim because "in the absence of proof to the contrary, Plaintiff's conclusory allegations are insufficient to raise an issue of fact and to avoid summary judgment"); *King v. Time Warner Cable*, 113 F. Supp. 3d 718, 726 (S.D.N.Y. 2015) (explaining that absence of evidence failed to contradict fact asserted by plaintiff

19

and create a question of fact that would warrant denial of summary judgment),

*vacated on other grounds*, 894 F.3d 473 (2d Cir. 2018). Indeed, no reasonable jury

could conclude that an officer would not reasonably fear injury when dealing with

an armed suspect who did not appear to be complying with instructions.

Thus, Defendants are entitled to summary judgment on Plaintiffs' § 1983 and

New York false arrest claims, because they had actual probable cause to arrest

Taranto for second-degree menacing. *See LaFontaine*, 2009 WL 3335362, at *5

(granting summary judgment to defendants on § 1983 false arrest claim after

concluding there was probable cause to arrest plaintiff); *see Williams v. City of New*

*York*, 20 Civ. 5995 (LGS), 2023 WL 2308529, at *3–4 (S.D.N.Y. Mar. 1, 2023)

(granting summary judgment dismissing plaintiff's federal and New York false

arrest claims because defendants had probable cause to arrest him).

### 2.  Qualified Immunity

Even assuming Defendants lacked probable cause to arrest Taranto,

Defendants argue that they would be entitled to qualified immunity because they

had "arguable probable cause" to arrest him. (ECF No. 86 at 11–12). Although

qualified immunity generally only protects police officers from liability for federal

claims, "a similar doctrine exists under New York" law. *Jenkins*, 478 F.3d at 86–87.

Thus, if an officer is entitled to qualified immunity on a federal false arrest claim,

"summary judgment would be similarly appropriate" on the parallel New York

claim. *Id.* A police officer is entitled to qualified immunity if they can establish "that

there was 'arguable probable cause' to arrest." *Escalera v. Lunn*, 361 F.3d 737, 743

20

(2d Cir. 2004). This standard is "more lenient" than the one for actual probable cause. *Gogol v. City of New York*, 15 Civ. 5703 (ER), 2017 WL 3449352, at *8 (S.D.N.Y. Aug. 10, 2017). And as with actual probable cause, an officer only needs arguable probable cause to arrest for *any* crime. *See Kass v. City of New York*, 864 F.3d 200, 206 (2d Cir. 2017) ("An officer is entitled to qualified immunity from a federal false arrest . . . claim if he had arguable probable cause to arrest the plaintiff for any offense, regardless of the offense with which the plaintiff was actually charged."), *cert. denied*, 583 U.S. 999 (2017).

Arguable probable cause exists if it was "objectively reasonable for the officer to believe that probable cause existed" or if reasonably competent officers could disagree about whether probable cause existed. *Escalera*, 361 F.3d at 743 (internal quotation marks and citations omitted). At summary judgment, this means dismissal is appropriate "if a reasonable jury *could* find that there was probable cause." *Sacaza v. City of New York*, __ F.4th __, __, 2026 WL 680910, at *7 (2d Cir. 2026); *see Lennon v. Miller*, 66 F.3d 416, 424–25 (2d Cir. 1995) (holding officers entitled to qualified immunity if "a rational jury could *not* find that the officers' judgment was so flawed that no reasonable officer would have made a similar choice").

Here, Defendants are entitled to qualified immunity because there was arguable probable cause to arrest Taranto. It is undisputed that Taranto openly displayed his firearm to Defendants (ECF Nos. 88 at 4–5 ¶¶ 32, 41; 90 at 8, 10 ¶¶ 32, 41) and did not initially comply with orders to put the gun down and raise

21

his hands. (ECF Nos. 90 at 43 ¶ 7; 93 at 3 ¶ 7). Under these circumstances, no rational jury could find that the officers' judgment was so flawed that no reasonable officer would have made a similar choice to arrest Taranto. *See Lennon*, 66 F.3d at 424–25. Thus, because a reasonable jury could conclude that Defendants had probable cause to arrest Taranto for a crime, Defendants are entitled to qualified immunity. *Burgess v. Town of Wallingford*, 569 F. App'x 21, 24 (2d Cir. 2014) (summary order) (concluding officers had qualified immunity from false arrest claim brought by plaintiff exposing firearm in public because reasonable officers could disagree about whether probable cause existed to arrest plaintiff); *Goldberg v. Town of Glastonbury*, 453 F. App'x 40, 41–42 (2d Cir. 2011) (summary order) (similar); *Albright v. City of Peekskill*, 23 Civ. 7152 (JCM), 2025 WL 1928550, at *8–9 (concluding defendants entitled to qualified immunity on plaintiff's § 1983 false arrest claim because defendants had arguable probable cause to arrest plaintiff on second-degree menacing charge after plaintiff displayed knife to neighbor while threatening to kill her).

### B. Plaintiffs' Malicious Prosecution Claims Under Section 1983 and New York Law (Counts 1 and 10)

Like their false arrest arguments, Defendants argue that they are entitled to summary judgment on Plaintiffs' § 1983 and New York malicious prosecution claims because there was probable cause to prosecute Taranto on each of the three charges pending against him when he died. (ECF No. 89 at 12–14). They also argue that Taranto's criminal prosecution did not end favorably because the proceeding was "abated" by his death. (*Id.* at 15–16). Lastly, they argue that they are entitled

22

to qualified immunity on the federal malicious prosecution claim because they had arguable probable cause to prosecute Taranto. (*Id.* at 14–15).

Plaintiffs respond that Defendants lacked probable cause to arrest Taranto for any crimes and "engaged in an ongoing course of conduct seeking to manipulate" his criminal prosecution. (ECF No. 89 at 19–21). They also argue that Taranto's criminal prosecution ended favorably because he was never convicted. (*Id.* at 20–21). Lastly, they argue that Defendants are not entitled to qualified immunity because they lacked arguable probable cause. (*Id.* at 20).

Because the legal standard for a malicious prosecution claim under § 1983 and New York law are "substantially the same," *Boyd v. City of New York*, 336 F.3d 72, 75 (2d Cir. 2003) (internal quotation marks and citation omitted), the Court analyzes these claims together, and addresses each of Defendants' arguments in turn.

### 1. Probable Cause

To survive summary judgment on a malicious prosecution claim under § 1983, "a plaintiff must show a violation of his rights under the Fourth Amendment, and must establish the elements of a malicious prosecution claim under state law." *See Manganiello v. City of New York*, 612 F.3d 149, 160–61 (2d Cir. 2010) (citations omitted). Under New York law, a plaintiff must show that: (1) a criminal proceeding was commenced against them, (2) there was no probable cause to commence that proceeding, (3) the proceeding was commenced with actual malice, (4) that proceeding terminated in the plaintiff's favor, and (5) "a sufficient

post-arraignment liberty restraint" occurred. *See Kee*, 12 F.4th at 161–62 (internal

quotation marks and citation omitted); *De Lourdes Torres v. Jones*, 47 N.E.3d 747,

760 (N.Y. 2016).[12]

If a plaintiff fails to establish one of the elements of the New York malicious

prosecution claim, a court may also dismiss the associated § 1983 claim without

deciding whether a Fourth Amendment violation occurred. *See Singer v. Fulton*

*Cnty. Sheriff*, 63 F.3d 110, 114, 118 (2d Cir. 1995) (affirming district court's denial

of § 1983 claim after determining that plaintiff failed to satisfy all elements of New

York malicious prosecution claim), *cert. denied*, 517 U.S. 1189 (1996); *see Smith v.*

*Ware*, 17-CV-5152 (JPO), 2019 WL 2616194, at *4–5 (S.D.N.Y. June 26, 2019)

("[T]he Court may resolve its inquiry into both . . . Section 1983 and state law

malicious prosecution claims by examining whether [the plaintiff] has produced

facts sufficient to go to a jury on the elements of common law malicious

prosecution.").

Notably, the probable cause standard for malicious prosecution claims "is

slightly higher" than the one for false arrest. *Stansbury v. Wertman*, 721 F.3d 84, 95

(2d Cir. 2013). Unlike false arrest claims, probable cause must support each charge

at issue, not simply any crime. *Alexander v. City of Syracuse*, 132 F.4th 129, 158 (2d

Cir. 2025) (explaining "probable cause must support *each* charge brought by the

prosecution").

---

[12] Here, the parties do not dispute (or at least argue) whether a criminal proceeding was commenced against Taranto or that the proceeding was commenced with actual malice. (ECF Nos. 86 at 13–16; 89 at 19–21).

Traditionally, malicious prosecution claims are not brought against police officers because they generally do not start criminal proceedings. *See Bermudez v. City of New York*, 790 F.3d 368, 377 (2d Cir. 2015). And once a prosecutor chooses to pursue criminal charges, that decision constitutes an "intervening exercise of independent judgment" that breaks the causal chain for probable cause purposes. *Dufort v. City of New York*, 874 F.3d 338, 352 (2d Cir. 2017) (internal quotation marks and citation omitted). But a plaintiff can re-establish that causal chain and survive summary judgment if they can produce evidence that the prosecutor was "misled or pressured by the police" into pursuing the charges. *Id.* (internal quotation marks and citation omitted).

Plaintiffs have not done so here. They fail to identify any admissible evidence from which a reasonable jury could conclude that Defendants misled or pressured the prosecutor into pursuing the case. With respect to misleading the prosecutor, giving Plaintiffs every favorable inference, they appear to make two broad assertions: that Defendants fabricated an investigation report on excessive force and that discrepancies between Defendants' deposition testimony and the post-arrest documents misled the prosecutor. (ECF No. 90 at 51 ¶¶ 68–70, 54 ¶ 88). But Plaintiffs never identify what within the investigation report was fabricated. Instead, they simply infer fabrication solely from the report's late disclosure. (*Id.* at 51 ¶ 68–70). Nor do they identify the supposed discrepancies between Defendants'

deposition testimony and the post-arrest documents, much less explain how those discrepancies impacted the prosecutor's charging decision.[13]

With respect to pressuring the prosecutor, giving Plaintiffs every favorable inference, they point to four things: (1) Sergeant Quick's to-do list to the Putnam County District Attorney's Office saying he wanted the menacing charge elevated to a felony and Mackenzie Ferguson, the prosecutor, removed from the case, (2) Quick's email to Ferguson stating that Plaintiffs' claims could "easily be rebuked" by the available in-car video of the incident and that "a fervent prosecution" would also help Defendants, (3) an email from District Attorney Robert Tendy to Sheriff Langley asking for a confidential meeting to discuss the criminal case against Taranto, and (4) Quick's belief that Ferguson was removed from the case because she was not doing her job. (ECF Nos. 90 at 51–52 ¶¶ 72–75; 91-32). But none of that is enough.

First, starting with Sergeant Quick's to-do list seeking to elevate the menacing charge to a felony and getting Ferguson removed as prosecutor, there is no evidence that either of those events occurred. It is undisputed that the menacing

---

[13] At most, Plaintiffs appear to be arguing that in deposition testimony, Defendants testified that they thought Taranto might be holding a second gun in his left hand, which turned out to be a holster. (ECF Nos. 88 at 11–12 ¶¶ 111–13; 90 at 26 ¶¶ 111–13). Plaintiffs argue that this information does not appear in the arrest report and thus constitutes a "discrepancy." (ECF No. 89 at 6–8). But as noted earlier, there is no admissible evidence in the record that contradicts the Defendants' deposition testimony on this point or raises doubts about their veracity. Indeed, at least one post-arrest record prepared just a few months after the incident corroborates their testimony that they thought Taranto might be holding a second gun in his left hand. (*See* ECF No. 91-11 at 2) (Sergeant Quick memo describing "second object, later determined to be a holster in [Taranto's] left hand"). In any case, the absence of evidence in the arrest report cannot create a genuine issue of disputed fact. *See Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (holding party opposing summary judgment cannot establish question of fact by using "metaphysical doubt," "conjecture," or "surmise" (internal quotation marks and citations omitted)).

charge against Taranto remained a misdemeanor at the time of his death in August 2021. (ECF Nos. 88 at 16 ¶¶ 158, 163; 90 at 38–39 ¶¶ 158, 163). And Plaintiffs cite no evidence to establish that Ferguson was removed, only that Quick thought she was. (ECF No. 90 at 52 ¶ 75). In fact, both Tendy and Ferguson testified that Ferguson was not going to handle the matter at trial but would remain on the trial team. (ECF Nos. 87-13 at 15–16; 91-36 at 35–36). In other words, there is no evidence that Quick's preferences influenced the prosecution.

Second, the meeting request from Tendy to Sheriff Langley proves no more. Meetings among law enforcement officials are commonplace, especially after a criminal prosecution has begun. And Plaintiffs fail to highlight any nefarious or ulterior motive behind the meeting, beyond mere speculation.

Third, and finally, Sergeant Quick's email to Ferguson stating "a fervent prosecution" would be helpful to Defendants, does not save Plaintiffs' claim. Again, there is no evidence that Quick's wishes influenced Ferguson's conduct in pursuing the case. The record suggests the opposite. It is undisputed that Taranto's criminal proceedings began in July 2019, and were still pending over two years later when he died in August 2021. And as noted above, Ferguson did not elevate the charges, despite Quick's stated preference that she do so. (ECF Nos. 88 at 16 ¶¶ 158, 163; 90 at 38–39 ¶¶ 158, 163). In fact, Ferguson later dropped one of the charges—criminal possession of a weapon—once it became clear that Taranto had a valid license to carry a weapon. (ECF Nos. 88 at 16 ¶ 164; 90 at 39 ¶ 164).

27

In short, there is no evidence from which a reasonable jury could conclude that Defendants misled or pressured the prosecution. *See Dasent v. Muñoz*, 15-cv-1620 (PKC), 2018 WL 2356662, at *5 (S.D.N.Y. Feb. 16, 2018) (granting summary judgment dismissing malicious prosecution claim because there was no evidence of pressure or misleading statements); *cf. Minott v. Duffy*, No. 11 Civ. 1217(KPF), 2014 WL 1386583, at *19 (S.D.N.Y. Apr. 8, 2014) (denying summary judgment because officer failed to advise prosecutor that wording used in charging instrument was inaccurate).

In any event, Plaintiffs' claim fails for the separate reason that Defendants had probable cause for each of the three charges pending against Taranto. As explained above, there was probable cause to support the menacing charge. (*See* Section III.A.1., *supra*). And the same is true for the charges of resisting arrest and obstructing governmental administration. A person is guilty of resisting arrest when they "intentionally prevent[] or attempt[] to prevent a police officer . . . from effecting an authorized arrest." N.Y. Penal Law § 205.30. And they are guilty of obstruction of governmental administration when they prevent "a public servant from performing an official function, by means of intimidation, physical force[,] or interference." N.Y. Penal Law § 195.05. Merely refusing to comply with an order from a police officer is sufficient to find probable cause for both crimes. *See Johnson v. City of New York*, No. 05 Civ. 7519(PKC), 2008 WL 4450270, at *10 (S.D.N.Y. Sept. 29, 2008) (finding probable cause to prosecute plaintiff for resisting arrest and second-degree obstruction where plaintiff refused to comply with police officer

28

orders regarding handcuffing during arrest). And merely interfering with an ongoing investigation can suffice to establish probable cause for obstruction of governmental administration. *See People v. Tarver*, 591 N.Y.S.2d 907, 907–08 (N.Y. App. Div. 1992) (affirming conviction for obstructing governmental administration where officer had to stop defendant from striking other officer effecting arrest because defendant's conduct "necessitated another officer to divert his assistance in the arrest and intervene to protect his partner"); *Berger v. Schmitt*, 91 F. App'x 189, 190–91 (2d Cir. 2004) (summary order) (finding defendants had probable cause to arrest plaintiff for obstructing governmental administration because plaintiff ordered to leave scene where altercation occurred between other people, returned to scene, and began asking questions to people involved, which "interfere[d] with the officers' efforts to contain what had only recently been a volatile situation").

The evidence is uncontroverted that Taranto failed to comply with orders from Defendants while they were effecting his arrest. According to Defendants' testimony and arrest records prepared shortly after the incident, Taranto did not comply when officers initially ordered Taranto to drop his gun and raise his hands. (ECF Nos. 87-8 at 4; 88 at 7–8 ¶¶ 64–65; 90 at 15 ¶¶ 64–65). Eventually Taranto did comply and put his gun on the ground with his right hand. (ECF Nos. 88 at 8 ¶ 69; 90 at 16, 43 ¶¶ 7, 69; 93 at 3 ¶ 7). But multiple officers testified that, when ordered to raise both hands above his head, Taranto again did not fully comply. (ECF Nos. 88 at 8–9 ¶¶ 75–78, 82–83; 90 at 17–18, 43 ¶¶ 7, 75–78, 82–83; 93 at 3 ¶ 7). And once on the ground, when Defendants ordered him to reveal his hands,

29

Taranto kept his arms pinned under his body so Defendants could not place him in handcuffs. (ECF Nos. 87-4 at 153–54, 173–74; 87-5 at 69–70; 87-7 at 68–69; 87-8 at 4; 88 at 10 ¶¶ 98–99; 90 at 22–23 ¶¶ 98–99).

To be sure, Plaintiffs deny that Taranto failed to comply with Defendants' orders. But they do so in conclusory terms by simply referring the Court "to the reports prepared at the time of this incident and arrest as Plaintiff's Exhibits 6, 8, 10 and 14." (ECF No. 90 at 18, 20 ¶¶ 81–83, 89). But the cited reports only corroborate Defendants' testimony that Taranto failed to comply with their orders. (ECF No. 87-8 at 4 (Arrest report) (stating that "Taranto did not initially comply with orders and took cover behind a vehicle"); 87-10 (Use of Force form) (boxes checked for "Verbal Non Compliance," "Verbal Threats/Gestures," and "Physically Uncooperative (Resisting)"); 91-10 at 2 (Sergeant Quick memo) (stating Taranto "remained in a non-compliant stand-off"); 91-14 at 1 (Personnel Investigation) (stating that "defendant was ordered to drop his weapon multiple times over the course of 3 minutes" and "continued to struggle while members attempted to handcuff him")). Such conclusory denials, unsupported by the documentary evidence, cannot give rise to genuine issues of material fact to preclude summary judgment. *See Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (holding party opposing summary judgment cannot establish question of fact by using "metaphysical doubt," "conjecture," or "surmise" (internal quotation marks and citations omitted)).

Thus, Taranto's refusal to comply with Defendants' orders is sufficient to find probable cause to prosecute him both for resisting arrest and obstruction of governmental administration. *See Johnson*, 2008 WL 4450270, at *10 (granting summary judgment dismissing malicious prosecution claim based on resisting arrest and obstruction of governmental administration charges).[14] Of course, the fact that the prosecutor had probable cause to prosecute Taranto does not mean the Court endorses their decision to do so. Taranto appeared to be an unwell elderly man suffering from dementia. But unfortunately the Court's view about the wisdom of prosecuting Taranto differs from whether the Court believes there was probable cause to do so.

### 2. Qualified Immunity

Even if Defendants lacked actual probable cause to arrest and prosecute Taranto, Defendants argue that they would still be entitled to qualified immunity because they had "arguable probable cause" to arrest him. (ECF No. 86 at 14–15). When a court determines that a police officer is entitled to qualified immunity because arguable probable cause existed at the time of an arrest, that qualified immunity extends to a malicious prosecution claim unless the plaintiff can show that it dissipated between the arrest and the start of the prosecution. *Da Mata v. City of New York*, 21 Civ. 155 (KPF), 2023 WL 112449, at *12 n.12 (S.D.N.Y. Jan. 5,

---

[14] Because Plaintiffs cannot establish the probable cause element of the malicious prosecution claim, it is unnecessary to analyze the parties' dispute over whether there was a sufficient deprivation of Taranto's liberty or whether Plaintiffs' prosecution ended favorably. *See McDay v. City of New York*, 2026 WL 554746, at *4 (S.D.N.Y. Feb. 27, 2026) ("Where a plaintiff cannot establish one of the elements of his malicious prosecution claim under state law, a district court may dismiss the Section 1983 claim without deciding whether the alleged malicious prosecution amounted to a violation of the plaintiff's constitutional rights." (internal quotation marks, brackets, and citations omitted)).

31

2023) ("The Court's finding that arguable probable cause existed for Plaintiff's arrest, coupled with the absence of any evidence that 'dissipated' that arguable probable cause before his prosecution, similarly requires a finding of qualified immunity as to Plaintiff's malicious prosecution claims."); *see Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996) (explaining qualified immunity from malicious prosecution claim could be eliminated, despite qualified immunity from false arrest claim, if officer learned new information between arrest and prosecution that altered probable cause determination).

As explained above, Defendants had arguable probable cause to arrest Taranto for the second-degree menacing charge. (*See* Section III.A.2, *supra*). They also had arguable probable cause to arrest Taranto for resisting arrest and obstructing governmental administration. Given Defendants' uncontradicted testimony that they believed Taranto was not obeying their orders to drop his gun, raise both hands above his head, and present his hands for handcuffing, a reasonable jury could conclude that the officers had probable cause to arrest Taranto for either charge. *See Sacaza v. City of New York*, __ F.4th __, __, 2026 WL 680910, at *7 (2d Cir. 2026) ("[L]aw enforcement officers must be granted qualified immunity if a reasonable jury *could* find that there was probable cause."). Put another way, if reasonable officers could disagree about whether probable cause existed to arrest Taranto for resisting arrest or obstructing governmental administration, then arguable probable cause existed to arrest him. *See id.* at *6 ("Arguable probable cause exists where reasonable police officers could disagree on

whether there was probable cause."). And Plaintiffs identified no change in the facts between Taranto's arrest and prosecution as to those pending charges.

Taranto's prosecution for fourth-degree criminal possession of a weapon presents a counter example. Taranto was initially charged with criminal possession of a weapon. (ECF Nos. 87-9 at 2; 88 at 16 ¶ 158; 90 at 38 ¶ 158). And it is undisputed that between his arrest and the abatement of his prosecution, it was discovered that Taranto "had a lawful permit for [his] firearm." (ECF Nos. 88 at 16 ¶ 164; 90 at 39 ¶ 164). The District Attorney's Office then dropped that charge. (*Id.*). But nothing in the record suggests that anything similar happened with Taranto's three other remaining charges. Thus, Defendants are entitled to qualified immunity because there was arguable probable cause to prosecute Taranto. *See Garcia v. County of Westchester*, No. 11-CV-7267 (KMK), 2017 WL 6375791, at *25 (S.D.N.Y. Dec. 12, 2017) (granting summary judgment after concluding arguable probable cause extended to malicious prosecution claim because plaintiff failed to offer facts that some information or knowledge changed between arrest and prosecution); *Keith v. City of New York*, No. 11 Civ. 3577(KPF), 2014 WL 6750211, at *20 n.23 (S.D.N.Y. Dec. 1, 2014) (similar), *aff'd*, 641 F. App'x 63 (2d Cir. 2016).

### C. Plaintiff's Section 1983 Excessive Force Claim (Count 2)

Defendants argue that the force they used to arrest Taranto was reasonably necessary because he failed to comply with their orders, some officers believed he was still holding a weapon, and he pinned his arms under his body while

33

Defendants attempted to handcuff him. (ECF No. 86 at 16–19).[15] They also renew their argument that they are entitled to summary judgment because qualified immunity applies. (*Id.* at 19–20).

Plaintiffs respond that summary judgment is improper because discrepancies between the arrest records and Defendants' deposition testimony create genuine factual disputes about the amount of force used. (ECF No. 89 at 22–24). They also argue that Defendants are not entitled to qualified immunity because they lacked probable cause to arrest Taranto in the first place. (*Id.* at 24).

To survive summary judgment on a § 1983 excessive force claim, a plaintiff must show that the force used against them "was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 396–397 (2015); *accord Kirton v. Doe*, No. 20-CV-10860 (KMK), 2025 WL 2696510, at *4 (S.D.N.Y. Sept. 22, 2025). And reasonableness is viewed "from the perspective of a reasonable officer on the scene" considering all of the facts and circumstances unique to a given case. *Graham v. Connor*, 490 U.S. 386, 396 (1989); *accord Matusak v. Daminski*, 165 F.4th 702, 713 (2d Cir. 2026). Relevant considerations include the severity of the crime involved, whether the suspect posed an immediate threat, and whether they were resisting arrest or attempting to flee—often referred to as the *Graham* factors. *See Graham*, 490 U.S. at 396. The Court must also remember that an officer's right to make an arrest inherently involves the right to use some amount of physical force, and that an officer's decision about how much force to use occurs in "tense, uncertain, and

---

[15] Defendants reiterate this argument in their reply papers. (ECF No. 92 at 10–11).

rapidly evolving" situations which often require "split-second judgments." *Id.* at 396–397 ("Not every push or shove . . . violates the Fourth Amendment." (internal quotation marks and citation omitted)).

Before turning to the analysis, the Court acknowledges that the only firsthand account of what happened during the incident comes from Defendants. Because Taranto died about two years after the incident, his version is unavailable. Although this asymmetry arises most often in deadly-force cases, *see O'Bert ex rel. O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003), the same concern is present here. In grappling with these difficult situations, "the court may not simply accept what may be a self-serving account by the police officer." *Id.* (internal quotation marks and citation omitted). Instead, it must undertake "a fairly critical assessment" of "circumstantial evidence" contained in things like the officer's "original reports or statements" that goes against their version of events and could convince a reasonable jury to reject the officer's account. *Id.* (internal quotation marks and citations omitted); *see Soto v. Gaudett*, 862 F.3d 148, 157 (2d Cir. 2017) ("[T]he record should be given the same careful scrutiny where the alleged victim of excessive force is alive, but the events have left him incapable of communicating.").

Here, Plaintiffs argue that genuine factual disputes exist about the amount of force used because the arrest records and Defendants' deposition testimony do not line up. (ECF No. 89 at 22–24). Even giving Plaintiffs every favorable inference, the force here is best described as tackling Taranto to the ground and using an impact weapon. That is Plaintiffs' most forceful account of the encounter, and the Court

35

assumes it in their favor. As noted above, one document states that Taranto was "tackled" (ECF No. 87-10), which matches Sergeant Quick's deposition testimony and a recorded call Quick made to a police dispatcher in which he twice stated that the officers had to tackle Taranto. (ECF Nos. 87-4 at 95, 168–69; 91-35) ("[W]e f***ing tackled him. . . . [W]e literally had to tackle him to the f***ing ground because he wasn't obeying any of our commands."). And although Defendants later testified that no impact weapon was used, (ECF Nos. 88 at 12 ¶¶ 114–15; 87-7 at 44; 90 at 26–27 ¶¶ 114–15), a "Use of Force" form completed by Quick after the incident checked the box for an impact weapon. (ECF No. 87-10).[16]

But even on those assumptions, the *Graham* factors compel the conclusion that the force used was not excessive. The reasonableness of the officer's actions must be judged "from the perspective of a reasonable officer on the scene" considering all of the facts and circumstances unique to a given case, not with hindsight. *Graham*, 490 U.S. at 396. Here, two officers testified that they encountered Taranto at or near his home, identified themselves as police officers searching for a suspect, and instructed him to remain inside. (ECF Nos. 87-7 at 29–30; 90 at 43 ¶ 4; 93 at 2 ¶ 4). It is undisputed that Taranto nevertheless came outside and stood in his driveway holding a firearm. (ECF Nos. 88 at 4 ¶ 32; 90 at 8 ¶ 32). The officers testified, and their arrest records reflect, that when they first ordered Taranto to drop his gun and raise his hands, he did not comply and instead took cover behind parked cars. (ECF Nos. 87-8 at 4; 88 at 7–8 ¶¶ 64–65; 90 at 15

---

[16] It is undisputed that Dalo had a taser on his belt (ECF Nos. 88 at 7 ¶ 60; 90 at 14 ¶ 60), although he testified that he did not use it when bringing Taranto to the ground. (ECF No. 87-6 at 38).

¶¶ 64–65). True, Taranto eventually put the gun down with his right hand. (ECF Nos. 88 at 8 ¶ 69; 90 at 16, 43 ¶¶ 7, 69; 93 at 3 ¶ 7). But when officers then ordered him to raise both hands above his head, multiple officers testified that Taranto again failed to fully comply. (ECF Nos. 88 at 8–9 ¶¶ 75–78, 82–83; 90 at 17–18, 43 ¶¶ 7, 75–78, 82–83; 93 at 3 ¶ 7). Two officers also testified that they saw something in Taranto's left hand that they believed was a gun just before Deputy Sheriff Dalo tackled him. (ECF Nos. 88 at 8 ¶¶ 71–73; 85–86; 90 at 16, 19 ¶¶ 71–73, 85–86). And after Taranto was taken to the ground, the officers testified—and the arrest records reflect—that he kept his arms pinned beneath his body, preventing them from handcuffing him. (ECF Nos. 87-4 at 153–54, 173–74; 87-5 at 69–70; 87-7 at 68–69; 87-8 at 4; 88 at 10 ¶¶ 98–99; 90 at 22–23 ¶¶ 98–99). Only after he was handcuffed did it become clear that the object in his left hand was a holster, not a second gun. (ECF Nos. 88 at 11–12 ¶¶ 111–13; 90 at 26 ¶¶ 111–13). Nothing in the record contradicts that account or provides circumstantial evidence from which a reasonable jury could discredit it. To the contrary, the presence of the holster is corroborated by a memo Sergeant Quick wrote in October 2019, just a few months after the incident. (ECF No. 91-10 at 2) ("It was later discovered that the object in Taranto's left hand was the holster for the recovered loaded firearm.").

On this record, no reasonable jury could find that Deputy Sheriff Dalo's split-second decision to subdue Taranto by tackling him to the ground—and, even accepting Plaintiffs' version, using an impact weapon—was objectively unreasonable. *See Ortiz v. Village of Monticello*, No. 06 Civ. 2208(ER), 2012 WL

37

5395255, at \*12 (S.D.N.Y. Nov. 2, 2012) (granting summary judgment on excessive force claim where officer pushed suspect to the ground, handcuffed them, and forced them against barbed wire fence, despite suspect complying, because suspect was involved in domestic dispute and "was believed to still possess [a] weapon"); *Blackwood v. Omorvan*, 16-cv-644 (NSR), 2019 WL 4600662, at \*6–7 (S.D.N.Y. Sept. 23, 2019) (granting summary judgment on excessive force claim where officers tackled plaintiff and struck his head because they reasonably believed he had weapon).

Plaintiffs try to create a factual dispute by denying that Taranto failed to comply with the Officers' instructions or that the Officers suspected that he had a second gun in his left hand. (*See, e.g.,* ECF No. 90 at 16, 19, 26 ¶¶ 71–73, 85–86, 111–13). But those denials are conclusory and cite only "the reports prepared at the time of this incident and arrest as Plaintiff's Exhibits 6, 8, 10, and 14." (*Id.*) Those exhibits do not contradict the Officers' account. If anything, they support it. They confirm that Taranto failed to comply with orders. (ECF No. 87-8 at 4 (Arrest report) (stating that "Taranto did not initially comply with orders and took cover behind a vehicle"); 87-10 (Use of Force form) (boxes checked for "Verbal Non Compliance," "Verbal Threats/Gestures," and "Physically Uncooperative (Resisting)"); 91-10 at 2 (Sergeant Quick memo) (stating Taranto "remained in a non-compliant stand-off"); 91-14 at 1 (Personnel Investigation) (stating that "defendant was ordered to drop his weapon multiple times over the course of 3 minutes" and "continued to struggle while members attempted to handcuff him")).

To be sure, most of those reports do not mention the officers' suspicion that Taranto had a second gun in his left hand.[17] But that omission alone does not create a genuine dispute of material fact. The reports still state that Taranto had possessed a firearm and was not complying with officers' commands. So the omission does not contradict the officers' account of a continuing threat; at most, it shows that the contemporaneous reports were less detailed than the later testimony. That is not enough. On summary judgment, Plaintiffs must do more than raise "metaphysical doubt" or ask the Court to disbelieve the officers based on speculation. *See Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (internal quotation marks and citation omitted) (explaining that summary judgment cannot be defeated by "conjecture or surmise"), *cert. denied*, 502 U.S. 849 (1991). Of course, because Taranto cannot testify, the Court must scrutinize the officers' account carefully and consider whether circumstantial evidence undermines it. *See O'Bert*, 331 F.3d at 37. But here there is no video, no forensic inconsistency, no conflicting officer testimony, and no physical evidence suggesting that Taranto's hands were empty. In those circumstances, the omission is not the kind of affirmative contradiction from which a reasonable jury could infer that the officers' account was fabricated. *See Terzani v. Fitzpatrick*, 15 CV 3732 (VB), 2018 WL 357306, at *6 (S.D.N.Y. Jan. 8, 2018) (noting that plaintiffs could not identify a single witness or

---

[17] But at least one of them—the memo prepared by Sergeant Quick a few months after the incident—states that Taranto was "standing on the sidewalk with a handgun in his right hand and a second object, later determined to be the holster, in his left hand." (ECF No. 91-10 at 2). Defendants' testimony consistently says the same thing. (ECF Nos. 88 at 8 ¶¶ 71–73; 85–86; 90 at 16, 19 ¶¶ 71–73, 85–86).

any physical evidence to support their version of events leading to officers' alleged use of excessive force); *cf. Callahan c. County of Suffolk*, 96 F.4th 362, 369 (2d Cir. 2024) (vacating summary judgment award to defendant, in part, because witness testimony contradicted officer's testimony and documentary evidence about how use of force unfolded); *Campbell v. City of Yonkers*, 19 CV 2117 (VB) and 19 CV 9444 (VB), 2023 WL 4867459, at *10–11 (S.D.N.Y. July 31, 2023) (denying summary judgment on excessive force claim because witness testimony and autopsy evidence discredited defendant's version of events).

In any event, Plaintiffs' excessive force claim also fails because Defendants are entitled to qualified immunity. Qualified immunity shields an officer from suit under § 1983 "unless their conduct violates clearly established law." *Zorn v. Linton*, 607 U.S. __, ___, No. 25-297, 2026 WL 795469, at *2 (2026). The law is clearly established when existing precedent has identified the rights at issue "with a high degree of specificity" and concluded that "an officer taking similar actions in similar circumstances was held to have violated the Constitution." *Id.* at *2–3 (internal quotation marks and citations omitted). No such precedent exists here. In response to Defendants' assertion that there is "no controlling precedent" regarding these specific circumstances, (ECF No. 86 at 19), Plaintiffs similarly identify no case holding that an officer violates the Fourth Amendment by tackling a suspect from behind and using an impact weapon when the suspect had displayed a gun and officers reasonably believed he was still holding another one. Put simply, no clearly established law would have told Deputy Sheriff Dalo that he could not act as he did

40

under the circumstances as he reasonably understood them. As explained above, Taranto had possessed a gun, did not appear to comply fully with commands to drop it and raise both hands, and was believed to be holding something in his left hand that could be another weapon. In analogous circumstances, courts have found similar non-lethal force objectively reasonable. *See Ortiz*, 2012 WL 5395255, at \*12; *Blackwood*, 2019 WL 4600662, at \*6–7. Thus, Defendants are entitled to qualified immunity on Plaintiffs' § 1983 excessive force claim. *See Matusak*, 165 F.4th at 720–21 (finding officers entitled to qualified immunity because no clearly established law prohibited "use of fist and knee strikes and a taser" against suspect "officers reasonably, but mistakenly, believed . . . posed a threat to officer safety"); *see also Estate of Jaquez v. City of New York*, 706 F. App'x 709, 714–15 (2d Cir. 2017) (summary order) (granting qualified immunity after finding "no triable issue of fact with respect to the objective reasonableness" where officers used taser after suspect refused to follow commands, was in close proximity to lethal weapon, and behaved "erratically").

### D. Plaintiffs' Section 1983 Deliberate Indifference Claim (Count 6)

Defendants seek summary judgment on Plaintiffs' § 1983 claim for deliberate indifference to medical needs claim, arguing that any alleged deprivation of medical care was not serious, as Taranto was treated within roughly 30 minutes of the incident. (ECF No. 86 at 21–22). Plaintiffs respond that factual disputes remain because Defendants unnecessarily delayed in bringing Taranto to the hospital, and

41

because the supposed treatment at the scene is not documented in the record. (ECF No. 89 at 25–26).

To survive summary judgment on a deliberate indifference claim, a plaintiff must establish, somewhat obviously, that they had a "serious medical condition" that needed treatment and that the defendant denied them treatment because of their "deliberate indifference to that need." *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996). When, as here, the claim rests on a delay in medical care, the threshold inquiry is whether the plaintiff "was actually deprived of adequate medical care." *Salahuddin v. Goord*, 467 F.3d 263, 279–80 (2d Cir. 2006). In other words, a deliberate indifference claim cannot survive when the plaintiff "receive[d] prompt medical treatment." *Dunham v. City of New York*, 11-cv-01223 (ALC), 2021 WL 918373, *10 (S.D.N.Y. Mar. 10, 2021) (granting summary judgment where it was undisputed "that EMS treated Plaintiff at the scene before taking him to the hospital").

Here, the core of Plaintiffs' argument is that Defendants never called for an ambulance and no emergency personnel responded to the scene. In their brief, Plaintiffs argue that "[Defendants] admittedly *did not call for an ambulance*" while Taranto sat in the back of a police vehicle. (ECF No. 89 at 26–27). And in response to Defendants' Rule 56.1 statement, they simply denied all statements that EMS personnel were called, responded to the scene, and treated Taranto. (ECF No. 90 at 30–34 ¶¶ 126–44). In doing so, they took the incredible position that the absence of documentary evidence from the subpoenaed EMS/paramedic service proves that

42

Taranto was never treated. (*Id.*). And they repeatedly "refer[red] the Court to Plaintiffs' Exhibits 15 and 16," which were videos from inside the car where Taranto was placed. (*Id.*).

But those videos contradict Plaintiffs' own arguments that EMS personnel were never called, responded to the scene, and treated Taranto. They depict a different sequence of events. After Taranto was placed in the back of the police vehicle, he can be heard telling Defendants that he recently underwent open-heart surgery, and one of the Defendants can be heard responding that an ambulance was already on the way. (ECF No. 91-16 at 3:50-4:00). According to the video evidence, within roughly seven minutes after Taranto was placed in the vehicle, EMS personnel arrive on the scene and begin evaluating him. (*Id.* at 6:50-7:00). Over the next 20 minutes, the video shows Taranto being evaluated and having his head bandaged. (*Id.* at 7:00-18:45). Within 30 minutes of being placed in the vehicle, he is seated on a stretcher and placed in an ambulance. (*Id.* at 26:00-29:20). This video evidence thus shows that EMS treated Taranto at the scene within minutes of his arrest.

Thus, on this record, Plaintiffs fail to demonstrate that a question of fact exists regarding deliberate indifference. No reasonable jury could accept Plaintiffs' version of events alleging that Defendants never called an ambulance and that Taranto was never treated at the scene. *See Wigfall v. City of New York*, 13 Civ. 268 (PGG), 2015 WL 14073445, at *6–7 (S.D.N.Y. Sept. 18, 2015) (granting summary judgment on deliberate indifference claim because evidence in record meant "no

reasonable jury could accept Plaintiff's account of what transpired"); *see also*

*Johnson v. City of New York*, 19 Civ. 08745 (GBD) (OTW), 2025 WL 2776053, at *6

(noting that a court may grant summary judgment where "a relevant videotape

whose accuracy is unchallenged so utterly discredits the opposing party's version

that no reasonable juror could fail to believe the version advanced by the moving

party" (internal quotation marks, ellipsis, and citations omitted)). Plaintiffs'

deliberate indifference claim must be dismissed. *See Dunham*, 2021 WL 918373, at

*10–11; *Santiago v. City of New York*, No. 98 Civ. 6543(RPP), 2000 WL 1532950, at

*6–7 (S.D.N.Y. Oct. 17, 2000) (granting summary judgment on deliberate

indifference claim where plaintiff alleged defendant "never sought medical

attention" because evidence established plaintiff "received medical treatment from

EMS within thirty-five minutes" and transported to hospital shortly thereafter).

### E.  Plaintiffs' Section 1983 Fabrication of Evidence Claim (Count 1)

Defendants argue that they are entitled to summary judgment on Plaintiffs'

§ 1983 fabrication of evidence claim because they failed to "identify any specific

evidence" that was fabricated or explain how any fabrication deprived Taranto of

his right to liberty. (ECF No. 86 at 22–24). Plaintiffs respond that factual disputes

exist because the record shows attempts to change the Use of Force form, "efforts" to

influence or remove the prosecutor, and "efforts to provide deposition testimony that

contradicts all prior records and statements made" about Taranto's arrest and

prosecution. (ECF No. 89 at 27).

44

A plaintiff may pursue a § 1983 fabrication of evidence claim even if the underlying criminal charges against them were dropped and the allegedly fabricated evidence was never presented at trial. *See Kee v. City of New York*, 12 F.4th 150, 168 (2d Cir. 2021). And unlike false arrest and malicious prosecution claims, probable cause is not a complete defense; a plaintiff may still assert a fabrication claim even if an officer had probable cause to arrest them. *See Garnett v. Undercover Officer C0039*, 838 F.3d 265, 278 (2d Cir. 2016) ("[F]air trial claims cover kinds of police misconduct not addressed by false arrest or malicious prosecution claims."). But to establish a § 1983 fabrication claim against a police officer, a plaintiff must show that "the officer created false information, the officer forwarded the false information to prosecutors, and the false information was likely to influence a jury's decision." *Id.* at 280. And where, as here, the claim rests on attempted fabrication, an unsuccessful attempt is not enough. *See Dufort v. City of New York*, 874 F.3d 338, 355 (2d Cir. 2017) ("Mere attempts to withhold or falsify evidence cannot form the basis for a § 1983 claim . . . when those attempts have no impact on the conduct of a criminal trial.").

Here, between their complaint, Rule 56.1 statement, and motion papers, Plaintiffs identify roughly five instances that purportedly create questions of fact about Defendants' fabrication: (1) Sheriff Langley's alleged efforts to alter the Use of Force form to uncheck the box showing that an impact weapon was used (ECF Nos. 60 at 11 ¶ 70; 89 at 27; 90 at 49 ¶ 52); (2) Sergeant Quick's efforts to increase the charges against Taranto and remove Ferguson as prosecutor (ECF No. 90 at 51

45

¶ 72); (3) Defendants' alleged effort to get Sherri Koval, Taranto's neighbor, to give a written statement that she had seen Taranto holding a firearm outside his house on prior occasions (ECF Nos. 60 at 11 ¶ 72; 90 at 56 ¶ 104); (4) the excessive force investigation report issued on July 9, 2020 (ECF Nos. 60 at 12 ¶ 81; 90 at 51 ¶¶ 68–70); and (5) asserted discrepancies between Defendants' deposition testimony and the post-arrest documents (ECF No. 60 at 12 ¶¶ 78, 81; 90 at 54 ¶ 88). But Plaintiffs fail to show that the record evidence supports these allegations or creates a question of fact about them.

First, the purported actions by Sheriff Langley are entirely unsupported by the record. Nothing in the record suggests that Langley ever asked anyone to alter the Use of Force form after it was generated. To the extent Plaintiffs allege that Langley admitted as much during an interview, that allegation is speculative. Their Rule 56.1 statement offers no record citation to support it. (ECF No. 90 at 49 ¶ 52). Nor does the rest of the record contain evidence that any such interview occurred. Langley was not even asked about such an interview during his deposition. (ECF No. 87-12). In any event, the Use of Force form was never altered. In the record, the form still has the box checked to show an impact weapon was used. (ECF No. 87-10). Thus, even assuming there was an attempt to fabricate evidence, that attempt cannot sustain Plaintiffs' § 1983 claim because it undisputedly failed. *See Dufort*, 874 F.3d at 355 (affirming summary dismissal of fabrication of evidence claim because alleged attempt by defendants to misrepresent witness' testimony failed due to witness testifying at trial).

46

Second, Plaintiffs' allegations about Sergeant Quick's efforts to influence the prosecution fail for the same reasons as their allegations about Sheriff Langley. Although it is undisputed that Quick preferred to have the menacing charge elevated to a felony and wanted Ferguson removed as prosecutor (ECF Nos. 91-27; 90 at 51 ¶ 72; 93 at 20 ¶ 72), none of those things actually happened. Taranto's menacing charge remained a misdemeanor when his criminal prosecution was abandoned. (ECF Nos. 88 at 16 ¶ 163; 90 at 39 ¶ 163). And nothing in the record shows that Ferguson was ever removed as the prosecutor. Tendy and Ferguson both testified that Ferguson was not going to handle the matter when it went to trial, but she would have remained on the team conducting the trial. (ECF Nos. 87-13 at 15–16; 91-36 at 35–36). Thus, Quick's efforts cannot sustain a § 1983 claim because they failed. *See Dufort*, 874 F.3d at 355.

And the same is true of Plaintiffs' allegations about Koval. Koval's written statement and her deposition testimony mention that an Officer McMahon asked her to include in her written statement that she witnessed Taranto holding a firearm outside his house on prior occasions. (ECF Nos. 91-26 at 2; 91-45 at 34–35). But the written statement does not actually contain that false information; it does not say what McMahon wanted Koval to include. (ECF No. 91-26). In fact, it says the opposite, so that no false information was created. *See Johnson v. Geraci*, 22 CV 4450 (VB), 2026 WL 457043, at *8–9 (S.D.N.Y. Feb. 18, 2026) (granting summary judgment on fabrication of evidence claim because no false information created as defendants' "statements were literally true").

47

Finally, Plaintiffs' assertions about a fabricated investigation report and discrepancies between deposition testimony and post-arrest documents are too vague and conclusory to survive summary judgment. Plaintiffs fail to identify what those discrepancies are, and how they were made knowingly. And they fail to specify what portions of the investigation report were fabricated. Instead, they merely assert that the report must have been fabricated because it was completed about a year after the incident and was not produced during Taranto's criminal proceedings until months after its completion date. (ECF No. 93 at 19–20 ¶¶ 68–70). Those speculative and conclusory allegations are insufficient to survive summary judgment. *See Debrosse v. City of New York*, 739 F. App'x 48, 51 (2d Cir. 2018) (summary order) (affirming summary judgment because plaintiff's claim rested on "conclusory, speculative allegations . . . unsupported by admissible evidence in the record"); *cf. Long v. New York City*, 14-CV-9908 (VEC), 2016 WL 4203545, at *3 (S.D.N.Y. Aug. 8, 2016) (denying summary judgment on fabrication of evidence claim because Plaintiff identified "specific sentences in specific documents were intentionally falsified" by defendant).

And to the extent Plaintiffs argue that discrepancies alone are enough to create a question of fact, that argument also lacks merit. "The mere fact that the parties present conflicting evidence does not mean that one side's evidence was fabricated." *Davis-Guilder v. City of Troy*, 23-589, 2024 WL 5199294, at *3 (2d Cir. Dec. 23, 2024) (summary order) (affirming grant of summary judgment to police officer defendants on fabrication of evidence claim because plaintiff pointed to no

evidence that defendants knowingly fabricated evidence). Thus, Defendants are entitled to summary judgment on Plaintiffs' § 1983 fabrication of evidence claim.

### F.  Plaintiffs' Section 1983 Cover Up Claim (Count 1)

Defendants argue that Plaintiffs' § 1983 cover-up claim should be dismissed summarily because this case itself shows that Taranto was never completely prohibited from pursuing any claims against Defendants. (ECF No. 86 at 24–25). Plaintiffs respond that the record "demonstrates the cover-up collectively employed by the Defendants, including the District Attorneys (sic) office when allegedly investigating excessive force claims." (ECF No. 89 at 28).

The case law frames a § 1983 cover-up claim in two distinct ways. The first frames the claim as a violation of a plaintiff's "First Amendment right of access to courts" where the defendants' alleged cover up "made it impossible for the plaintiff to litigate an underlying claim." *Tavares v. N.Y.C. Health and Hosps. Corp.*, No. 13-cv-3148 (PKC)(MHD), 2015 WL 158863, at *7 (S.D.N.Y. Jan. 13, 2015). But under that theory, a plaintiff must establish that the cover-up "completely foreclosed" suit. *Sousa v. Marquez*, 702 F.3d 124, 128 (2d Cir. 2012) (internal quotation marks and citation omitted).

The second way, which appears to be more common, frames the claim as a conspiracy among the defendants. Under that theory, a plaintiff must show that there was: "'(1) an agreement between two or more state actors or between a state actor and private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages.'" *House v.*

*City of New York*, 18 Civ. 6693 (PAE) (KNF), 2020 WL 6891830, at *20 (S.D.N.Y. Nov. 24, 2020) (quoting *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999)). That showing can be made "through either direct or circumstantial evidence," but the plaintiff must offer enough evidence to support a reasonable inference that the defendants "positively or tacitly came to a mutual understanding to try and accomplish a common and unlawful plan." *House*, 2020 WL 6891830, at *20 (internal quotation marks and citations omitted).

Plaintiffs fail to identify which theory supports their § 1983 cover-up claim, but it fails either way. If framed as an issue of access to the Court, their claim cannot survive summary judgment because no evidence shows that Plaintiffs were completely foreclosed from bringing their claims against Defendants—they have brought those very claims here. *See Tavares*, 2015 WL 158863, at *7–8 (dismissing § 1983 cover up claim because plaintiff not prohibited from bringing Eighth Amendment and medical malpractice claims as "he is bringing those very claims in this action"). If framed as a conspiracy claim, Plaintiffs fail to provide "any evidence that demonstrates that there was any 'meeting of the minds,' or 'any agreement, express or tacit' to deprive [Taranto] of any constitutionally protected right." *See Ampratwum v. City of New York*, No. 11 Civ. 6111(DLC), 2013 WL 1935321, at *9 (S.D.N.Y. May 9, 2013) (dismissing § 1983 cover up claim because plaintiffs provided no evidence of conspiracy among defendants), *aff'd*, 563 F. App'x 6 (2d Cir. 2014); *Salazar v. City of New York*, 15-cv-1989 (KBF), 2016 WL 3748499, at *8 (S.D.N.Y. July 11, 2016) (similar).

In any case, Plaintiffs fail to identify what evidence was purportedly "covered up" and where it appears in the record. The phrase "cover up" appears only twice in the Fourth Amended Complaint: once alleging that Defendants worked "to cover up their wrongful acts" and again alleging that Defendants "engaged in a cover-up in order to conceal the wrongdoing and unlawful conduct taken against Plaintiff[s]." (ECF No. 60 at 14 ¶ 93, 20 ¶ 145). But there is no other information to articulate the extent of the cover-up or any specific actions taken by Defendants.

Plaintiffs' opposition brief suffers from the same flaws. It devotes a single sentence to vaguely arguing that a question of fact exists. (ECF No. 89 at 28). But even there, Plaintiffs cite no concrete record evidence in support. These speculative, vague allegations are insufficient to establish that a triable question of fact exists regarding Defendants' liability under § 1983. *See Salazar*, 2016 WL 3748499, at *8 (granting summary judgment to defendant on § 1983 "conspiracy claim" because plaintiff's position that there "was a coordinated effort to cover-up police misconduct [was] pure speculation and insufficient to establish that a triable issue exists" (internal quotation marks omitted)); *Ortiz v. Cornacchia*, No. 88 CIV. 5988 (CHT), 1990 WL 103982, at *4 (S.D.N.Y. July 16, 1990) (granting summary judgment to defendant on § 1983 claim premised on "vague allegation of a conspiracy to cover up the actions" of another defendant because "[s]uch broad and conclusory allegations . . . are insufficient to establish liability under [the statute] (internal quotation marks and citations omitted)). Thus, Defendants are entitled to summary judgment on Plaintiffs' § 1983 cover up claim.

51

### G. Plaintiffs' Section 1983 Failure to Intercede Claim (Count 4)

Defendants seek summary judgment on Plaintiffs' § 1983 failure to intercede claim, arguing that the incident here happened within seconds. (ECF No. 86 at 20). Thus, according to Defendants, "no reasonable jury could conclude that Hunsberger, Yeager, Diskin, or Quick enjoyed a realistic opportunity to intervene" during the seconds that Dalo approached Taranto from behind. (*Id.*). Plaintiffs respond that summary judgment should be denied because Defendants "changed the version of events and the amount of force utilized during their depositions." (ECF No. 89 at 25).

Police officers have a "duty to intercede" and prevent officers from using excessive force against a citizen. *Figueroa v. Mazza*, 825 F.3d 89, 106 (2d Cir. 2016). But an officer can only be held liable for failing to intercede if he observed the use of excessive force and had "sufficient time to act to prevent it." *Id.*; *see Lennox v. Miller*, 968 F.3d 150, 158 (2d Cir. 2020) ("In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring." (internal quotation marks and citation omitted)). Contrary to Defendants' contentions, there is no "hard-and-fast temporal cutoff" for deciding whether there was enough time to intervene. *Figueroa*, 825 F.3d at 107. Although "duration will always be relevant and will frequently assume great importance," the analysis turns on many factors like "the number of officers present, their relative placement, the environment in which they acted, the nature of the assault, and a dozen other considerations." *Id.* Even so, whether an officer had enough time to intervene is

usually a jury question, unless no reasonable jury could conclude otherwise after considering all the evidence presented. *See Terebesi v. Torreso*, 764 F.3d 217, 244 (2d Cir. 2014), *cert. denied*, 575 U.S. 962 (2015).

Here, Plaintiffs' failure to intercede claim fails because the Court has already found that Plaintiffs' excessive force claims fail as a matter of law. (*See* Section III.C., *supra*). And without an underlying constitutional violation, there can be no failure to intercede claim. *See Chepilko v. Henry*, 722 F. Supp. 3d 329, 347 (S.D.N.Y. 2024) ("A failure to intervene claim is a derivative claim that must be predicated upon a viable § 1983 claim."); *Posner v. City of New York*, No. 11 Civ. 4859(JMF), 2014 WL 185880, at *8 (S.D.N.Y. Jan. 16, 2014) ("Because Defendants are entitled to summary judgment on Plaintiff's primary [§ 1983] claims that they violated her constitutional rights, it follows that they are entitled to summary judgment on her failure-to-intervene . . . claims as well."). Here, Plaintiffs expressly predicate their failure to intercede claim on their excessive force claim. (ECF No. 89 at 25). Because that claim fails, the derivative claim fails with it. *See Chepilko*, 722 F. Supp. 3d at 347 (granting summary judgment on failure to intercede claim after granting summary judgment on excessive force claim); *Rolkiewicz v. City of New York*, 442 F. Supp. 3d 627, 646 (S.D.N.Y. 2020) (similar); *Coleman v. City of New York*, No. 07 Civ. 1051(CM), 2010 WL 571986, at *4–5 (S.D.N.Y. Feb. 2, 2010) (similar).

But even if Plaintiffs could make out a viable excessive force claim, the failure to intercede claim would still fail. It is undisputed that five officers were at the scene, with three in front of Taranto and two behind him. (ECF Nos. 88 at 3

53

¶ 13, 7 ¶ 59; 90 at 3 ¶ 13, 14 ¶ 59). Deputy Sheriff Yeager testified that he heard Deputy Sheriff Dalo say he would move around Taranto to "flank him," and then saw Dalo approach Taranto from behind. (ECF No. 87-7 at 43). Deputy Sheriff Diskin testified that, as Dalo moved behind Taranto, he shouted out to Dalo that Taranto was holding something in his left hand. (ECF No. 87-5 at 51). And Dalo testified that he had a "brief opportunity" and made a "split-second decision" to move from behind the house and take Taranto into custody. (ECF No. 87-6 at 99). Plaintiffs present no facts to contradict Defendants' testimony and only point to the arrest records and related reports to argue that these more detailed facts are missing from them. (ECF No. 90 at 19 ¶¶ 84, 86). But given the undisputed evidence that Taranto had a gun, and the uncontroverted evidence that the incident was a fast-moving situation in which Dalo made a "split-second decision," no reasonable jury could conclude that the other officers present had a realistic opportunity to step in to prevent Dalo from tackling Taranto. *See Baker v. Jiminian*, 18 Civ. 5003 (NRB), 2020 WL 3172700, at *4-5 (S.D.N.Y. 2020) (finding no reasonable juror could find there was enough time to prevent tackling of Plaintiff to the ground because the use of force lasted just a few seconds); *see also O'Neill v. Krzeminski*, 839 F.2d 9, 11–12 (2d Cir. 1988) (concluding defendant's three strikes "in rapid succession . . . was not an episode of sufficient duration" to support failure to intercede claim). Thus, Defendants are entitled to summary judgment on Plaintiffs' § 1983 failure to intercede claim.

### H. Plaintiff's Section 1983 Supervisory Liability Claims Against Langley and Quick (Count 5)

Defendants argue that they are entitled to summary judgment on Plaintiffs' § 1983 supervisory liability claims against Sheriff Langley and Sergeant Quick because all the underlying § 1983 claims fail to survive summary judgment. (ECF No. 86 at 24). They also argue that, under Second Circuit precent, there is no freestanding claim for supervisory liability. Instead, Plaintiffs must show that Langley and Quick were personally involved in the alleged constitutional violations. (*Id.*). As to Langley, Defendants argue that he first learned about Taranto's arrest and the incident only after the events had taken place and was, thus, not personally involved. (*Id.*)

Plaintiffs respond that the supervisory liability claim against Sheriff Langley survives summary judgment because he is implicated in their § 1983 claims for fabrication of evidence and cover up. (ECF No. 89 at 27–28).[18] Plaintiffs do not challenge Defendants' argument that the supervisory liability claim against Sergeant Quick should be dismissed.

Although Plaintiffs allege a § 1983 supervisory liability claim against Sergeant Quick in their operative complaint (ECF No. 60 at 17–18 ¶¶ 125–26), they fail to address the claim in opposition to Defendants' summary judgment motion. As

---

[18] Plaintiffs had alleged a supervisory liability claim against Sheriff Langley in their second amended complaint (ECF No. 31 at 20 ¶¶ 139–40), which Judge Karas dismissed after concluding that Plaintiffs failed to allege that Langley was personally involved in their excessive force claim (ECF No. 47 at 29–32). But Plaintiffs' supervisory liability claim in their operative pleading differs from the one articulated in their second amended complaint. Plaintiffs now allege that Langley was personally involved in their constitutional claims of fabrication of evidence and cover up, so their allegations are no longer tied to the excessive force claim. Thus, the prior determination by Judge Karas does not impact this Court's determination.

a result, they waive that argument and Quick is entitled to summary dismissal of that claim against him. *See Phx. Light SF Ltd. v. U.S. Bank Nat'l Ass'n*, 14-CV-10116 (VSB), 2020 WL 4699043, at *4 (S.D.N.Y. Aug. 12, 2020) ("In the Second Circuit, a party that fails to raise an argument in its opposition papers on a motion for summary judgment has waived that argument."), *aff'd*, 2021 WL 4515256 (2d Cir. Oct. 4, 2021) (summary order), *cert. denied*, 142 S. Ct. 1371 (Mem) (2022); *Loma Deli Grocery Corp. v. United States*, 20 Civ. 7236 (JPC), 2021 WL 4135216, at *13 (S.D.N.Y. Sept. 10, 2021) (granting defendant summary judgment on claim after plaintiffs waived issue by failing to address it in opposition to summary judgment motion).

The supervisory liability claim against Sheriff Langley must also be dismissed. Defendants are right that there is "no special rule for supervisory liability." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020). Instead, a plaintiff must show that the supervisory official directly violated their constitutional rights in some way, which will vary based on the underlying § 1983 claim at issue. *Id.*; *see Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (explaining various ways plaintiff can demonstrate supervisory liability through direct involvement). As explained above, Plaintiffs' § 1983 claims for fabrication of evidence and cover up fail because they cannot establish the existence of a material question of fact. And because the § 1983 claims underlying Plaintiffs' supervisory liability claims cannot survive summary judgment, neither can the supervisory liability claim against Langley. *See Cruz v. City of New Rochelle*, 13CV7432 (LMS),

56

2017 WL 1402122, at *27 (S.D.N.Y. Apr. 3, 2017) (granting summary judgment on § 1983 supervisory liability claim because summary judgment was granted on unlawful entry and excessive force claims underlying it); *Moore v. Kwan*, 12-CV-4120 (VSB), 2016 WL 9022575, at *16 (S.D.N.Y. Mar. 30, 2016) (similar), *aff'd*, 683 F. App'x 24 (2d Cir. 2017).

## I.  Plaintiffs' Remaining State-Law Claims

Although Defendants argue that all of Plaintiffs' federal claims should be dismissed, they also urge the Court to exercise supplemental jurisdiction over Plaintiffs' state-law claims and dismiss them as well. (ECF No. 86 at 25–29). Plaintiffs do not address that argument directly, but their papers suggest that they too prefer this Court to exercise supplemental jurisdiction and decide the state-law claims. (ECF No. 89 at 29–30).

Whether to exercise supplemental jurisdiction over a plaintiff's state-law claims falls within the district court's discretion. *See Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994) ("[T]he exercise of supplemental jurisdiction is left to the discretion of the district court."). And there is a "general proposition" that a court should decline to exercise supplemental jurisdiction when it dismisses all federal claims before trial. *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 56 (2d Cir. 2004), *cert. denied*, 544 U.S. 1044 (2005). But declining supplemental jurisdiction in those instances is not mandatory, especially when the case is in the late stages of litigation and doing so would be unfair to the parties because of the "time, effort, and money" expended to reach that point. *Purgess*, 33 F.3d at 138 (explaining it is

57

not "necessary" to decline supplemental jurisdiction when it is "late in the action" (internal quotation marks and citations omitted)). When considerations like "judicial economy, convenience, and fairness to [the] litigants" weigh in favor of exercising supplemental jurisdiction, a court may do so. *Id.*

Here, those relevant considerations weigh in favor of exercising supplemental jurisdiction over Plaintiffs' state-law claims. This Court expended substantial effort reviewing the record and researching the relevant law governing Plaintiffs' many § 1983 claims. And for many of Plaintiffs' state-law claims, the analysis is nearly identical to their federal counterparts. *See Boyd v. City of New York*, 336 F.3d 72, 75 (2d Cir. 2003) ("The elements of false arrest and malicious prosecution under § 1983 are substantially the same as the elements under New York law." (internal quotation marks and citation omitted); *Posr v. Doherty*, 944 F.2d 91, 94–95 (2d Cir. 1991) (explaining that "essential elements" of § 1983 excessive force claim and state law assault and battery were "substantially identical").

These similarities highlight how much more convenient it would be to resolve those claims now and what a waste of judicial resources it would be to force the parties to litigate them in state court. They also demonstrate that the state-law claims do not present novel or unsettled questions of law for this Court to address. It would also be unfair to force the litigants to start over elsewhere. Both sides spent considerable time, effort, and money to reach summary judgment. Declining to exercise supplemental jurisdiction would force them to duplicate much of that effort in state court. Thus, this Court will exercise supplemental jurisdiction over all

58

of Plaintiffs' state-law claims. *See Aberra v. City of New York*, No. 21-1992, 2023 WL 221096, at \*2 (2d Cir. Jan. 18, 2023) (affirming district court's exercise of supplemental jurisdiction after dismissing plaintiff's federal § 1983 claims because court "had already invested substantial effort in th[e] case" and state-law claims "presented no novel or unsettled issues of state law" (internal quotation marks and citation omitted)).

### 1.  Assault and Battery (Count 9)

The elements of New York claims for assault and battery are "substantially identical" to a federal § 1983 claim of excessive force. *Posr*, 944 F.2d at 94–95; *see Tompkins v. City of New York*, 50 F. Supp. 3d 426, 440 (S.D.N.Y. 2014) ("New York courts analyze assault and battery claims against police officers using the same standard applicable to excessive force claims under Section 1983."); *Mesa v. City of New York*, No. 09 Civ. 10464(JPO), 2013 WL 31002, at \*27 (S.D.N.Y. Jan. 3, 2013) ("New York law regarding assault and battery generally parallels federal law regarding excessive force." (internal quotation marks and citation omitted)). Thus, when a defendant is entitled to summary judgment on an excessive force claim because the force used was reasonable, the parallel claim for assault and battery under New York law must also fail. *See Mesa*, 2013 WL 31002, at \*27 ("[W]here the force employed by an officer is objectively reasonable, a claim for assault and battery against that same officer will not lie."). As stated above in Section III.C., Defendants did not use excessive force. Thus, they are entitled to summary judgment on Plaintiffs' New York assault and battery claims. *See id.* (granting

summary judgment on plaintiff's New York assault and battery claims because it concluded force used was not excessive).

### 2. State Wrongful Death (Count 11)

Defendants argue that they are entitled to summary judgment on Plaintiffs' wrongful death claim because it is predicated on Plaintiffs' excessive force claim and Defendants' use of force was reasonable under the circumstances. (ECF No. 86 at 27). They also argue that their experts' opinions show no causal connection between Taranto's death and the injuries he suffered during the incident, and that Plaintiffs' expert offers no contrary opinion. (*Id.* at 27–28). Plaintiffs respond that causation presents a triable issue because their expert witness concluded that Taranto's injuries "were consistent with an assault." (ECF No. 89 at 29–30).

To survive summary judgment on a wrongful death claim under New York law, a plaintiff must establish that: (1) a death of a human being occurred, (2) their death was caused by a "wrongful act, neglect[,] or default of the defendant," (3) people surviving the deceased suffered a pecuniary loss because of the death, and (4) a personal representative of the deceased has been appointed. *Garcia v. Dutchess County*, 43 F. Supp. 3d 281, 298–99 (S.D.N.Y. 2014) (internal quotation marks and citations omitted). But when a wrongful death claim is predicated on a § 1983 claim of excessive force and state-law claims of assault and battery, summary judgment on those claims requires summary judgment on the wrongful death claim as well. Without excessive force, assault, or battery, a plaintiff "cannot

establish a wrongful act, neglect[,] or default to support the [wrongful death] claim."
*See Cruz*, 2017 WL 1402122, at *30.

That is the case here. Defendants have been granted summary judgment on Plaintiffs' claims for excessive force, assault, and battery. (*See* Section III.C. and III.I.1, *supra*). Plaintiffs, therefore, cannot establish the second element for their wrongful death claim. Thus, Defendants are entitled to summary judgment on that claim as well. *See Campbell v. City of Yonkers*, 19 CV 2117 (VB) and 19 CV 9444 (VB), 2023 WL 4867459, at *18 (S.D.N.Y. July 31, 2023) (granting summary judgment on wrongful death claim after granting summary judgment on claims for excessive force, assault, and battery); *Phillips v. City of Middletown*, No. 17-CV-5307 (CS), 2021 WL 4462821, at *11–12 (S.D.N.Y. Sept. 29, 2021) (similar); *Cruz*, 2017 WL 1402122, at *30 (similar).

### 3. Respondeat Superior Claim Against Putnam County (Count 8)

"[A] municipality may be subject to respondeat superior liability for state-law tort claims brought against a police officer it employs." *Al-Anesi v. City of New York*, 18 Civ. 8439 (LAK) (GWG), 2022 WL 1948879, at *9 (S.D.N.Y. June 6, 2022); *see Ackerson v. City of White Plains*, 702 F.3d 15, 22 (2d Cir. 2012). In the context of summary judgment, this means that a plaintiff's claim against a municipality can survive summary judgment if they demonstrate that one of their underlying claims under state law survives dismissal as well. *See Campbell*, 2023 WL 4867459, at *18–19 (denying summary judgment on respondeat superior claim because state-law claims against some defendants for assault, battery, and wrongful death

survived summary dismissal). Here, all of Plaintiffs' state-law claims against the officers are being dismissed, meaning there are no claims for which Putnam County could be held liable. (*See* Section III.I.1.–2.). Thus, Defendants are also entitled to summary judgment on Plaintiffs' state-law claim for respondeat superior. *See Campbell*, 2023 WL 4867459, at *18–19 (granting partial summary dismissal of respondeat superior claim after granting partial summary judgment on state-law claims for excessive force, assault, battery, and wrongful death)

## IV.    CONCLUSION

For the above reasons, the motion for summary judgment by Defendants Putnam County, Robert Langley, Jr., Ronald Yeager, Daniel Hunsberger, Ryan Diskin, Vincent Dalo, and William Quick is GRANTED. The Clerk of the Court is respectfully directed to terminate the pending motion at ECF No. 85, enter judgment for Putnam County, Robert Langley, Jr., Ronald Yeager, Daniel Hunsberger, Ryan Diskin, Vincent Dalo, and William Quick, and close the case.

   **SO ORDERED.**

DATED:    White Plains, New York
      March 31, 2026

_____
VICTORIA REZNIK
United States Magistrate Judge

62